| | | |
|---|---|---|
| **JANE DOE** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| | : | **CASE No. 2:22-cv-02679-RMG** |
| **v.** | : | |
| | : | |
| **MASSAGE ENVY FRANCHISING, LLC;** | : | |
| **MASSAGE ENVY WESCOTT; PGD** | : | |
| **INVESTMENTS INC.; ROBERT W. LEE and** | : | |
| **CATHERINE H. LEE; ABC, INC 1-10** | : | |
| **(fictitious entities); and JOHNS DOES 1-10** | | |
| **(fictitious persons),** | | |
| | | |
| **Defendants** | | |

## PLAINTIFF JANE DOE'S, MOTION TO REMAND TO THE COURT OF COMMON PLEAS OF DORCHESTER COUNTY, SOUTH CAROLINA

Plaintiff, Jane Doe (hereinafter "Plaintiff"), hereby files this Motion to Remand to the Court of Common Pleas of Dorchester County, South Carolina, and in support thereof, avers the following:

1.       Plaintiff, Jane Doe (hereinafter "Plaintiff"), a Virginia resident, filed a Complaint in the Court of Common Pleas of Dorchester County, South Carolina, as a result of injuries she sustained in South Carolina while at a Massage Envy Spa location in Wescott (hereinafter "MEW") a South Carolina Defendant. *See* a true and correct copy of Plaintiff's Complaint attached hereto as Exhibit "A."

2.       Specifically, Plaintiff suffered traumatic physical and psychological injuries including but not limited to post-traumatic stress disorder and permanent, life-long consequential challenges as a direct and proximate result of sexual assault, committed against her during what

her supposed massage. Plaintiff has alleged that MEW, its individual owners (the Lees"), and Massage Envy Franchising (hereinafter "MEF") knew, should have known, and/or were otherwise on notice of a history of pervasive sexual assaults by massage therapists that occurred at Massage Envy locations around the country, and was specifically on notice of the danger posed by the perpetrator therapist in this case.

3.      Plaintiff commenced this action against the Defendants in the Court of Common Pleas for Dorchester County, South Carolina, by way of Complaint on July 5, 2022. *See* Plaintiff's Complaint attached hereto as Exhibit "A". Upon information and belief, MEW is s South Carolina Corporation with its principal place of business in Dorchester County, South Carolina. See Exhibit A at ¶ 4. Upon information and belief, Franchise owners Robert Lee and Catherine Lee (hereinafter "The Lees") are residents of Horry County, South Carolina, and are, therefore, South Carolina Defendants. *Id.* at ¶ 7. Defendant MEW was served with the Summons and Complaint on July 7, 2022. *See* Affidavit of Service on MEW attached hereto as Exhibit "C". Defendant MEW claims it was improperly named. Plaintiff has since been informed of the correct corporate name for this entity but there is no dispute that the business operates as Massage Envy Wescott and operates out of the location where service was made on MEW.

4.      On August 12, 2022, MEW and the Lees filed a Notice of Removal in the United States District Court for the District of South Carolina, Charleston Division, despite the lack of a federal question or subject matter jurisdiction. *See* Defendant's Notice of Removal attached hereto as Exhibit "B".

5.      The forum defendant rule inherent in § 1441 exempts from removal those cases in which "any of the parties in interest properly joined and served as defendants is a citizen of the State in which such action is brought." (Emphasis added). 28 U.S.C. § 1441. As stated by this

Court in *Turtle Factory Building Corporation v. McGrath Real Estate Holdings, LLC,* "the forum-defendant rule confines removal based on diversity jurisdiction to instances where no defendant is a citizen of the forum state." *Turtle Factory Building Corporation v. McGrath Real Estate Holdings, LLC,* 2021 WL 688697, (D.S.C. Jan. 28, 2021). Hence, if a forum Defendant, such as the Lees and MEW here, seek to remove a case to federal court based on diversity, then the case must be remanded to state court pursuant to and consistent with the requirements of 28 U.S.C. § 1441 and the prevailing authority in this District and the Fourth Circuit.

6.      As will be discussed in greater detail, proof substantiating plaintiff's tort claims as set forth in her Complaint do not involve elements of federal law as an essential component. Indeed, Plaintiff's complaint refers specifically to state law, including Title 16, Chapter 3, § 654(a) and (b) of the South Carolina Criminal Code Relating to Criminal Sexual Misconduct and the South Carolina Unfair Trade Practices Act (SCUPTA), Stat. § 39-5-20. That Plaintiff's claims sound entirely in state law weighs heavily in favor of remand.

7.      Additionally, federal law does not create Plaintiff's cause of action, nor does her right to relief depend on resolution of a substantial question of federal law.  Rather, as will be explained in greater detail, Plaintiff's claims depend on the questions of state law.

8.      Plaintiff does not assert any federal interest nor that a federal question is involved in this action.  Additionally, there are no "unusual circumstances" involved in the instant matter. This is a defendant in a personal injury matter asking a federal court to "step in" and address what is essentially, a state court matter where there is already substantial state legal precedent. Defendants give no legitimate reason why this matter should proceed in federal court.

9.      Even if this matter did assert a federal question, which it does not, pursuant to F.R.C.P. 12(b)(1), this Court lacks subject matter jurisdiction to hear this case.   Plaintiff's

Complaint does not involve elements of federal law as an essential component; nor does it reference any federal law specifically. Thus, the fact that the Plaintiff's Complaint refers specifically to state law, including Title 16, Chapter 3, § 654(a) and (b) of the South Carolina Criminal Code Relating to Criminal Sexual Misconduct and the South Carolina Unfair Trade Practices Act (SCUPTA), Stat. § 39-5-20 weighs strongly in favor of remand.

10. Plaintiff, by and through counsel, hereby respectfully request, for the reasons stated herein, that this matter be remanded to the Dorchester County Court of Common Pleas.

WHEREFORE, Plaintiff Jane Doe, respectfully requests that this Honorable Court remand this matter to the Court of Common Pleas, Dorchester County, South Carolina.

Dated: September 9, 2022

FROST LAW GROUP, LLC

s/Jack C. Frost
Jack C. Frost
Federal Bar No: 13286
P.O. Box 1986
Summerville, SC 29484
Phone: 843.419.6653
Fax: 843.419.6674
Email: jack@frostlawgroupsc.com
Attorney for the Defendant Jane Doe

| | | |
|---|---|---|
| **JANE DOE** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| | : | **CASE No. 2:22-cv-02679-RMG** |
| **v.** | : | |
| | : | |
| **MASSAGE ENVY FRANCHISING, LLC;** | : | |
| **MASSAGE ENVY WESCOTT; PGD** | : | |
| **INVESTMENTS INC.; ROBERT W. LEE and** | : | |
| **CATHERINE H. LEE; ABC, INC 1-10** | : | |
| **(fictitious entities); and JOHNS DOES 1-10** | | |
| **(fictitious persons),** | | |
| | | |
| **Defendants** | | |

## BRIEF IN SUPPORT OF PLAINITFF JANE DOE'S MOTION TO REMAND TO THE COURT OF COMMON PLEAS OF DORCHESTER COUNTY, SOUTH CAROLINA

## I.      FACTS GIVING RISE TO DEFENDANT'S LAWSUIT

Plaintiff suffered bodily harm, humiliation, severe emotional distress, and permanent psychological damages as a result of being sexually assaulted at a Massage Envy location in South Carolina. Jane Doe additionally suffers from anxiety, sleeplessness, and has had struggles with interpersonal relationships. She has incurred expenses and will likely incur future expenses for medical and psychological treatment and has suffered loss of earning capacity as a direct and proximate cause of sexual assault committed against her while at Massage Envy Wescott by a Massage therapist in the employ of MEF, MEW and/or the Lees (hereinafter "Defendants"), Julius Goodley.  Plaintiff has alleged that MEW and the Lees knew, should have known, and/or were otherwise on notice both of the general risk posed to customers of Massage Envy by predator

therapists, as well as that that Julius Goodley specifically posed a substantial risk to his clients. *See* Ex. A at ¶ 66.

Plaintiff alleged additional negligent and intentional acts by Defendants including that Defendants failed to provide a safe environment, failed to adequately train, supervise, or educate staff, failed to properly investigate instances of sexual assault at their franchise, among others. *See* Exhibit "A".

## II.      RELEVANT PROCEDURAL HISTORY

Plaintiff commenced this state action in the Court of Common Pleas Dorchester County, South Carolina, by way of Complaint on July 5, 2022. *See* Plaintiff's Complaint attached hereto as Exhibit "A".  Shortly thereafter, and before Plaintiff could serve the complaint upon the Lees but after service was made on MEW, Defendants filed a Notice of Removal in the United States District Court for the District of South Carolina, Charleston Division on August 12, 2022. *See* Defendant's Notice of Removal attached hereto as Exhibit "B". This matter does not involve a federal question or otherwise invoke federal subject matter jurisdiction. Instead, the case was removed in violation of the forum defendant rule.

## II.      LEGAL ARGUMENT

Once a case has been removed, the plaintiff may seek remand pursuant to 28 U.S.C. § 1447(c). "Cases may be remanded under § 1447(c) for (1) lack of district court subject matter jurisdiction or (2) a defect in the removal procedure.*" Ellenburg v. Spartan Motors Chassis, Inc.,* 519 F.3d 192, 196 (4th Cir. 2008). A motion to remand based on a defect in the removal procedure—such as untimeliness—must be filed within thirty days after the filing of the notice of removal under § 1446(a). 28 U.S.C. § 1447(c).  In ruling on a motion to remand, the district court "evaluate[s] the propriety of removal based on the state of the case at the time of filing of the notice

of removal." Doubts as to jurisdiction should weigh in favor of remanding to state court. *Mulcahey v. Columbia Organic Chem. Co.*, 29 F.3d 148, 151 (4th Cir. 1994). Congress has the "clear intention to restrict removal and to resolve all doubts about the propriety of removal in favor of retained state court jurisdiction." *Marshall v. Manville Sales Corp.*, 6 F.3d 229, 232 (4th Cir. 1993). The party "invoking jurisdiction [. . .] bears the burden of establishing that the case was properly removed from state court." *Mulcahey* 29 F.3d at 151.

The party invoking the Court's jurisdiction, here MEW and the Lees, bears the burden of establishing that the case was properly removed from state court. *Turtle Factory Building Corporation v. McGrath Real Estate Holdings, LLC,* 2021 WL 688697, at *1 (D.S.C. Jan. 28, 2021).

This case should be remanded because Defendants' violation of the forum defendant rule renders their attempt at removal procedurally imperfect. Defendants filed a notice of removal in violation of the forum defendant rule, as multiple defendants properly named in Plaintiff's Complaint are residents of South Carolina, including those Defendants who now seek removal. This Court has already issued a ruling in an essentially identical case that is dispositive, *Turtle Factory Building Corporation v. McGrath Real Estate Holdings, LLC,* 2021 WL 688697, at *1 (D.S.C. Jan. 28, 2021), and other courts in this district have since followed suit. The result here should be no different.

A.    The "Forum Defendant Rule"

The forum defendant rule is a logical addendum to the diversity jurisdiction statute given the purpose of diversity jurisdiction. This provision, "is separate and apart from the statute conferring diversity jurisdiction ... [and] confines removal on the basis of diversity to instances where no defendant is a citizen of the forum state." *Councell v. Homer Laughlin China Co.,* 823

F.Supp.2d 370, 377 (N.D.W.Va.2011) (Stamp, J.) (quoting *Lively v. Wild Oats Mkts., Inc.,* 456 F.3d 933, 939 (9th Cir.2006)). The basic purpose of diversity jurisdiction is to "give a citizen of [a foreign] state access to an unbiased court to protect him from parochialism." *Ziady v. Curley*, 396 F.2d 873, 875 (4th Cir. 1968). When the forum defendant is a citizen of the state in which the action is brought, i.e. a forum defendant, "there is no need to protect [them] from local prejudice." *Reimold*, 110 F.Supp.3d at 642. The forum defendant rule therefore aims to prevent a forum defendant from removing a case to federal court. *See id.* at 642–43.

The forum-defendant rule reads that "[a] civil action otherwise removable solely on the basis of [diversity jurisdiction] may not be removed if any of the parties in interest properly joined and served as defendants is a citizen of the State in which such action is brought." 28 U.S.C. § 1441(b)(2). As interpreted by Courts within the Fourth Circuit, "served" in the context of 1441(b)(2) and removability more accurately means "actual notice and involvement in the case," rather than a formulaic application of the procedures involved in service of process. *See e.g. Campbell v. Hampton Roads Bankshares, Inc*., 925 F. Supp. 2d 800, 810 (E.D. Va. 2013).

Having joined and served Defendant MEW, a South Carolina corporation with its primary place of business in Dorchester County, South Carolina, 1441(b)(2) is plainly implicated and Defendants are precluded from removing this case subject to the forum defendant rule. *See* Exhibit A at ¶ 4. The record demonstrates clearly that a forum defendant was served prior to the either notice or effectuation of removal. *See* Affidavit of Service on MEW attached hereto as Exhibit "C". Defendants argue that Massage Envy Wescott, the name which Plaintiff used to serve the defendant, is a trade name and not a legal entity capable of being sued, and, accordingly, were not properly served.

While Plaintiff understands that the entity at issue is incorporated under another name, the corporation nonetheless does business as Massage Envy Wescott and at the location where MEW was served. Just like this Court's rulings with regard to the forum defendant rule, here there was an in-state defendant, MEW, that was properly served even if MEW claims that they are incorporated under a different name.

However, even if MEW were correct that Plaintiff failed to properly serve an in-state defendant, removal here still fails under prevailing authority from this Court and the Fourth Circuit. The Defendants now seeking removal certainly became "involved" in the case by seeking removal and were also obviously aware that the suit had been filed and served at the address where the business operates. *See Campbell*, 925 F. Supp. 810. ("A removing defendant has actual notice of the case, and has become involved by seeking removal. Accordingly, for the purposes of 1441(b)(2), and forum defendant has been joined and served, and Defendants are now precluded from removal).

Even if this court should determine that no forum defendant was properly served at the time that Defendants sought removal, relevant caselaw demonstrates that the forum defendant rule still applies, and removal is improper.

B. The Clear Intent of 28 U.S.C. § 1441

The forum defendant rule provides that an action cannot be removed on the basis of diversity jurisdiction "if any of the parties in interest properly joined and served as defendants is a citizen of the State in which such action is brought." 28 U.S.C. § 1441(b)(2) (emphasis added). Although there is limited legislative history on the "joined and served" requirement, the intent of the statute was to avoid gamesmanship, not to encourage pre-service removal.

Further, this Court and others within the Fourth Circuit have declined to apply a literal interpretation of the phrase "properly joined and served," permitting pre-service removal, as it would produce an absurd result contrary to clear legislative intent. *See, e.g., Campbell v. Hampton Rds. Bankshares, Inc.,* 925 F.Supp.2d 800, 809 (E.D.Va.2013) (finding pre-service removal when there is a forum defendant improper). Courts in this Circuit and elsewhere look past a literal reading of the statute, determine that a blind application of the plain meaning of Section 1441(b)(2) is contrary to legislative intent or produces absurd results, and remand the case. *See, e.g., id.* at 809–10 ("[P]ermitting a forum defendant to appear and seek federal jurisdiction for an action through removal, whilst simultaneously asserting that it cannot be barred from removing because it has not been properly made party to the action—through delivery of summons and a copy of the complaint—is patently absurd."); *Testosterone Prods.,* 67 F.Supp.3d at 962, No. 14 C 1748, 14 C 4856, 2014 WL 4638679, at *5 (N.D.Ill. Sept. 15, 2014) ("Given [the defendant's] ability to obtain on its own near-instantaneous information about the filing of suit, application of the literal language of section 1441(b) would defeat the statute's purpose. The Court therefore declines to read the statute that way."); *Swindell–Filiaggi v. CSX Corp.,* 922 F.Supp.2d 514, 521 (E.D.Pa.2013) ("[R]ewarding a 'race to remove' is at odds with Congress's interest in limiting the right of removal."); *Perez v. Forest Labs., Inc.,* 902 F.Supp.2d 1238, 1245–46 (E.D.Mo.2012) ("It is unlikely that the plain wording of Section 1441(b)(2) broadly encompasses an electronic docket vigil that would enable forum defendants, or out-of-state defendants joined to forum defendants, to exercise their own forum-shopping manipulation of jurisdiction."); *Laugelle v. Bell Helicopter Textron, Inc.,* Civ. A. No. 10–1080(GMS), 2012 WL 368220, at *3 (D.Del. Feb. 2, 2012) ("Given the Third Circuit's clear preference for remand ..., and considering the purpose of the forum defendant rule and the deference afforded to the plaintiff's choice of forum, the court finds that

removal under § 1441(b) was improper."); *Sullivan v. Novartis Pharm. Corp.,* 575 F.Supp.2d 640, 643 (D.N.J.2008) ("The literal application of § 1441(b) in this case would both produce bizarre results that Congress could not have intended, and results that are demonstrably at odds with the objectives Congress did intend to effect."); *Ethington v. Gen. Electric Co.,* 575 F.Supp.2d 855 (N.D.Oh.2008) ("[T]he Court finds that applying the plain language of § 1441(b) would produce a result demonstrably at odds with Congressional intent underpinning the forum defendant rule, and specifically with the 'properly joined and served' language.").

This Court need look no further than the opinion and order it issued in *Turtle Factory Building Corporation v. McGrath Real Estate Holdings, LLC.* There, the Plaintiff, a citizen of Illinois, filed a lawsuit against a Delaware Defendant and a South Carolina Defendant in South Carolina State Court. *Turtle Factory Building Corporation v. McGrath Real Estate Holdings, LLC,* 2021 WL 688697, at *1 (D.S.C. Jan. 28, 2021). Prior to the South Carolina Defendant being served, the Delaware Defendant removed the case to federal court in the District of South Carolina. The Plaintiff filed a motion for remand citing the forum defendant rule. This Court held as following:

> [T]he Court is persuaded by the opinions that find the literal application of § 1441(b)(2) is contrary to congressional intent and creates absurd results. One of the principal purposes of diversity jurisdiction was to give a "citizen of one state access to an unbiased court to protect him from parochialism if he was forced into litigation in another state in which he was a stranger and of which his opponent was a citizen." *Ziady v. Curley,* 396 F.2d 873, 875 (4th Cir. 1968). The forum defendant rule appears to recognize that there is no need to protect out-of-state defendants from local prejudice where the defendant is a citizen of the state in which the case is brought. *Lively v. Wild Oats Markets, Inc.,* 456 F.3d 933, 940 (9th Cir. 2006); *Morris v. Nuzzo,* 718 F.3d 660, 665 (7th Cir. 2013).
>
> The addition of the "properly joined and served" language to § 1441(b)(2) has been interpreted as an effort to prevent gamesmanship by plaintiffs from joining forum defendants merely to preclude federal jurisdiction. *Goodwin,* 757 F.3d at 1221 (quoting *Sullivan v. Novartis Pharm. Corp.,* 575 F. Supp. 2d 640, 644 (D.N.J. 2008) (abrogated by *Encompass Ins. Co. v. Stone Mansion Rest. Inc.,* 902 F.3d 147 (3d Cir. 2018))). Further, if the forum defendant rule were read to allow pre-service removal, it would provide an incentive for defendants to employ gamesmanship by

racing to remove newly filed actions, which would stand in contrast to the purpose behind the inclusion of the language to prevent gamesmanship. *Id.*; *Phillips Construction, LLC*, 93 F. Supp. 3d at 553; *Little v. Wyndham Worldwide Operations, Inc.*, 251 F. Supp. 3d 1215, 1221 (M.D. Tenn. 2017) (finding based on statutory scheme "permitting pre-service removals when a forum defendant is sued runs counter to the reasons underlying the forum defendant rule and is not a result that Congress could have envisioned ... when it enacted the rule to protect out of state defendants from local juries). Removal statutes are to be strictly construed and the removing party bears the burden of establishing the right to removal *Mulcahey*, 29 F.3d at 151. Courts are clearly split as to this issue and the propriety of removal in this case is doubtful. As such, the Court weighs in favor of remanding to state court.

This Court's analysis in *Turtle Factory* has been adopted by a number of other courts within the District of South Carolina. *See Kickin' Chicken, LLC v. TFD, Inc.,* No. 9:22-CV-00013-RMG, 2022 WL 682403, at *2 (D.S.C. Mar. 4, 2022); *Bassford v. Bassford*, No. 2:21-CV-02955-DCN, 2022 WL 669625, at *3 (D.S.C. Mar. 7, 2022). The only distinction between *Turtle Factory* and the present case, is that it was the out of state Defendant who sought removal in *Turtle Factory,* whereas here it is the South Carolina Defendants themselves (Both the Lees and MEW), in contravention of the forum defendant rule, who are attempting to remove to federal court.

Under 28 U.S.C. § 1447(c), a plaintiff may remand an action to state court if removal was "procedurally defective." *Ellenburg v. Spartan Motors Chassis, Inc.,* 519 F.3d 192, 196 (4th Cir. 2008). While not addressed by the Fourth Circuit, of the ten Circuits that have addressed the question of whether removal by a forum defendant is a procedural defect, nine have found it to be so. *See Councell v. Homer Laughlin China Co.,* 823 F. Supp. 2d 370, 378 (N.D.W. Va. 2011) Further, District Courts within the Fourth Circuit have held that removal by a forum defendant is a procedural defect. *See Ada Liss Grp. v. Sara Lee Branded Apparel,* 2007 WL 634083, *3–4, 2007 U.S. Dist. LEXIS 13497, *12–13 (arguing that it appears clear that the Fourth Circuit would follow the majority and find violation of § 1441(b) procedural).

Plaintiff decisively initiated this claim in state court and Defendants' Notice of Removal is procedurally defective as it violates the forum defendant rule. Thus, because the Lees and MEW are forum defendants, removal was done in violation of the forum defendant rule, and Plaintiff's motion for remand must be granted. Defendants bear the burden to show that removal was proper and, under the circumstances that is simply not possible.

      C.   <u>There is Absolutely no basis for Moving Defendants' Claim of Fraudulent Joinder</u>

Considering that MEW (whether sued by their trade name or the name of the incorporated entity that operates the business according to the trade name) and the Lees are both South Carolina residents, this Court's decision in *Turtle Factory* is entirely dispositive of this issue. Nonetheless, Plaintiff will briefly address Defendants' claims of fraudulent joinder.

As explained by the Fourth Circuit, fraudulent joinder exists when the removing party "demonstrate[s] either 'outright fraud in the plaintiff's pleading of jurisdictional facts' or that 'there is *no possibility* that the plaintiff would be able to establish a cause of action against the in-state defendant in state court.' " *Hartley v. CSX Transp., Inc.,* 187 F.3d 422, 424 (4th Cir.1999) (emphasis in original) (quoting *Marshall v. Manville Sales Corp.,* 6 F.3d 229, 232 (4th Cir.1993)). Furthermore, "the party alleging fraudulent joinder bears a heavy burden—it must show that the plaintiff cannot establish a claim even after resolving all issues of law and fact in the plaintiff's favor." *Id.* The plaintiff's pleadings are to be treated with great deference at this point, as "this standard is even more favorable to the plaintiff than the standard for ruling on a motion to dismiss under [Federal Rule of Civil Procedure] 12(b)(6) ." *Id.*

Defendants provide no meaningful basis for a finding of fraudulent joinder here, and certainly are incapable of bearing the heavy burden describe above. As noted in Plaintiff's complaint, the Lees, as Franchisees of Massage Envy Franchising, entered into a Franchise

Agreement with MEF. A copy of a form franchise agreement is attached as an exhibit to Plaintiff's Complaint. Included in that Franchise Agreement is a "Guarantee and Assumption of Obligations," which create a contractual duty obligating Robert Lee and/or Catherine Lee to personally ensure enforcement of "each and every obligation of the Franchisee under the Franchise Agreement or other agreements." Section 16 of the Franchise Agreement addresses the relationship of the parties and indemnification. The Franchise Agreement specifically states:

- 16A. INDEPENDENT BUSINESS OWNER You are, and shall remain, an independent business owner responsible for all obligations and liabilities of your Business and for all claims or demands based on injury…of any person or persons directly or indirectly, resulting from the operation of your Business…we shall not be construed to be jointly liable for any of your acts or omissions under any circumstances. We have no relationship with your employees and you have no relationship with our employees.…

- 16B. NO LIABILITY FOR ACTS OF OTHER PARTY We will not be obligated for any damages to any person or property directly or indirectly arising out of the operation of the Business or your other activities conducted under this Agreement.

- 16D. INDEMNIFICATION To the fullest extent permitted by law, you will defend, indemnify and hold harmless us, and our affiliates, and subsidiary companies, and their permitted successors and assigns, and each of their respective direct and indirect owners, directors, officers, managers, employees, agents, attorneys, and representatives and, if applicable, your Regional Developer and its members, owners, officers, directors and employees from and against all Losses, which any of the Indemnified Parties may suffer, sustain or incur as a result of a claim asserted or inquiry made formally or informally, or a legal action investigation, or other proceeding brought, by a third party and directly or indirectly arising out of the Business, your Franchise, the business you conduct under this Agreement, your breach of this Agreement and any noncompliance or alleged noncompliance with any law, ordinance, rule or regulation concerning the construction, design or operation of your Business including….

In addition to the Franchise Agreement, MEF requires franchise owners like Robert W. Lee and Catherine H. Lee to sign a Franchise Disclosure Agreement which summarizes the Franchise Agreement in plain language and requires the franchise owner to assume personal liability for claims made against the owner's business. This disclosure agreement indicates that

"**all franchise owners and their spouses must sign a guarantee and assumption of obligations making the owners and their spouses jointly and severally liable for all obligations of the franchise whether or not such spouse is involved in the operation of the franchise business. This requirement places the personal assets of the franchise owner and their spouse at risk**." *Id..*

The Guarantee and Assumption of Obligations is a part of the Franchise Agreement. This document specifically states that the individual owner and his/her spouse personally assume liability when claims are made against the franchise.

Plainly, pursuant to the franchise agreement and the personal guarantee, the Lees voluntarily assumed *personal* joint and several liability for any claims arising from the operation of the Franchise. Accordingly, each of Defendant's arguments related to the fact that Plaintiff did not allege facts directed specifically at the Lees are irrelevant, as the Lees voluntarily assumed personal responsibility for claims arising out of the operation for their Franchise. Because "all legal uncertainties are to be resolved in Plaintiff's favor in determining whether fraudulent joinder exists," the effect of the above agreement must be interpreted to create personal liability on the Lees for claims arising out of the operation of their Franchise. Plaintiff alleged that the assault of Plaintiff occurred on a massage table on premises owned operated and controlled by MEW and the Lees, during normal business hours and in the course and scope of the performance of duties of the assaultive Massage therapist in their employ. *See* Exhibit A at ¶ 60. Clearly, Plaintiff has plead sufficient facts, in congruence with the above agreement, to demonstrate far more than the

*possibility* that Plaintiff would be able to establish a cause of action against the in-state defendants, the Lees and MEW, which is all that is required of Plaintiff at this stage.[1]

       1.   <u>Plaintiff's Negligence Claims</u>

In order to establish a claim for negligence, Plaintiff must present evidence of a legal duty owed by Defendants to her, a breach of that duty by a negligent act or omission, and damages that were proximately caused by that breach.*Benjamin v. Wal-Mart Stores, Inc., et al.,* 413 F. Supp. 2d 652, 654 (D.S.C. 2006).

Defendants incorrectly assert that Plaintiff has inappropriately "lumped" one defendant with another. Functionally, Plaintiff's Complaint is directed at two entities, a Franchisor, and their Franchisee. As noted above, the Lees voluntarily assumed personal liability for any claims arising out of the operation of their franchise, and are legally indistinguishable from the Franchise they own. This hardly constitutes Plaintiff assembling "some collection of defendants and then mak[ing] vague, non-specific allegations against all of them as a group." Rather, Plaintiff's well-plead complaint is full of allegations demonstrating how these two entities, in concert with one another, owed Plaintiff a duty, and breached that duty to Plaintiff's detriment. For example, Plaintiff alleged that the Lees, in their capacity as the owners and guarantors of their franchise location in Wescott, owed Plaintiff a duty to protect Plaintiff and other female customers from the

---

[1] While Defendants are plainly attempting to treat their Notice of Removal as a motion to dismiss by making a number of unfounded factual arguments related to Plaintiff's Complaint (*See* Exhibit B at ¶13-36), the law is quite clear that a motion for remand must be decided before a motion to dismiss. *See Burrell v. Bayer Corp.,* 918 F.3d 372, 379-80 (4th Cir. 2019) (If a case "was not properly removed, because it was not within the original jurisdiction of the United States district courts,' then the district court [is] without jurisdiction to rule on the merits and instead [is] required to remand the action to state court."). Despite this gamesmanship, Plaintiff will briefly address Defendant's Arguments.

"depraved and vile acts" of massage therapist in their employ, including the perpetrator in this case. *See* Ex. A at ¶100. They also had a duty to disclose information to the public in general, and to Plaintiff in particular, to "reasonably identify, remove, and/or report (to law enforcement authorities and/or to state massage therapy boards) individuals who [they] knew or should have known, were unfit individuals in [their] service or employ." *Id* at 124.

Further, as it relates to Notice of the danger posed by Goodley, Plaintiff alleged:

"Prior to the assault alleged above, upon information and belief, all Defendants knew, had reason to know, or were otherwise on notice of the unlawful sexual conduct of Goodley and/or other massage therapists at franchise locations nationwide. All Defendants failed to take reasonable steps and failed to implement reasonable safeguards to avoid acts of unlawful sexual conduct in the future by Goodley, including, but not limited to, preventing, or avoiding placement of Goodley in functions or environments in which contact with female customers in vulnerable positions was an inherent part of those functions or environments. Furthermore, at no time during the periods of time alleged did Defendants have in place a system or procedure to supervise and/or monitor employees, representatives, or agents to ensure they did not sexually assault female customers at franchise locations."

*Id.* at ¶ 66. Given the leniency of the standard to be applied, these allegations are more than sufficient to create, at the very least, the possibility that Plaintiff could bring a negligence cause of action against Defendants.

2. <u>Plaintiff's Intentional Infliction of Emotional Distress, Unfair Trade Practices and Fraudulent Concealment Claims</u>

To recover for intentional infliction of emotional distress, a plaintiff must establish the following: "(1) the defendant intentionally or recklessly inflicted severe emotional distress, or was certain, or substantially certain, that such distress would result from his conduct; (2) the conduct was so 'extreme and outrageous' so as to exceed 'all possible bounds of decency' and must be regarded as 'atrocious, and utterly intolerable in a civilized community;' (3) the actions of the defendant caused plaintiff's emotional distress; and (4) the emotional distress suffered by plaintiff

was 'severe' such that 'no reasonable man could be expected to endure it.'" *Bass v. South Carolina Dept. of Social Services*, 414 8.C. 558, 575, 780 S.E.2d 252, 260-61 (2015).

As pointed out by Defendants, Plaintiff alleges that "Defendants" made explicit and implied representations, knowing they were false, that the massage therapists were psychologically fit and could be entrusted with the safety and well-being of female customers. *See* Exhibit A at ¶ 156-157, 163-164. Defendant is incorrect, however, in stating that Plaintiff did not state specific representations or statements made. Plaintiff alleged that she entered into a "Wellness agreement" with Defendant, in which it was represented by Defendants, including the Lees, that:

a. "Male/female genitalia and women's breasts will not be exposed or massaged at any time."

b. "To the best of the Franchisee's knowledge, only professional massage therapists and estheticians who comply with state, city, and/or local licensing of certification requirements are hired by the Franchisee."

c. "Inappropriate or illegal behavior by clients or staff will not be tolerated in any manner."

Such representations were specifically designed to lull Plaintiff into a false sense of security, and to prevent her from making an informed decision about using the services of Massage Envy spas, and to conceal the reality of the epidemic of sexual assaults occurring at Massage Envy Locations nationwide. That representation resulted in her eventual sexual assault and the above-described harm.

As it relates to the Unfair Trade Practices claim, The South Carolina Unfair Trade Practices Act (""SCUTPA") "declares unfair or deceptive acts or practices in trade or commerce unlawful." *Singleton v. Stokes Motors, Inc.,* 358 S.C. 369, 379, 595 S.E.2d 461, 466 (2004) (citing S.C. Code Ann. § 39-5-20(a) (2002)). "SCUTPA requires that a private claimant suffer an actual loss, injury, or damage, and requires a causal connection between the injury-in-fact and the complained of

unfair or deceptive acts or practices." *State ex. Rel. Wilson v. Ortho-McNeil-Janssen Pharmaceuticals, Inc*., 414 S.C. 33, 5758, 777 S.E.2d 176, 189 (2015) (citing S.C. Code Ann. § 39-5-140(a). Defendants incorrectly claim that Plaintiff did not allege that she sustained an actual loss of money or property as a result of the misrepresentation and unfair practices engaged in by the Lees and the other Defendants. On the contrary, Plaintiff alleged that on the day of her assault, she purchased a massage. *See* Exhibit A at ¶ 54. Rather than receiving the value of the service she purchased, which she would not have done were it not for the misrepresentations made by the Defendants in this case, Plaintiff was sexually assaulted. As a result, Plaintiff suffered actual loss in the amount she paid to receive a massage that day.

Finally, as it related to the Plaintiff's claim for Fraudulent Concealment, "Nondisclosure is fraudulent when there is a duty to speak." *Ellie, Inc. v. Miccichi*, 358 S.C. 78, 101, 594 S.E.2d 485, 497 (Ct. App. 2004) (citing Ardis v. Cox, 314 S.C. 512, 517, 431 S.E.2d 267, 270 (Ct. App. 1993)). "Non-disclosure becomes fraudulent concealment only when it is the duty of the party having knowledge of the facts to make them known to the other party to the transaction.*" Id. (citing Lawson v. Citizens S. Natl. Bank of* S.C., 259 S.C. 477, 48182, 193 S.E.2d 124, 126 (1972)). As noted above, and contrary to Defendants assertion, Plaintiff did indeed allege the specific material misrepresentations made by the Lees and other defendants.

Plainly, Plaintiff has alleged sufficient facts to survive a Motion to Dismiss, there can be no doubt that those same facts are sufficient to overcome the much lower standard applied in determining whether a Fraudulent Joinder occurred.

V.     **CONCLUSION**

Pursuant to all the aforementioned reasons, Plaintiff Jane Doe respectfully requests this Honorable Court grant this instant motion and remand this matter to state court through application

of the forum defendant rule and/or lack of subject matter jurisdiction and/or because the procedure employed by Defendants violates Plaintiff's rights to Due Process.

WHEREFORE, Plaintiff Jane Doe respectfully requests that this Honorable Court remand this lawsuit to the Common Pleas Dorchester County, South Carolina.


Dated: September 9, 2022

FROST LAW GROUP, LLC

s/Jack C. Frost
Jack C. Frost
Federal Bar No: 13286
P.O. Box 1986
Summerville, SC 29484
Phone:  843.419.6653
Fax:  843.419.6674
Email: jack@frostlawgroupsc.com
Attorney for the Defendant Jane Doe

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | | |
|---|---|---|
| **JANE DOE** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| | : | **CASE No. 2:22-cv-02679-RMG** |
| **v.** | : | |
| | : | |
| **MASSAGE ENVY FRANCHISING, LLC;** | : | |
| **MASSAGE ENVY WESCOTT; PGD** | : | |
| **INVESTMENTS INC.; ROBERT W. LEE and** | : | |
| **CATHERINE H. LEE; ABC, INC 1-10** | : | |
| **(fictitious entities); and JOHNS DOES 1-10** | | |
| **(fictitious persons),** | | |
| | | |
| **Defendants** | | |

## CERTIFICATE OF SERVICE

On September 9, 2022 the undersigned served the following documents, electronically, on all parties in this action. I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

FROST LAW GROUP, LLC

s/Jack C. Frost
Jack C. Frost
Federal Bar No: 13286
P.O. Box 1986
Summerville, SC 29484
Phone: 843.419.6653
Fax: 843.419.6674
Email: jack@frostlawgroupsc.com
Attorney for the Defendant Jane Doe

| | | |
|---|---|---|
| **JANE DOE** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| | : | **CASE No. 2:22-cv-02679-RMG** |
| **v.** | : | |
| | : | |
| **MASSAGE ENVY FRANCHISING, LLC;** | : | |
| **MASSAGE ENVY WESCOTT; PGD** | : | |
| **INVESTMENTS INC.; ROBERT W. LEE and** | : | |
| **CATHERINE H. LEE; ABC, INC 1-10** | : | |
| **(fictitious entities); and JOHNS DOES 1-10** | | |
| **(fictitious persons),** | | |
| **Defendants** | | |

And NOW, this _____ day of _____, 2022, upon consideration of Plaintiff,

Jane Doe's Motion to Remand and any response thereto, it is hereby **ORDERED** and **DECREED**

that said Motion is **GRANTED** and this matter is **REMANDED** to the Court of Common Pleas

for Dorchester County, South Carolina.

BY THE COURT:

_____
                                                                                                    **J.**

# Exhibit A

(Court of Commons Pleas Complaint with Exhibits)

| | |
|---|---|
| **STATE OF SOUTH CAROLINA** ) | **IN THE COURT OF COMMON PLEAS** |
| ) | **FOR THE FIRST JUDICIAL DISTRICT** |
| **COUNTY OF DORCHESTER** ) | |
| ) | **CIVIL ACTION 2022-CP-18-_____** |
| ) | |
| **JANE DOE,** ) | |
| ) | **SUMMONS** |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | |
| ) | |
| **MASSAGE ENVY FRANCHISING,** ) | |
| **LLC; MASSAGE ENVY WESCOTT;** ) | |
| **PGD INVESTMENTS, INC.; ROBERT** ) | |
| **W. LEE and CATHERINE H. LEE;** ) | |
| **ABC, INC 1 – 10 (fictitious entities);** ) | |
| **and JOHN DOES 1 – 10 (fictitious** ) | |
| **persons)** ) | |
| ) | |
| **Defendants.** ) | |
| _____ ) | |

**TO THE DEFENDANTS ABOVE-NAMED:**

    **YOU ARE HEREBY SUMMONED** and required to answer the Complaint in this action, of which a copy is herewith served upon you, and to serve a copy of your Answer to said Complaint in the subscribed to Jack C. Frost, FROST LAW GROUP, LLC, PO BOX 1986, SUMMERVILLE, SOUTH CAROLINA, 29484 within THIRTY (30) DAYS after the service hereof, exclusive of the date of such service; and if you fail to answer the Complaint within the time aforesaid, judgment by default will be rendered against you for the relief demanded in the Complaint.

1

FROST LAW GROUP, LLC


s/ Jack C. Frost
_____
Jack C. Frost, Esq.
SC Bar # 103633
PO Box 1986
Summerville, SC 29484
Office: (843) 419-6653
Fax: (843) 419-6674


LAFFEY, BUCCI, & KENT, LLP

s/ Brian D. Kent
Brian D. Kent, Esq.
M. Stewart Ryan, Esq.
Laffey, Bucci & Kent, LLP
1100 Ludlow Street
Suite 300
Philadelphia, PA 19107
Office: (215) 399-9255
Fax: (215) 241-8700
(*pro hac vice* admission expected)

Attorneys for the Plaintiff


July 1, 2022
Summerville, South Carolina

ELECTRONICALLY FILED - 2022 Jul 01 6:02 PM - DORCHESTER - COMMON PLEAS - CASE#2022CP1801053

ELECTRONICALLY FILED - 2022 Jul 01 6:02 PM - DORCHESTER - COMMON PLEAS - CASE#2022CP1801053

| STATE OF SOUTH CAROLINA | ) | IN THE COURT OF COMMON PLEAS |
|---|---|---|
| | ) | FOR THE FIRST JUDICIAL DISTRICT |
| COUNTY OF DORCHESTER | ) | |
| | ) | CIVIL ACTION 2022-CP-18-_____ |
| | ) | |
| JANE DOE, | ) | |
| | ) | **COMPLAINT** |
| Plaintiff, | ) | (Jury Trial Demanded) |
| | ) | (Negligence/ Intentional Infliction of Emotional |
| v. | ) | Distress/ Unfair Trade Practices) |
| | ) | |
| MASSAGE ENVY FRANCHISING, | ) | |
| LLC; MASSAGE ENVY WESCOTT; | ) | |
| PGD INVESTMENTS, INC.; ROBERT | ) | |
| W. LEE and CATHERINE H. LEE; | ) | |
| ABC, INC 1 – 10 (fictitious entities); | ) | |
| and JOHN DOES 1 – 10 (fictitious | ) | |
| persons) | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

The Plaintiff, Jane Doe, by and through her undersigned attorneys, complaining of the above-named Defendants would allege and show unto the Court the following:

## PARTIES

1.     The Plaintiff is a citizen and resident of Virginia.

2.     Plaintiff, Jane Doe, is an adult female whose name and address is not contained in this Complaint so as to protect her privacy and identity as she incurred injuries and damages of a sensitive nature as a result of the intentional and negligent acts and failures of Defendants outlined below.

3.     There exists good cause for Plaintiff to use a pseudonym due to the harmful effect of the public disclosure of their identity and the harm inflicted by the Defendants to Jane Doe. Plaintiff's undersigned counsel will provide the identity of the Plaintiff to all Defendants. As such, Defendants suffer no prejudice as a result of concealing their identity in the Complaint.

4.      Defendant, Massage Envy Wescott is a South Carolina corporation with its principal place of business located in Dorchester County. Massage Envy Wescott owns, operates, controls, manages and/or does business as Massage Envy Spa Westcott, located at 9500 Dorchester Road, Ste 314, Summerville, South Carolina, a day spa that offers massages and other spa services. Defendant Massage Envy Wescott also a Dorchester County resident, entered into a franchise agreement with Defendant Massage Envy Franchising, LLC to own/operate the Massage Envy Wescott franchise, located in Summerville, South Carolina, where the assault at issue occurred and as such, operates as Massage Envy Wescott's alter ego.



5.      Defendant, Massage Envy Franchising, LLC (hereinafter referred to as "Massage Envy" or "MEF"), is an Arizona corporation with its principal place of business located in Scottsdale, Arizona. Massage Envy is a massage and spa therapy franchise with over 1,150 franchises located across the United States and is the largest employer of massage therapists nationwide. It is also believed and therefore averred that Massage Envy owns, operates, controls manages and/or does business as Massage Envy Wescott located at 9500 Dorchester Road, Ste 314, Summerville, South Carolina.

ELECTRONICALLY FILED - 2022 Jul 01 6:02 PM - DORCHESTER - COMMON PLEAS - CASE#2022CP1801053

6. Defendant, PGD Investments, Inc. ("PGD"), is and at all relevant times was a corporation and was registered to do business in the State of South Carolina. PGD Investments, Inc.'s primary place of business is 7205 Piper Point Lane, Charlotte, NC, 28277 and is the Regional Developer of Massage Envy Wescott. At all times relevant herein, PGD Investments, Inc. served as the corporate entity for Massage Envy Franchising and Massage Envy Franchise locations throughout areas in South Carolina including Massage Envy Wescott.

7. Robert W. Lee and Catherine H. Lee are citizens and residents of Horry County, South Carolina. Defendants Robert W. Lee and Catherine H. Lee are the owners and franchisees of the Massage Envy Wescott location and.

8. Defendants ABC, Inc. 1-10 are fictitious entities that own, operate, control, manage or do business as Massage Envy Wescott and/or employed, supervised, controlled and/or oversaw Julius Goodley and/or which otherwise owed a legal duty to Plaintiff to prevent the incident of sexual abuse at Massage Envy locations as is more fully alleged herein.

9. Defendants John Does 1-10 are fictitious persons who own, operate, control, manage or do business as Massage Envy Wescott and/or employed, supervised, controlled and/or oversaw Julius Goodley and/or which otherwise owed a legal duty to Plaintiff to prevent the incident of sexual abuse at Massage Envy locations as is more fully alleged herein.

10. The parties, matters, and all things and matters hereinafter alleged are within the jurisdiction of this Court, as all Defendants regularly and systematically conduct business within Dorchester County. Specifically, Massage Envy Wescott regularly and systematically do business within Dorchester County through advertisement and sales of its massage and spa services within Dorchester County.

## FACTS OF DEFENDANTS' RELATIONSHIP

11.     Massage Envy, the first and by far the largest chain of massage franchises in the country, boasts a billion-dollar business that falsely promises safety in the treatment room for massage and spa services at an affordable price while intentionally concealing the known dangers of their services to men and women at their locations nationwide. Massage Envy not only failed and continues to fail to provide basic safety to clients in a most vulnerable setting, but it systemically and intentionally conspired and concealed the rampant problem, danger and extensive reports of hundreds of massage therapists at Massage Envy franchise locations sexually assaulting customers throughout the country, including within the State of South Carolina.

12.     Sexual misconduct committed by massage therapists at MEF franchise locations is a national epidemic, with over hundreds of known reports of sexual assaults by its therapists occurring throughout the country. *See* Katie J.M. Baker, *Hands Off: More Than 180 Women Have Reported Sexual Assaults At Massage Envy*, BuzzFeed News, November 26, 2017, attached hereto as Exhibit "A." The assaults range from forcible sexual intercourse to digital and oral penetration of women's vaginas to touching of women's breasts to therapists putting their genitals on women as well as ejaculating on women.  Unfortunately, customers being sexually assaulted after prior reports of a perpetrating Massage Envy therapist were made to Massage Envy and its franchisee have happened to women in numerous other states throughout the country.

13.     Women throughout the country have been sexually assaulted as a result of Massage Envy's calculated efforts with its franchisees to conceal reports of sexual assaults and the known danger within their company. Massage Envy's policy of telling staff to "not go to police" was singularly designed to continue its profit and protect the brand at the expense of the safety of unsuspecting customers. In furtherance of their conspiracy, the Defendants actively sought to

conceal the knowledge and danger of customers being sexually assaulted within their business locations by actively preventing sexual assault reports from being reported to law enforcement and/or state massage therapy boards. According to at least one former employee: "[The internal review policy] is not in place to protect the client. It's in place to protect the company. It is centered upon defusing the situation so the client does not call the police. You don't want cop cars showing up at your location the next day." *See* "Hands Off - A Buzzfeed Investigation: More than 180 Women Have Reported Sexual Assaults at Massage Envy" by Katie Baker, *Buzzfeed*, November 26, 2017, attached hereto as Exhibit "A."

14. Not only does MEF not require its franchisees to report sexual assaults of customers by its massage therapists to law enforcement and/or state massage therapy boards, but it has a policy and procedure of directing franchisees to conceal allegations of inappropriate sexual behavior involving its massage therapists and directing franchisees not to report said allegations to local law enforcement and/or state massage therapy boards in order to "protect the brand."

15. These efforts among MEF and its franchisees have led to MEF being placed on the "2019 Dirty Dozen List" by the National Center on Sexual Exploitation (hereinafter "NCOSE". According to NCOSE Director Dawn Hawkins:

"Customers need to know that Massage Envy has egregious policies that seem to protect corporate interests above customer safety in cases of sexual harassment and assault. Massage Envy has been, and is being, sued by hundreds of women for failing to take appropriate measures when a massage therapist sexually harasses or assaults a client. Despite making some superficial improvements, Massage Envy has failed to change essential policies that could promote safety and transparency."
"Among a number of poor policies, the company has hidden clauses in customer agreements which force women to surrender their rights and many former employees report being trained to do all in their power not to encourage police to show up at their locations. Massage Envy does not even require reporting of suspected assaults to the Massage Therapy Board, which is alarming considering the fact that a number of cases against Massage Envy involve repeat perpetrators who were reported to management for sexual assault by prior customers."

16. MEF claims it has a "zero tolerance" policy regarding sexual assaults by massage therapists at its franchise locations, meaning that any allegation of a massage therapist sexually assaulting a customer will result in that therapist being terminated. This representation is made as part of a calculated effort to lure Plaintiff into believing that MEF and its franchisees are safe environments free from the risk of sexual assault, that any report of sexual assault will be taken seriously and result in termination of any therapists who commit those assaults. This is a fraud being perpetrated on the public.

17. In reality and behind closed doors, MEF company protocol encourages employees to handle any allegations of sexual misconduct by its massage therapists "in-house." MEF policy requires that every instance of sexual assault be reported to MEF by the franchisee via a web portal and MEF works with the franchisee to ensure that the report is not made public. In furtherance of that conspiracy and contrary to their public declaration of "zero tolerance", MEF therapists are often allowed to remain employed and/or were transferred and/or hired/re-hired at another Massage Envy franchise location, only to go on to improperly touch multiple other female customers, as occurred here.

18. MEF, other Defendants named herein, and other of MEF's franchisees have long feared that the public would learn about the problem of massage therapists sexually assaulting female customers at its franchise locations but took no action whatsoever to prevent these assaults. To the contrary, Defendants continued to protect the company at the expense of the safety of its customers and have actively and intentionally taken steps to cover up the sexual assaults in order to conceal them from their customers and members.

19. According to a former corporate employee, the company's leadership has long feared the media, and therefore the public, would realize the national scope of the problem. That

person recalled executives discussing what would happen "if someone connects the dots of how many sexual assaults have occurred across the country." In at least one risk management training, franchisees were told the goal when investigating claims is "to avoid police and keep membership." Although required to disclose dangers associated with the services they offer, Defendants know that if the truth is exposed it will decimate their reputation and ultimately, their company's profits.

20.     Defendants have intentionally made false statements about their customer's safety as Massage Envy franchisee locations.   Such statements were designed and made by Defendants to conceal the rampant problem of sexual assaults within Defendants' business.

21.     Massage Envy requires that franchisees inform customers that they will not be sexually assaulted or exploited at franchise locations if they purchase services from Defendants. As described herein, Defendants know this is false.

22.     MEF controls the day-to-day operations of all of its franchises, both directly and through their agent regional developers ("RD"). A copy of MEF's standard franchise agreement is attached hereto as Exhibit "B."

23.     Specifically, and as can be seen in Exhibit "B," MEF formulates all policies and procedures that its franchisees are required to follow, including, but not limited to those relating to the prevention, investigation, reporting and handling of sexual assault allegations, franchisees are regularly trained by MEF or its agents on how to comply with said policies and procedures, MEF supervises its franchisees to ensure compliance with MEF policies and procedures in the day-to-day operations, inspections are performed by MEF to ensure compliance and franchisees can and will be disciplined, sanctioned and/or have their franchise agreement terminated if they fail to comply with MEF's policies, rules, regulations and protocols in every aspect of the

9

ELECTRONICALLY FILED - 2022 Jul 01 6:02 PM - DORCHESTER - COMMON PLEAS - CASE#2022CP1801053

operations of the franchise. In other words, franchisees have no discretion in how they operate the business. They must follow MEF protocol, are supervised and inspected regularly to ensure they are following said protocol and can/will be disciplined for failing to comply.

24.     In fact, MEF, its regional developers and its franchisees implement MEF's conspiracy and scheme to defraud the public through MEF system standards and policies that are dictated, implemented and enforced by MEF down to the franchise level as described above with the help of MEF regional developers.

25.     MEF's policy and procedure of directing franchises to conceal reports of allegations of sexual assaults involving Massage Envy therapists and directing franchises not to report said allegations to local law enforcement and/or state massage therapy boards enables the assaults to occur on a national level.

26.     Massage Envy company protocol, policies, and trainings, as created by MEF and implemented and overseen by their Regional Developers, directs all owners, managers, and employees involved to handle sexual assault allegations by Massage Envy therapists "in house."

27.     Massage Envy company protocol instructs franchises to put customers who have a complaint in a private room and to avoid admitting to anything, or making any promise to do anything, more than to internally investigate the matter, then to create an incident report and send it to the Corporate Office in Arizona.

28.     All reports of sexual assault are sent to MEF by franchisees via a web portal that is maintained by MEF. MEF thereafter monitors and controls sexual assault investigations at the franchise level.  MEF maintains a database of all allegations of sexual assaults occurring within their franchise locations.

ELECTRONICALLY FILED - 2022 Jul 01 6:02 PM - DORCHESTER - COMMON PLEAS - CASE#2022CP1801053

29.    MEF policy dictates that franchisees should keep reports of sexual assaults secret and does not require reporting sexual assaults of customers by its massage therapists to law enforcement and/or the South Carolina Massage/Bodywork Panel in order to "protect the brand."

30.    Massage Envy also requires that franchisees <u>not</u> warn customers of the known danger of sexual assault when purchasing massage services from Defendants.

31.    Upon information and belief, when Plaintiff entered into a wellness agreement with Defendants, it was represented by Defendants that:

   a.    "Male/female genitalia and women's breasts will not be exposed or massaged at any time."

   b.    "To the best of the Franchisee's knowledge, only professional massage therapists and estheticians who comply with state, city, and/or local licensing of certification requirements are hired by the Franchisee."

   c.    "Inappropriate or illegal behavior by clients or staff will not be tolerated in any manner."

*See* Sample Wellness Agreement attached as Exhibit "C."

32.    The above statements are false and were known to be false when they were made to Plaintiff in exchange for Plaintiff purchasing services from Defendants.

33.    Despite the above statements being knowingly false, Massage Envy required, and its franchisees agreed, to make said statements to customers, including Plaintiff, in hopes they purchased massage services and/or memberships in order to benefit Defendants financially.

34.    Massage Envy specifically informs its franchisees of reports of sexual assaults at franchise locations. MEF requires franchisees to carry sexual misconduct insurance. MEF also has a policy to deal with sexual assaults and has a database of sexual assaults that have occurred at franchise locations throughout the country. Thus, Defendants have specific knowledge that there is a danger/risk of sexual assault associated with the service/product it sells to the public.

35. However, Defendants have agreed not to inform customers of the risk/danger of sexual assault inherent in their business and service/product it sells to the public. Instead, as mentioned herein, they tell customers there is no risk of sexual assault at Massage Envy franchise locations.

36. Numerous times employee(s) at Defendants franchise locations recommended Defendants' employees and/or agents to unknowing female customers after they knew Defendants' actual agents or employees had already sexually assaulted at least one client at that location.

37. In numerous cases involving sexual misconduct at franchise locations by its massage therapists, MEF therapists were allowed to remain employed and/or were transferred and/or hired/re-hired at another Massage Envy franchise location, only to go on to improperly touch multiple other customers.

38. At one Massage Envy location, a member who was sexually assaulted terminated her membership after informing Defendants about the sexual assault. Thereafter, this victim was called by Defendants asking if she wanted to schedule a massage appointment with the very therapist that she reported to Defendants had sexually assaulted her. Rather than fire the therapist for sexually assaulting its members, Defendants let him keep his job and then attempted to lure this former member back into the hands of her assaulter.

39. The fact that Defendants have done nothing to inform and/or warn customers of the problem and danger of women being sexually assaulted at its franchise locations by massage therapists, even though it trains franchisees on the problem, is exemplary of this concerted fraud.

40. The core reason these sexual assaults and exploitations continue to occur is a conspiracy among MEF, its regional developers and its franchisees to hide the known danger of sexual assaults at its franchise locations from the public so that unsuspecting customers will

12

ELECTRONICALLY FILED - 2022 Jul 01 6:02 PM - DORCHESTER - COMMON PLEAS - CASE#2022CP1801053

purchase their massage services. In other words, MEF, its regional developers and its franchisees have conspired, agreed and devised a schematic plan and system nationwide to ensure that reports of sexual assaults and/or the known danger associated with the services MEF provides to the purchasing public is never known. This is in violation of South Carolina common law as well as consumer protection laws.

41. Defendants have also taken deliberate and intentional steps to oppose and kill legislation in states that would have required them to report sexual assaults within their business to police and other regulatory agencies. Defendants took these steps with the intent to conceal the rampant problem of sexual assaults occurring within their business. MEF's backdoor politics is also in direct contradiction with commitments they have made to "work[] toward all 50 states requiring licensing (and standards for licensing) for massage therapists."[1]

42. In addition to their intentional, fraudulent declaration of having a "zero tolerance" policy that has and will be followed, MEF, other Defendants named herein, and other of MEF's franchisees intentionally and falsely told Plaintiff and all of Defendants' customers that safety is at the core of their company's mission, that they protect their customers, that they carefully select and thoroughly train their massage therapists, that they are dedicated to providing a comfortable and professional environment, that Plaintiff and all of Defendants' customers can be confident they will have a positive experience, that they bring joy into Plaintiff's life and all of Defendants' customers' lives, and that they make the best of everybody, among other intentionally false statements to Plaintiff and all of Defendants' customers.

43. Contrary to then-CEO, Joseph C. Magnacca's, declaration to the public of a "Commitment to Safety," Defendants continue their conspiracy to defraud the public today. The

---

[1] *http://web.archive.org/web/20160429191557/http://www.massageenvy.com/about-massage-envy.aspx.*

ELECTRONICALLY FILED - 2022 Jul 01 6:02 PM - DORCHESTER - COMMON PLEAS - CASE#2022CP1801053

Defendants continue to deceive the public regarding the dangers of its services and its knowledge of therapists' sexual assaults on customers and are, in fact, engaging in a continuous and repeated pattern to keep sexual assault claims "in-house" and from law enforcement, state massage therapy boards, unsuspecting customers and the public at large.

44.     As a result of an intentional corporate policy tolerating sexual assaults and the fraud being perpetrated on the public claiming a "commitment to safety" and "zero tolerance" in order to lure more unsuspecting customers into their locations and increase their profits, women continue to and will in the future be sexually assaulted as a result of the Defendants inexplicable, deceptive actions.  Due to the actions of Defendants to conspire and conceal the assaults while representing to the public otherwise, they fraudulently deceived Plaintiff into purchasing what they thought were safe services from the Defendants.

45.     Defendants advertise their massage therapy services through numerous mediums and platforms across the nation and have built a nationally recognizable brand associated with massage therapy.  In creating a nationally recognizable brand, Defendants have repeatedly and consistently represented, explicitly to Plaintiff and/or implicitly to the public in general, that the services offered by this brand are safe, when in fact Defendants know the services are not safe. Defendants knew there was a substantial chance that Plaintiff would be assaulted before Plaintiff entered into Massage Envy memberships or purchased a massage at Massage Envy but did nothing.

46.     Plaintiff relied on representations by Defendants that Plaintiff would be safe from harm and their modesty would be respected at all times while receiving massage services in choosing to Purchase massage service(s). Further, Plaintiff relied on representations by Defendants that the massage therapists they would be exposed to would be not only psychologically fit but were therapists who could be entrusted with the safety and well-being of customers of Defendants.

Had Plaintiff been notified of the epidemic of sexual assaults occurring - and being covered up – or even simply of the risk of sexual assault within and by Defendants, Plaintiff would not have purchased massage services or memberships.

47.     Defendants Robert W. Lee and Catherine H. Lee are liable in their individual capacity as a result of guarantees they personally made through entering a franchise agreement with MEF.

48.     The Franchise Agreement and Guarantee and Assumption of Obligation, which is attached to the Franchise Agreement, each create a contractual duty obligating Robert Lee and/or Catherine Lee to personally ensure enforcement of "each and every obligation of the Franchisee under the Franchise Agreement or other agreements." Section 16 of the Franchise Agreement addresses the relationship of the parties and indemnification. The Franchise Agreement specifically states:

- **16A. <u>INDEPENDENT BUSINESS OWNER</u>** You are, and shall remain, an independent business owner responsible for all obligations and liabilities of your Business and for all claims or demands based on injury…of any person or persons directly or indirectly, resulting from the operation of your Business…we shall not be construed to be jointly liable for any of your acts or omissions under any circumstances. We have no relationship with your employees and you have no relationship with our employees.…

- **16B. <u>NO LIABILITY FOR ACTS OF OTHER PARTY</u>** We will not be obligated for any damages to any person or property directly or indirectly arising out of the operation of the Business or your other activities conducted under this Agreement.

- **16D. <u>INDEMNIFICATION</u>** To the fullest extent permitted by law, you will defend, indemnify and hold harmless us, and our affiliates, and subsidiary companies, and their permitted successors and assigns, and each of their respective direct and indirect owners, directors, officers, managers, employees, agents, attorneys, and representatives and, if applicable, your Regional Developer and its members, owners, officers, directors and employees from and against all Losses, which any of the Indemnified Parties may suffer, sustain or incur as a result of a claim asserted or inquiry made formally or informally, or a legal action

15

ELECTRONICALLY FILED - 2022 Jul 01 6:02 PM - DORCHESTER - COMMON PLEAS - CASE#2022CP1801053

investigation, or other proceeding brought, by a third party and directly or indirectly arising out of the Business, your Franchise, the business you conduct under this Agreement, your breach of this Agreement and any noncompliance or alleged noncompliance with any law, ordinance, rule or regulation concerning the construction, design or operation of your Business including….

49.     In addition to the Franchise Agreement, MEF requires franchise owners like Robert W. Lee and Catherine H. Lee to sign a Franchise Disclosure Agreement which summarizes the Franchise Agreement in plain language and requires the franchise owner to assume personal liability for claims made against the owner's business. This disclosure agreement indicates that **"all franchise owners and their spouses must sign a guarantee and assumption of obligations making the owners and their spouses jointly and severally liable for all obligations of the franchise whether or not such spouse is involved in the operation of the franchise business. This requirement places the personal assets of the franchise owner and their spouse at risk**."

50.     The Guarantee and Assumption of Obligations is a part of the Franchise Agreement. This document specifically states that the individual owner and his/her spouse personally assume liability when claims are made against the franchise. Per the Guarantee and Assumption of Obligations:

- In consideration of the grant by Massage Envy Franchising, LLC to the Franchisee as a provided in the Franchise Agreement of even date hereof, each of the undersigned hereby agrees, in consideration of the benefits received and to be received by each of them, jointly and severally, and for themselves, their heirs, legal representatives and assigns that they and each of them, to be firmly bound by all of the terms, provisions and conditions of the Franchise Agreement and any other agreements between the Franchisee and Massage Envy Franchising LLC and/or its affiliates, **that they and each of them do hereby unconditionally guarantee the full and timely payment and performance of the Franchisee of each and every obligation of the Franchisee under the Franchise Agreement or other agreements, including without limitation (i) any indebtedness of the Franchisee arising under or by virtue of the Franchise agreement**….The undersigned agree that **this Guarantee is directly enforceable against each of them** without first resort to and exhausting remedies against the Franchisee, and any indulgences, forbearances or extensions of time for performance will not in any

16

way release the undersigned from liability hereunder including, without limitation, the acceptance of any partial payment or performance or the compromise or release of any claims (including the release of other guarantors) **This is an absolute and continuing guaranty** and shall remain in full force and effect during the term of the Franchise Agreement.

## OPERATIVE FACTS

51.     At all times relevant herein, Julius Everette Goodley was an employee, agent, and/or servant of Defendants at the Massage Envy Wescott location and they are liable for the harm to the Plaintiff resulting from the conduct of their employee, agent and/or servant's conduct because Defendants knew or should have known their massage therapist's unfitness and propensities prior to his assault on the Plaintiff and at the time of his hire.

52.     At all times relevant hereto, Julius Everette Goodley, a male massage therapist working at Massage Envy Wescott, was ultimately assigned to massage Plaintiff, Jane Doe, on July 3, 2019 and had been assigned to give massages to multiple female customers in his capacity as an employee and/or agent of Massage Envy Wescott and/or Massage Envy.

53.     At all times relevant hereto, Defendants authorized and/or entrusted Goodley to have skin-to-skin contact with female customers and to be alone with them while the customers were undressed and in a vulnerable position. Goodley was aided in his commission of the sexual assault described more fully above and below by virtue of his duties as a massage therapist because Plaintiff would already be undressed in a private room in a vulnerable position per the protocol of massage clients at Massage Envy franchises.

54.     Jane Doe was a member at Massage Envy and had previously received a massage from Goodley. On July 3, 2019, Jane Doe was scheduled for a massage with Goodley. Goodley brought Jane Doe to a massage room, asked her to disrobe and left the room. Jane Doe proceeded

17

to disrobe and got on the massage table, covering herself with the sheet. At that point, Goodley reentered the room and began to massage Jane Doe.

55.     Everything started out normally. Jane Doe started out face down on the massage table while Goodley was massaging her legs. During the course of massaging her legs Goodley made contact with the upper part of Jane Doe's legs including the inner portions of her thigh. Jane Doe was unsure why Goodley was touching these areas of her body because she had never before had these areas of her body touched before during a massage.

56.     When Jane Doe turned face up on the massage table it was quickly apparent to her that it was no accident. Goodley reached all the way up her leg, under the massage draping and was touching the area of her genitals, over her underwear, with his hands. Jane Doe, feeling utterly shocked, helpless, and scared, told Goodley that he had gone up too high and that she was uncomfortable.

57.     At that point Goodley moved his hands and began touching Jane Doe's breasts. Jane Doe was completely terrified and frozen. She did not know what to do and was afraid that if she said anything Goodley would hurt her. She waited for the massage to end, remaining in fear throughout the massage. After the massage was over, Goodley gave her his business card for his in-home services.

58.     When the massage was over, Jane Doe checked out of the Massage Envy Wescott and went directly home. She did not want to talk to anyone after the assault happened. Jane Doe later sent a negative customer review to Massage Envy after the incident. No one from Massage Envy Franchising, LLC, Massage Envy Wescott or any other Defendant contacted Plaintiff.

59.     Jane Doe was later contacted by the Charleston Police Department regarding another woman that Goodley had assaulted. Upon information and belief law enforcement

uncovered Plaintiff's negative review and understood she too had been victimized by Goodley. Plaintiff related to law enforcement what had happened to her at the hands of Goodley.

60.     The sexual assault described herein occurred on a massage table, on the premises operated and/or controlled by Massage Envy Wescott and/or Massage Envy during normal business hours and in the course and scope of the performance of duties of Goodley while he was making skin-to-skin contact with Plaintiff.

61.     After being alerted of Jane Doe's sexual assault, it is believed that while Massage Envy Wescott took a written statement from Goodley and notified Massage Envy Franchising of the assault. No one from Massage Envy Wescott and/or Massage Envy Franchising reported the assault to the South Carolina Department of Labor, Licensing and Regulation Division of Professional and Occupational Licensing - Massage/Bodywork Therapy panel, law enforcement or anyone else for that matter.

62.     As a direct and proximate result of the sexual assault, Jane Doe suffers bodily harm, humiliation, severe emotional distress, and permanent psychological damages. Jane Doe additionally suffers from anxiety, sleeplessness, and has had struggles with interpersonal relationships. She has incurred expenses and will likely incur future expenses for medical and psychological treatment and has suffered loss of earning capacity.

**FIRST CAUSE OF ACTION**
**RESPONDEAT SUPERIOR**
**(ALL DEFENDANTS)**

63.     Plaintiff incorporates the preceding paragraphs as if each was set forth herein at length.

ELECTRONICALLY FILED - 2022 Jul 01 6:02 PM - DORCHESTER - COMMON PLEAS - CASE#2022CP1801053

ELECTRONICALLY FILED - 2022 Jul 01 6:02 PM - DORCHESTER - COMMON PLEAS - CASE#2022CP1801053

64. Goodley engaged in unpermitted, harmful and offensive sexual assault and contact upon the person of Plaintiff in violation of South Carolina state law. Said conduct was undertaken while Goodley was an employee and agent of Defendants, while in the course and scope of agency/employment with said Defendants, and/or was ratified by said Defendants.

65. Massage Envy Franchising, LLC controls every aspect of Massage Envy Wescott, its employees and its day-to-day operations and as such, are vicariously liable for the acts of Massage Envy Wescott and Goodley.

66. Prior to the assault alleged above, upon information and belief, all Defendants knew, had reason to know, or were otherwise on notice of the unlawful sexual conduct of Goodley and/or other massage therapists at franchise locations nationwide. All Defendants failed to take reasonable steps and failed to implement reasonable safeguards to avoid acts of unlawful sexual conduct in the future by Goodley, including, but not limited to, preventing, or avoiding placement of Goodley in functions or environments in which contact with female customers in vulnerable positions was an inherent part of those functions or environments. Furthermore, at no time during the periods of time alleged did Defendants have in place a system or procedure to supervise and/or monitor employees, representatives, or agents to ensure they did not sexually assault female customers at franchise locations.

67. Moreover, incidents of psychologically unfit or mentally ill individuals in Massage Envy's service or employment were neither isolated nor unusual.

68. Upon information and belief, Massage Envy has, for years, failed to reprimand, punish, report, or otherwise sanction massage therapists which it knew or had reason to know were psychologically unfit and mentally ill, including, but not limited to, Goodley.

69.     Massage Envy's knowing acquiescence and silence with respect to the known, or reasonably knowable, activities of unfit and/or mentally ill individuals, including, but not limited to, Goodley, constituted a course of conduct through which acts of sexual perversion and the violation of female customers were condoned, approved, and effectively authorized.

70.     Through its failure to timely reprimand and sanction the acts referenced herein, and for all of the other reasons set forth in this Complaint including, without limitation, its failure to take the steps necessary to prevent the occurrence of such reprehensible acts, Defendants ratified said actions and, accordingly, are vicariously liable for the actions of Goodley.

71.     At all times material hereto, Goodley was acting within the course and scope of his employment, master-servant, or agency relationship with Defendants while he was providing massage services to Plaintiff. Accordingly, Defendants are liable for the acts and omissions of Goodley under the theories of respondeat superior, vicarious liability, master-servant, agency, and right of control.

72.     Defendants are vicariously liable to Plaintiff for injuries sustained as a result of the negligence, gross negligence, and willful and/or intentional misconduct of persons or entities whose conduct was under their control, or right to control, namely, Goodley, and which conduct directly and proximately caused Plaintiff's injuries.

73.     The Defendants' knowing acquiescence and silence with respect to the known, or reasonably knowable, activities of Goodley constituted a course of conduct through which acts of sexual perversion and the violation of Massage Envy customers, including Plaintiff, were condoned, approved, and effectively authorized.

74.     Through its failure to timely reprimand and sanction the acts referenced herein, and for all of the other reasons set forth in this Complaint including, without limitation, its failure to

take the steps necessary to prevent the occurrence of such reprehensible acts the Defendants ratified said actions and, accordingly, are vicariously liable for the actions of Goodley.

75.     As a result of the above-described conduct, Plaintiff has suffered and continues to suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation and loss of enjoyment of life; was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life; and/or has suffered a loss of income and/or loss of earning capacity and incurred and will continue to incur expenses for medical and psychological treatment, therapy and counseling.

76.     As a result of the above identified Defendants willful, wanton, reckless, negligent, and grossly negligent conduct, the sexual assault occurred causing the Plaintiff to sustain physical injury and great emotional upset, and distress as set forth below.

**FOR A SECOND CAUSE OF ACTION**
**NEGLIGENCE**
**(MASSAGE ENVY FRANCHISING, LLC and PGD INVESTMENTS, INC. and ABC, INC. 1 – 10 and JOHN DOES 1 - 10)**

77.     Plaintiff incorporates the preceding paragraphs as if each was set forth herein at length.

78.     At all times relevant herein, Julius Everette Goodley was an employee, agent, and/or servant of Defendants and they are liable for the harm to the Plaintiff resulting from the conduct of their employee, agent and/or servant's conduct because Defendants knew or should have known their massage therapist's unfitness and propensities prior to his assault on the Plaintiff and at the time of his hire.

79.     At all times relevant hereto, Julius Everette Goodley, a male massage therapist working at Massage Envy Wescott, was ultimately assigned to massage Plaintiff, Jane Doe, on

ELECTRONICALLY FILED - 2022 Jul 01 6:02 PM - DORCHESTER - COMMON PLEAS - CASE#2022CP1801053

July 3, 2019 and had been assigned to give massages to multiple female customers in his capacity as an employee and/or agent of Massage Envy Wescott and/or Massage Envy.

80.    At all times relevant hereto, Defendants authorized and/or entrusted Goodley to have skin-to-skin contact with female customers and to be alone with them while the customers were undressed and in a vulnerable position. Goodley was aided in his commission of the sexual assault described more fully above and below by virtue of his duties as a massage therapist because Plaintiff would already be undressed in a private room in a vulnerable position per the protocol of massage clients at Massage Envy franchises.

81.    The sexual assault described herein occurred on a massage table, on the premises operated and/or controlled by Massage Envy Wescott and/or Massage Envy.

82.    The sexual assault of Plaintiff occurred during normal business hours and in the course and scope of the performance of duties of Goodley while he was making skin-to-skin contact with Plaintiff.

83.    During the course of the massage while Jane Doe was disrobed and defenseless, Goodley sexually assaulted her as explained in detail above.

84.    Defendants explicitly and/or implicitly represented to the public in general, and to Plaintiff in particular, that the massage therapists, including Goodley, in its employ and service were not only psychologically fit but were therapists who could be entrusted with the safety and well-being of female customers.

85.    Defendants made these explicit and implied representations knowing that they were false and/or having reason to believe that they were false, and with the expectation that they would be relied upon by female customers making decisions regarding their engagement of massage/spa services.

86.     Defendants, by and through their agents, servants, and employees, knew or reasonably should have known of Goodley's dangerous and exploitive propensities and/or that Goodley was an unfit agent. It was foreseeable that if Defendants did not adequately exercise or provide the duty of care owed to female customers in their care, including, but not limited to Plaintiff, they would be vulnerable to sexual assaults by massage therapists, including Goodley.

87.     For years prior to the sexual assault of Plaintiff, as set forth in this Complaint, Defendants knew that there were at least several hundred allegations of sexual assaults by Massage Envy therapists occurring in numerous states.

88.     Defendants knew, and/or should have known, that those individuals who had sexually assaulted female customers, including Goodley, were likely to commit further acts of sexual assault.

89.     Defendants owed to the public in general, and to Plaintiff in particular, a duty to reasonably identify, remove, and/or report (to law enforcement authorities and/or to state massage therapy boards) individuals who it knew, or should have known, were unfit in its service and employ.

90.     Defendants owed to the public in general, and to Plaintiff in particular, a duty to reasonably supervise and/or monitor individuals who it knew, or should have known, were unfit in its service and employ.

91.     Defendants owed a duty to female customers, including Plaintiff herein, to provide a reasonably safe environment for them, to ensure their safety, and to provide reasonably necessary supervision and oversight for their safety and welfare while at Massage Envy franchise locations.

92.     As set forth in this Complaint, Defendants failed to fulfill their legal duty to provide a reasonably safe environment for female customers.

93.     Defendants had a duty to take reasonable steps to ensure that massage therapists at Massage Envy franchise locations were psychologically fit to provide massage therapy services to female customers at their franchise locations.

94.     To the contrary, Defendants hired, retained, transferred and/or re-hired individuals who it knew and/or had reason to know were unfit individuals, including, but not limited to, Goodley.

95.     Having been in the care of Defendants at the time under circumstances such as to deprive Plaintiff of her entitlement to safe care and protection, the Defendants owed to Plaintiff a duty to aid and/or protect her and to control the actions of third parties, as set forth in Restatement (Second) of Torts §§ 314A(4), 315.3

96.     Having been in the care of Defendants at the time under circumstances such as to deprive Plaintiff of her normal opportunities for protection, the Defendants owed to Plaintiff a duty to control the acts of its agents, servants, and/or employees.

97.     Despite actual knowledge of multiple instances in which unfit individuals were employed, transferred, re-hired and/or assigned to positions within Massage Envy franchise locations and despite the foreseeable risk that said unfit individuals would engage in repeated acts of sexual perversion and assault, Defendants did not have in place (or failed to enforce) adequate, reasonable, and necessary rules, regulations, policies, and procedures which could effectively identify, and deal with unfit individuals.

98.     At all times relevant hereto, Defendants did not have in place adequate, reasonable, and necessary rules, regulations, policies, and procedures which provided for the reporting to criminal authorities unfit individuals in the employ and/or service of Defendants.

99.     At all times relevant hereto, Defendants did not have in place adequate, reasonable,

ELECTRONICALLY FILED - 2022 Jul 01 6:02 PM - DORCHESTER - COMMON PLEAS - CASE#2022CP1801053

ELECTRONICALLY FILED - 2022 Jul 01 6:02 PM - DORCHESTER - COMMON PLEAS - CASE#2022CP1801053

and necessary rules, regulations, policies, and procedures which provided for the reporting to state boards of massage therapy the presence of unfit individuals in the employ and/or service of Defendant.

100.    As set forth in this Complaint, Defendants failed to fulfill its legal duty to protect Plaintiff and other female customers from the depraved and vile acts of its massage therapists, including Goodley.

101.    Defendants failed to take reasonable steps to ensure that massage therapists at Massage Envy franchise locations were psychologically fit to provide massage therapy services to female customers. These failures included the following:

     a.  Failure to investigate the background of massage therapists, including Julius Goodley in its employ or service of the Defendants;

     b.  Failure to have in place sufficient policies related to the hiring and screening of candidates including licensed massage therapists;

     c.  Failure to prohibit, restrict, or limit the activities of massage therapists suspected of sexual assault and/or those known to be sexual predators;

     d.  Failure to supervise, control, prohibit, restrict, or limit the activities of massage therapists suspected of sexual assault and/or those known to be unfit individuals;

     e.  Failure to prohibit, restrict, or limit the activities of massage therapists, including Julius Goodley, who were psychologically unfit and/or those known to be mentally ill;

     f.  Failure to reasonably and properly investigate allegations of sexual assault;

     g.  Failure to have in place sufficient policies related to the investigation of licensed massage therapists suspected of sexual assault and/or those known to be sexual predators;

     h.  Failure to properly train and instruct investigators;

     i.  Failure to have in place sufficient policies related to the training of licensed massage therapists;

ELECTRONICALLY FILED - 2022 Jul 01 6:02 PM - DORCHESTER - COMMON PLEAS - CASE#2022CP1801053

j.   Failure to have in place adequate standards of acceptable and unacceptable conduct;

k.   Failure to have in place sufficient policies to enforce standards of acceptable and unacceptable conduct;

l.   Negligently training franchisee employees regarding the prevention, investigation and reporting of sexual misconduct by massage therapists;

m.  Failure to have in place a sufficient training program or policies requiring a sufficient training program, for licensed massage therapists to prevent sexual misconduct by licensed massage therapists;

n.   Failure to have in place sufficient policies related to the supervision of licensed massage therapists;

o.   Negligently retaining license massage therapists after an allegation of sexual misconduct has been made;

p.   Failure to have sufficient policies related to retaining and/or termination of licensed massage therapists after an allegation of sexual misconduct has been made;

q.   Failure to designate competent investigators to evaluate complaints of sexual assault; and

r.   Failure to have in place standards for reporting acts of sexual misconduct to law enforcement authorities and/or state boards of massage therapy.

102.   Defendants' negligence in failing to take reasonable steps to ensure that Goodley was psychologically fit to provide massage therapy services to female customers at Massage Envy franchise locations proximately caused Plaintiff's injuries set forth in this Complaint.

103.   Defendants' negligence in failing to take reasonable steps to ensure that Goodley was psychologically fit to provide massage therapy services to female customers at Massage Envy franchise locations proximately caused Plaintiff's injuries set forth in this Complaint.

104.   Upon information and belief, Defendants employed deliberate strategies to conceal known sexual assaults by massage therapists in the employ or service of Defendants. These

strategies included the following:

    a. Conducting investigations which were designed to avoid establishing culpability of massage therapists accused of sexual assault;

    b. Failing to interview witnesses or persons who possessed, or may have possessed, information which might tend to establish the guilt of an accused massage therapist;

    c. Routinely transferring, assigning and/or re-hiring massage therapists suspected of sexually assaulting female customers to and/or at other Massage Envy locations;

    d. Purposefully failing to inform customers of the acts of sexual misconduct and/or allegations of same, despite circumstances which gave rise to a duty to disclose such information and in fact, recommending massage therapists who were known to have assaulted female customers; and

    e. Knowingly harboring individuals that were suspected and/or accused of sexual misconduct.

105. Defendants employed these strategies knowing that they exposed female customers, including Plaintiff, to a significant risk of serious physical and psychological harm, including a significant risk of sexual assault. Defendants' actions were willful, malicious, wanton, outrageous, abhorrent, abominable, revolting, vile, and unconscionable because Defendants were motivated by a desire to protect themselves at the expense of female customers who would foreseeably be sexually assaulted.

106. Through the negligent hiring and supervision by the Defendants, Goodley's unfitness and dangerous propensities proximately caused the resulting injuries to the Plaintiff.

107. The Defendants breached their duty of reasonable care in hiring and retaining Goodley because of the sensitive nature of the employment, which predictably involved a close degree of contact with vulnerable persons such as the Plaintiff.

108. Moreover, the negligent, reckless, intentional, outrageous, deliberately and recklessly indifferent and unlawful conduct of the Defendant included:

ELECTRONICALLY FILED - 2022 Jul 01 6:02 PM - DORCHESTER - COMMON PLEAS - CASE#2022CP1801053

a. Permitting massage therapists, including Goodley, to sexually assault female customers, including Plaintiff;

b. Permitting massage therapists, including Goodley, to engage in illegal sexual assaults of female customers, including Plaintiff, on the premises of Massage Envy franchise locations, including Massage Envy Wescott, during operating hours;

c. Failing to properly and adequately supervise and discipline its employees to prevent the sexual assault that occurred to Plaintiff;

d. Failing to adopt, enforce and/or follow adequate policies and procedures for the protection and reasonable supervision of female customers who engaged the services of Defendant, including Plaintiff, and, in the alternative, failing to implement and comply with such procedures which had been adopted;

e. Failing to implement, enforce and/or follow adequate protective and supervisory measures for the protection of female customers, including Plaintiff when Defendant knew or should have known of the risk;

f. Creating an environment that facilitated sexual assault by Goodley on Plaintiff;

g. Failing to adopt, enforce and/or follow policies and procedures to protect female customers against harmful contact by its massage therapists, including Goodley;

h. Breaching the duties imposed by Restatement (Second) of Torts, § 324A, as adopted in South Carolina;

i. Failing to warn Plaintiff of the risk of harm posed by Goodley after Defendant knew or should have known of such risk;

j. Violation of duties imposed by Restatement (Second) of Agency § 213, 219 and Restatement (Second) of Torts §317;

k. Failing to warn Plaintiff of the risk of harm that Plaintiff may suffer as a result of contact with Goodley;

l. Failing to warn or otherwise make reasonably safe the property which Defendant possessed and/or controlled, leading to the harm of Plaintiff;

m. Failing to adopt/implement and/or enforce policies and procedures for the reporting to law enforcement, state board of massage therapy and/or other authorities of sexual assaults by massage therapists;

ELECTRONICALLY FILED - 2022 Jul 01 6:02 PM - DORCHESTER - COMMON PLEAS - CASE#2022CP1801053

n.   Failing to report sexual assaults by massage therapists, including Goodley, to authorities;

o.   Violating its own policies and/or by-laws regarding sexual assaults by staff;

p.   Ignoring, concealing, or otherwise mitigating the seriousness of the known danger that Goodley posed;

q.   failing to warn Plaintiff of the risk of harm that Plaintiff may suffer as a result of contact with Goodley;

r.   failing to warn or otherwise make reasonably safe the property which Defendants possessed and/or controlled, leading to the harm of Plaintiff;

s.   Failing to prevent the sexual assault that was committed by Goodley on Plaintiff;

t.   Allowing Goodley to remain employed after knowing or should have known that he was psychologically unfit;

u.   Failing to properly supervise and/or discipline its employees;

v.   Failing to adequately and properly train its employees regarding sexual assaults of female customers by massage therapists;

w.   Negligently supervising and/or operating Massage Envy franchise locations, including Massage Envy Wescott;

x.   Failing to use adequate safety devices in their massage rooms to prevent assaults; and

y.   In such other ways as will become evident during discovery.

109.   As a result of the above-described conduct, Plaintiff has suffered and continues to suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation and loss of enjoyment of life; was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life; has incurred a loss of earnings and/or earning capacity and/or has incurred and will continue to incur expenses for medical and psychological treatment, therapy and counseling.

110.     As a result of the above identified Defendants willful, wanton, reckless, negligent, and grossly negligent conduct, the sexual assault occurred causing the Plaintiff to sustain physical injury and great emotional upset, and distress as set forth below.

### FOR A THIRD CAUSE OF ACTION
### NEGLIGENCE
### (MASSAGE ENVY WESCOTT and ROBERT W. LEE and CHRISTINE H. LEE and ABC, INC. 1 – 10 and JOHN DOES 1 - 10)

111.     Plaintiff incorporates the preceding paragraphs as if each was set forth herein at length.

112.     At all times relevant herein, Julius Everette Goodley was an employee, agent, and/or servant of Defendants and they are liable for the harm to the Plaintiff resulting from the conduct of their employee, agent and/or servant's conduct because Defendants knew or should have known their massage therapist's unfitness and propensities prior to his assault on the Plaintiff and at the time of his hire.

113.     At all times relevant hereto, Julius Everette Goodley, a male massage therapist working at Massage Envy Wescott, was ultimately assigned to massage Plaintiff, Jane Doe, on July 3, 2019 and had been assigned to give massages to multiple female customers in his capacity as an employee and/or agent of Massage Envy Wescott and/or Massage Envy.

114.     At all times relevant hereto, Defendants authorized and/or entrusted Goodley to have skin-to-skin contact with female customers and to be alone with them while the customers were undressed and in a vulnerable position. Goodley was aided in his commission of the sexual assault described more fully above and below by virtue of his duties as a massage therapist because Plaintiff would already be undressed in a private room in a vulnerable position per the protocol of massage clients at Massage Envy franchises.

115.     The sexual assault described herein occurred on a massage table, on the premises

ELECTRONICALLY FILED - 2022 Jul 01 6:02 PM - DORCHESTER - COMMON PLEAS - CASE#2022CP1801053

operated and/or controlled by Massage Envy Wescott and/or Massage Envy.

116. The sexual assault of Plaintiff occurred during normal business hours and in the course and scope of the performance of duties of Goodley while he was making skin-to-skin contact with Plaintiff.

117. During the course of the massage while Jane Doe was disrobed and defenseless, Goodley sexually assaulted her as explained in detail above.

118. Defendants explicitly and/or implicitly represented to the public in general, and to Plaintiff in particular, that the massage therapists, including Goodley, in its employ and service were not only psychologically fit but were therapists who could be entrusted with the safety and well-being of female customers.

119. Defendant made these explicit and implied representations knowing that they were false and/or having reason to believe that they were false, and with the expectation that they would be relied upon by female customers making decisions regarding their engagement of massage/spa services.

120. Defendants, by and through its agents, servants and employees, knew or reasonably should have known of Goodley's dangerous and exploitive propensities and/or that Goodley was an unfit agent. It was foreseeable that if Defendants did not adequately exercise or provide the duty of care owed to female customers in their care, including, but not limited to Plaintiff, they would be vulnerable to sexual assaults by Goodley.

121. For years prior to the sexual assault of Plaintiff, as set forth in this Complaint, Defendants knew that there were at least several hundred allegations of sexual assaults by Massage Envy therapists occurring in numerous states.

122. Defendant knew, and/or should have known, that those individuals who had

sexually assaulted female customers, including Goodley, were likely to commit further acts of sexual assault.

123. Defendant owed to the public in general, and to Plaintiff in particular, a duty to reasonably identify, remove, and/or report (to law enforcement authorities and/or to state massage therapy boards) individuals who it knew, or should have known, were unfit in its service and employ.

124. Defendants owed to the public in general, and to Plaintiff in particular, a duty to reasonably identify, remove, and/or report (to law enforcement authorities and/or to state massage therapy boards) individuals who it knew, or should have known, were unfit individuals in its service and employ, including Goodley.

125. Defendants owed to the public in general, and to Plaintiff in particular, a duty to reasonably supervise and/or monitor individuals who it knew, or should have known, were unfit individuals in its service and employ, including Goodley.

126. Defendants owed a duty to female customers, including Plaintiff herein, to provide a reasonably safe environment for them, to ensure their safety, and to provide reasonably necessary supervision and oversight for their safety and welfare while at Massage Envy franchise locations.

127. As set forth in this Complaint, Defendants failed to fulfill their legal duty to provide a reasonably safe environment for female customers.

128. Defendants had a duty to take reasonable steps to ensure that massage therapists at Massage Envy franchise locations were psychologically fit to provide massage therapy services to female customers at their franchise locations.

129. To the contrary, Defendants hired, retained, transferred and/or re-hired individuals who it knew and/or had reason to know were unfit individuals, including, but not limited to,

33

ELECTRONICALLY FILED - 2022 Jul 01 6:02 PM - DORCHESTER - COMMON PLEAS - CASE#2022CP1801053

Goodley.

130.     Having been in the care of Defendants at the time under circumstances such as to deprive Plaintiff of her entitlement to safe care and protection, Defendants owed to Plaintiff a duty to aid and/or protect her and to control the actions of third parties, as set forth in Restatement (Second) of Torts §§ 314A(4), 315.

131.     Defendants did not have in place (or failed to enforce) adequate, reasonable, and necessary rules, regulations, policies, and procedures which could effectively identify, and deal with unfit individuals, including Goodley.

132.     Having been in the care of Defendant at the time under circumstances such as to deprive Plaintiff of her normal opportunities for protection, the Defendant owed to Plaintiff a duty to control the acts of its agents, servants, and/or employees.

133.     Despite actual knowledge of multiple instances in which unfit individuals were employed, transferred, re-hired and/or assigned to positions within Massage Envy franchise locations and despite the foreseeable risk that said unfit individuals would engage in repeated acts of sexual perversion and assault, Defendant did not have in place (or failed to enforce) adequate, reasonable, and necessary rules, regulations, policies, and procedures which could effectively identify, and deal with unfit individuals.

134.     At all times relevant hereto, Defendants did not have in place adequate, reasonable, and necessary rules, regulations, policies, and procedures for the removal of sexually unfit individuals, in their employ, including Goodley.

135.     At all times relevant hereto, Defendants did not have in place adequate, reasonable, and necessary rules, regulations, policies, and procedures which provided for the reporting to criminal authorities unfit individuals, including Goodley, in the employ and/or service of

ELECTRONICALLY FILED - 2022 Jul 01 6:02 PM - DORCHESTER - COMMON PLEAS - CASE#2022CP1801053

Defendants.

136. At all times relevant hereto, Defendant did not have in place adequate, reasonable, and necessary rules, regulations, policies, and procedures which provided for the reporting to the state board of massage therapy the presence of unfit individuals, including Goodley, in the employ and/or service of Defendants.

137. As set forth in this Complaint, Defendants failed to fulfill their legal duty to protect Plaintiff and other female customers from the depraved and vile acts of its massage therapist, Goodley.

138. Defendants failed to take the reasonable steps to ensure that massage therapists at Massage Envy were psychologically fit to provide massage therapy services to female customers. These failures included the following:

   a. Failure to investigate the background of massage therapists, including Julius Goodley in its employ or service of the Defendants;

   b. Failure to have in place sufficient policies related to the hiring and screening of candidates including licensed massage therapists;

   c. Failure to prohibit, restrict, or limit the activities of massage therapists suspected of sexual assault and/or those known to be sexual predators;

   d. Failure to supervise, control, prohibit, restrict, or limit the activities of massage therapists suspected of sexual assault and/or those known to be unfit individuals;

   e. Failure to prohibit, restrict, or limit the activities of massage therapists, including Julius Goodley, who were psychologically unfit and/or those known to be mentally ill;

   f. Failure to reasonably and properly investigate allegations of sexual assault;

   g. Failure to have in place sufficient policies related to the investigation of licensed massage therapists suspected of sexual assault and/or those known to be sexual predators;

   h. Failure to properly train and instruct investigators;

i.   Failure to have in place sufficient policies related to the training of licensed massage therapists;

j.   Failure to have in place adequate standards of acceptable and unacceptable conduct;

k.   Failure to have in place sufficient policies to enforce standards of acceptable and unacceptable conduct;

l.   Negligently training franchisee employees regarding the prevention, investigation and reporting of sexual misconduct by massage therapists;

m.   Failure to have in place a sufficient training program or policies requiring a sufficient training program, for licensed massage therapists to prevent sexual misconduct by licensed massage therapists;

n.   Failure to have in place sufficient policies related to the supervision of licensed massage therapists;

o.   Negligently retaining license massage therapists after an allegation of sexual misconduct has been made;

p.   Failure to have sufficient policies related to retaining and/or termination of licensed massage therapists after an allegation of sexual misconduct has been made;

q.   Failure to designate competent investigators to evaluate complaints of sexual assault; and

r.   Failure to have in place standards for reporting acts of sexual misconduct to law enforcement authorities and/or state boards of massage therapy.

139.   Defendants' negligence in failing to take reasonable steps to ensure that Goodley was psychologically fit to provide massage therapy services to female customers at Massage Envy franchise locations proximately caused Plaintiff's injuries set forth in this Complaint.

140.   Defendants' negligence in failing to take reasonable steps to ensure that Goodley was psychologically fit to provide massage therapy services to female customers at Massage Envy franchise locations proximately caused Plaintiff's injuries set forth in this Complaint.

141.     Upon information and belief, Defendants employed deliberate strategies to conceal known sexual assaults by massage therapists in the employ or service of Defendants. These strategies included the following:

a.   Conducting investigations which were designed to avoid establishing culpability of massage therapists accused of sexual assault;

b.   Failing to interview witnesses or persons who possessed, or may have possessed, information which might tend to establish the guilt of an accused massage therapist;

c.   Routinely transferring, assigning and/or re-hiring massage therapists suspected of sexually assaulting female customers to and/or at other Massage Envy locations;

d.   Purposefully failing to inform customers of the acts of sexual misconduct and/or allegations of same, despite circumstances which gave rise to a duty to disclose such information and in fact, recommending massage therapists who were known to have assaulted female customers; and

e.   Knowingly harboring individuals that were suspected and/or accused of sexual misconduct.

142.     Defendants employed these strategies knowing that they exposed female customers, including Plaintiff, to a significant risk of serious physical and psychological harm, including a significant risk of sexual assault. Defendants' actions were willful, malicious, wanton, outrageous, abhorrent, abominable, revolting, vile, and unconscionable because Defendants were motivated by a desire to protect themselves at the expense of female customers who would foreseeably be sexually assaulted.

143.     Through the negligent hiring and supervision by the Defendants, Goodley's unfitness and dangerous propensities proximately caused the resulting injuries to the Plaintiff.

144.     The Defendants breached their duty of reasonable care in hiring and retaining Goodley because of the sensitive nature of the employment, which predictably involved a close

ELECTRONICALLY FILED - 2022 Jul 01 6:02 PM - DORCHESTER - COMMON PLEAS - CASE#2022CP1801053

degree of contact with vulnerable persons such as the Plaintiff.

145.    Moreover, the negligent, reckless, intentional, outrageous, deliberately and recklessly indifferent and unlawful conduct of Defendant, as set forth above and herein, further consisted of:

    a.  Permitting massage therapists, including Goodley, to sexually assault female customers, including Plaintiff;

    b.  Permitting massage therapists, including Goodley, to engage in illegal sexual assaults of female customers, including Plaintiff, on the premises of Massage Envy franchise locations, including Massage Envy Wescott, during operating hours;

    c.  Failing to properly and adequately supervise and discipline its employees to prevent the sexual assault that occurred to Plaintiff;

    d.  Failing to adopt, enforce and/or follow adequate policies and procedures for the protection and reasonable supervision of female customers who engaged the services of Defendant, including Plaintiff, and, in the alternative, failing to implement and comply with such procedures which had been adopted;

    e.  Failing to implement, enforce and/or follow adequate protective and supervisory measures for the protection of female customers, including Plaintiff when Defendant knew or should have known of the risk;

    f.  Creating an environment that facilitated sexual assault by Goodley on Plaintiff;

    g.  Failing to adopt, enforce and/or follow policies and procedures to protect female customers against harmful contact by its massage therapists, including Goodley;

    h.  Breaching the duties imposed by Restatement (Second) of Torts, § 324A, as adopted in South Carolina;

    i.  Failing to warn Plaintiff of the risk of harm posed by Goodley after Defendant knew or should have known of such risk;

    j.  Violation of duties imposed by Restatement (Second) of Agency § 213, 219 and Restatement (Second) of Torts §317;

    k.  Failing to warn Plaintiff of the risk of harm that Plaintiff may suffer as a result of contact with Goodley;

ELECTRONICALLY FILED - 2022 Jul 01 6:02 PM - DORCHESTER - COMMON PLEAS - CASE#2022CP1801053

l. Failing to warn or otherwise make reasonably safe the property which Defendant possessed and/or controlled, leading to the harm of Plaintiff;

m. Failing to adopt/implement and/or enforce policies and procedures for the reporting to law enforcement, state board of massage therapy and/or other authorities of sexual assaults by massage therapists;

n. Failing to report sexual assaults by massage therapists, including Goodley, to authorities;

o. Violating its own policies and/or by-laws regarding sexual assaults by staff;

p. Ignoring, concealing, or otherwise mitigating the seriousness of the known danger that Goodley posed;

q. failing to warn Plaintiff of the risk of harm that Plaintiff may suffer as a result of contact with Goodley;

r. failing to warn or otherwise make reasonably safe the property which Defendants possessed and/or controlled, leading to the harm of Plaintiff;

s. Failing to prevent the sexual assault that was committed by Goodley on Plaintiff;

t. Allowing Goodley to remain employed after knowing or should have known that he was psychologically unfit;

u. Failing to properly supervise and/or discipline its employees;

v. Failing to adequately and properly train its employees regarding sexual assaults of female customers by massage therapists;

w. Negligently managing and/or operating Massage Envy franchise locations, including Massage Envy Wescott;

x. Failing to use adequate safety devices in their massage rooms to prevent assaults; and

a. In such other ways as will become evident during discovery.

146. As a result of the above-described conduct, Plaintiff has suffered and continues to suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation and loss of enjoyment of life;

ELECTRONICALLY FILED - 2022 Jul 01 6:02 PM - DORCHESTER - COMMON PLEAS - CASE#2022CP1801053

was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life; and/or has incurred a loss of earnings and/or earning capacity and/or has incurred and will continue to incur expenses for medical and psychological treatment, therapy and counseling.

147.   As a result of the above identified Defendants willful, wanton, reckless, negligent, and grossly negligent conduct, the sexual assault occurred causing the Plaintiff to sustain physical injury and great emotional upset, and distress as set forth below.

**FOR A FOURTH CAUSE OF ACTION**
**NEGLIGENCE PER SE**
**(ALL DEFENDANTS)**

148.   The Plaintiff incorporates the preceding paragraphs as if fully set forth herein verbatim.

149.   Defendants' involving, permitting, and/or failing to prevent indecent contact between Goodley and Plaintiff constitutes per se violations of Title 16, Chapter 3, § 654(a) of the South Carolina Criminal Code Relating to Criminal Sexual Misconduct.

150.   Defendants' involving, permitting, and/or failing to prevent indecent contact between Goodley and Plaintiff constitutes per se violations of Title 16, Chapter 3, § 654(b) of the South Carolina Criminal Code Relating to Criminal Sexual Misconduct.

151.   Defendants' involving, permitting, and/or failing to report Goodley's misconduct as required by Massage/Bodywork Practice Act Rule §40-30-230(5) – *Misconduct* constitutes per se violations of same.

152.   Defendants' involving, permitting, and/or failing to report Goodley's misconduct as required by Massage/Bodywork Practice Act Rule §40-30-230(7) – *Misconduct* constitutes per se violations of same.

153.   As a direct result of the aforementioned conduct, Plaintiff suffered severe and

permanent harm as described above.

154.    As a result of the above identified Defendants willful, wanton, reckless, negligent, and grossly negligent conduct, the sexual assault occurred causing the Plaintiff to sustain physical injury and great emotional upset, and distress as set forth below.

**FOR A FIFTH CAUSE OF ACTION**
**RECKLESS INFLICTION OF SEVERE EMOTIONAL DISTRESS**
**(ALL DEFENDANTS)**

155.    The Plaintiff incorporates the preceding paragraphs as if fully set forth herein verbatim.

156.    Defendants explicitly and/or implicitly represented to the public in general, and to Plaintiff in particular, that the massage therapists, including Goodley, in its employ and service were not only psychologically fit but were therapists who could be entrusted with the safety and well-being of female customers.

157.    Defendants made these explicit and implied representations knowing that they were false and/or having reason to believe that they were false, and with the expectation that they would be relied upon by female customers making decisions regarding their engagement of massage/spa services.

158.    The Defendants led the Plaintiff to believe that the object of the business transaction was for the Defendants to provide the Plaintiff with a massage and comfort. This representation was false and was intended by Defendants to deceive the Plaintiff, to gain the Plaintiff's trust and confidence, and to obtain control over her for the purpose of taking advantage of her in an illicit, invasive, and harmful manner.

159.    The acts and conduct of Defendants, as heretofore alleged, were done recklessly, willfully, maliciously, outrageously, deliberately, and purposefully and were so extreme and

ELECTRONICALLY FILED - 2022 Jul 01 6:02 PM - DORCHESTER - COMMON PLEAS - CASE#2022CP1801053

outrageous as to exceed all possible bounds of decency knowing that an assault would cause the Plaintiff severe emotional distress. Such acts were done with reckless disregard of the probability of causing the Plaintiff severe and extreme emotional distress and the acts did in fact result in the Plaintiff suffering severe and extreme emotional distress.

160.     As a direct and proximate result of the Defendants' acts and conduct, the Plaintiff has suffered severe emotional distress resulting in fear, anxiety, trauma, depression, emotional upset, crying, nervousness, sleeplessness, and disruption of lifestyle.

161.     As a result of the above identified Defendants willful, wanton, reckless, negligent, and grossly negligent conduct, the sexual assault occurred causing the Plaintiff to sustain physical injury and great emotional upset, and distress as set forth below.

**FOR A SIXTH CAUSE OF ACTION**
**INTENTIONAL INFLICTION OF SEVERE EMOTIONAL DISTRESS**
**(ALL DEFENDANTS)**

162.     Plaintiff incorporates the averments of the preceding paragraphs as if each was set forth herein at length.

163.     As set forth above, Defendants concealed and/or suppressed material facts concerning the safety of their customers. Defendants knew that employees and/or agents, namely, massage therapists at franchise locations, were sexually assaulting and exploiting customers, but Defendants concealed those material facts. Defendants recklessly assigned these sexual predators masked as massage therapists to consumers in the United States, even though Defendants knew, or should have known, at the time of the scheduling of appointments, that employees and/or agents were sexually assaulting and/or exploiting customers. Plaintiff had no knowledge of these issues at the time that they scheduled/attended their massages at Massage Envy or purchased services at

Massage Envy franchise locations.

164.     Defendants made material omissions and/or affirmative misrepresentations regarding the safety of their business, employees and/or agents in massaging customers, including Plaintiff.

165.     Defendants each knew these representations were false when they were made.

166.     Defendants intended for customers, including Plaintiff, to rely on their representations and/or omissions.

167.     Plaintiff, in fact relying on the false representations, purchased massages that were, in fact, defective, unsafe, and unreliable, because Defendants knew their employees and/or agents were sexually assaulting customers yet, concealed this information from the public, including Plaintiff.

168.     Defendants had a duty to disclose these safety issues to Plaintiff, the public, and the South Carolina Massage/Bodywork Panel, but failed to do so.

169.     Defendants had a duty to disclose the true facts about the safety of its business and customers because Defendants had superior knowledge and access to those facts, and the facts were not known to or reasonably discoverable to Plaintiff.  Defendants knew that Plaintiff had no knowledge of Defendants' massage therapists sexually assaulting and exploiting customers and dangers within their company that may result in sexual assaults or exploitation by massage therapists, and Plaintiff did not have an equal opportunity to discover the facts to inform them of those defects.  Indeed, Plaintiff trusted Defendants not to sell them massage services that were dangerous, criminal, and defective or that violated South Carolina law.

170.     Defendants had a duty to disclose to Plaintiff that the massage services were defective, unsafe, and dangerous because Plaintiff relied on Defendants' representations that

ELECTRONICALLY FILED - 2022 Jul 01 6:02 PM - DORCHESTER - COMMON PLEAS - CASE#2022CP1801053

Plaintiff would be safe during the massages that they purchased.

171.    The aforementioned concealment was material, because if it had been disclosed, Plaintiff would not have bought massage services at Massage Envy.

172.    The aforementioned representations were also material because they were facts that would typically be relied on by a person purchasing massage services. Defendants each knew or recklessly disregarded that their representations and/or statements on the safety of the Plaintiff and general public were false.

173.    By misrepresenting and/or failing to disclose these material facts, Defendants intended to induce Plaintiff to purchase massages at Massage Envy.

174.    As a result of the above identified Defendants willful, wanton, reckless, negligent, and grossly negligent conduct, the sexual assault occurred causing the Plaintiff to sustain physical injury and great emotional upset, and distress as set forth below.

**FOR A SEVENTH CAUSE OF ACTION**
**UNFAIR TRADE PRACTICES**
**(ALL DEFENDANTS)**

175.    Plaintiff incorporates herein by reference, as though set forth in full, all preceding Paragraphs of this Complaint.

176.    As detailed above, Defendants have engaged in and continue to engage in "business activities" and practices in violation of the South Carolina Unfair Trade Practices Act (SCUPTA), Stat. § 39-5-20 by inter alia, actively concealing and failing to warn customers about the inadequacy of their background screening of massage therapists, as well as their failure to monitor the conduct of massage therapists after hire.

177.    Defendants also misled consumers about the safety of their services by falsely claiming they had a "zero tolerance" policy relating to sexual misconduct by massage therapists.

ELECTRONICALLY FILED - 2022 Jul 01 6:02 PM - DORCHESTER - COMMON PLEAS - CASE#2022CP1801053

Defendants misled consumers that the massage therapists in their employ and service were not only psychologically fit but were therapists who could be entrusted with the safety and well-being of female customers.

178. Defendants have actively concealed and failed to disclose this information knowing that such information is material to a reasonable consumer's decision to use Massage Envy for massage services, and thereby misrepresented the safety of massages offered by Massage Therapy.

179. Defendants' business practices are unfair and/or deceptive and should be enjoined.

180. Defendants have engaged in unfair or deceptive acts or practices intended to result in consumers agreeing to pay Defendants for massage services in violation of SCUPTA Stat. § 39-5-20.

181. Defendants knew and/or should have known that their concealment and/or omissions of material fact concerning their safety representations to consumers, including their screening of massage therapists, monitoring of massage therapists' conduct after hire, and safety during massages that were material and likely to mislead the public.

182. Defendants have engaged in and continue to engage in unlawful, fraudulent and unfair practices, which are substantially likely to mislead Plaintiff and all of Defendants' customers, by intentionally misrepresenting that their Massage Envy franchise locations were safe from sexual assaults, when in fact they knew they were not and their statements were false.

183. Plaintiff is informed and believe and thereon allege that Defendants' conduct resulted in profits and pecuniary gain received from Plaintiff and all of Defendants' customers who contracted with Defendants and/or purchased massage services from Defendants.

184. The business acts and practices of Defendants are unlawful, unfair and deceptive within the meaning of the consumer protection statutes because, inter alia, Defendants engaged in

ELECTRONICALLY FILED - 2022 Jul 01 6:02 PM - DORCHESTER - COMMON PLEAS - CASE#2022CP1801053

fraud by intentionally misrepresenting that their Massage Envy franchise locations were safe from sexual assaults, when in fact they knew they were not, and their statements were false. Further, Defendants have engaged in, and continue to engage in the following unlawful, unfair and/or fraudulent business practices in violation of SCUPTA Stat. § 39-5-20: sexual battery; sexual harassment; civil conspiracy; intentional infliction of emotional distress; negligence and negligent supervision and hiring; and fraud, concealment and misrepresentation.

185.    As a direct and proximate result of Defendants' conduct, as set forth herein, Defendants have received ill-gotten gains and/or profits, including, but not limited to money. Therefore, Defendants were and are unjustly enriched.

186.    Plaintiff engaged counsel to prosecute this action and pursuant to SCUPTA Stat. § 39-5-20 reasonable attorney fees should be awarded.

187.    Plaintiff's assessed damages should be rendered in favor of Plaintiff and against Defendants for treble the amount fixed by verdict pursuant to SCUPTA Stat. § 39-5-140.

188.    Plaintiff is informed and believe and based thereon allege that Defendants' illegal acts as described above are a serious and continuing threat to Plaintiff and the public. If Defendants are allowed to continue their unfair and unlawful acts, Plaintiff and the public will suffer further immediate and irreparable injury, loss and damage. Plaintiff is further informed and believes, and based thereon alleges, that, in the absence of a temporary restraining order and preliminary and permanent injunction as allowed by SCUPTA Stat. § 39-5-140 and as prayed for below, Defendants will continue to unfairly and unlawfully compete.

189.    As a result of the above identified Defendants willful, wanton, reckless, negligent, and grossly negligent conduct, the sexual assault occurred causing the Plaintiff to sustain physical injury and great emotional upset, and distress as set forth below.

ELECTRONICALLY FILED - 2022 Jul 01 6:02 PM - DORCHESTER - COMMON PLEAS - CASE#2022CP1801053

**FOR A EIGHTH CAUSE OF ACTION**
**FRAUDULENT CONCEALMENT**
**(ALL DEFENDANTS)**

190.     Plaintiff incorporates the averments of the preceding paragraphs as if each was set forth herein at length.

191.     As set forth above, Defendants concealed and/or suppressed material facts concerning the safety of their customers. Defendants knew that employees and/or agents, namely, massage therapists at franchise locations, were sexually assaulting and exploiting customers, but Defendants concealed those material facts. Defendants recklessly assigned these sexual predators masked as massage therapists to consumers in the United States, even though Defendants knew, or should have known, at the time of the scheduling of appointments, that employees and/or agents were sexually assaulting and/or exploiting customers. Plaintiff had no knowledge of these issues at the time that they scheduled/attended their massages at Massage Envy or purchased services at Massage Envy franchise locations.

192.     Defendants made material omissions and/or affirmative misrepresentations regarding the safety of their business, employees and/or agents in massaging customers, including Plaintiff.

193.     Defendants each knew these representations were false when they were made.

194.     Defendants intended for customers, including Plaintiff, to rely on their representations and/or omissions.

195.     Plaintiff, in fact relying on the false representations, purchased massages that were, in fact, defective, unsafe, and unreliable, because Defendants knew their employees and/or agents were sexually assaulting customers yet, concealed this information from the public, including Plaintiff.

196. Defendants had a duty to disclose these safety issues to Plaintiff, the public, and the South Carolina Massage/Bodywork Panel, but failed to do so.

197. Defendants had a duty to disclose the true facts about the safety of its business and customers because Defendants had superior knowledge and access to those facts, and the facts were not known to or reasonably discoverable to Plaintiff. Defendants knew that Plaintiff had no knowledge of Defendants' massage therapists sexually assaulting and exploiting customers and dangers within their company that may result in sexual assaults or exploitation by massage therapists, and Plaintiff did not have an equal opportunity to discover the facts to inform them of those defects. Indeed, Plaintiff trusted Defendants not to sell them massage services that were dangerous, criminal, and defective or that violated South Carolina law.

198. Defendants had a duty to disclose to Plaintiff that the massage services were defective, unsafe, and dangerous because Plaintiff relied on Defendants' representations that Plaintiff would be safe during the massages that they purchased.

199. The aforementioned concealment was material, because if it had been disclosed, Plaintiff would not have bought massage services at Massage Envy.

200. The aforementioned representations were also material because they were facts that would typically be relied on by a person purchasing massage services. Defendants each knew or recklessly disregarded that their representations and/or statements on the safety of the Plaintiff and general public were false.

201. By misrepresenting and/or failing to disclose these material facts, Defendants intended to induce Plaintiff to purchase massages at Massage Envy.

202. As a result of the above identified Defendants willful, wanton, reckless, negligent, and grossly negligent conduct, the sexual assault occurred causing the Plaintiff to

ELECTRONICALLY FILED - 2022 Jul 01 6:02 PM - DORCHESTER - COMMON PLEAS - CASE#2022CP1801053

sustain physical injury and great emotional upset, and distress as set forth below.

WHEREFORE Plaintiff prays for judgment against the Defendants on all causes of action in such an amount of actual damages, punitive damages, attorney fees and costs of this action to which they may be entitled, and for any other relief this Honorable Court deems just and proper.

FROST LAW GROUP, LLC

s/ Jack C. Frost
Jack C. Frost, Esq.
SC Bar # 103633
PO Box 1986
Summerville, SC 29484
Office: (843) 419-6653
Fax: (843) 419-6674

LAFFEEY, BUCCI & KENT, LLP

s/ Brian D. Kent
Brian D. Kent, Esq.

s/ M. Stewart Ryan
M. Stewart Ryan, Esq.
1100 Ludlow Street
Suite 300
Philadelphia, PA 19107
Office: (215) 399-9255
Fax: (215) 241-8700

Attorneys for the Plaintiff

July 1, 2022
Summerville, South Carolina

ELECTRONICALLY FILED - 2022 Jul 01 6:02 PM - DORCHESTER - COMMON PLEAS - CASE#2022CP1801053

**EXHIBIT "A"**

ELECTRONICALLY FILED - 2022 Jul 05 3:44 PM - DORCHESTER - COMMON PLEAS - CASE#2022CP1801053

ELECTRONICALLY FILED - 2022 Jul 05 3:44 PM - DORCHESTER - COMMON PLEAS - CASE#2022CP1801053



## More Than 180 Women Have Reported Sexual Assaults At Massage Envy

Across the US, people go to Massage Envy spas in search of a soothing, affordable escape. More than 180 people say what they got instead was sexual assault. But the billion-dollar company says that's not its problem to solve. A BuzzFeed News investigation.



**Katie J.M. Baker**
BuzzFeed News Reporter

Posted on November 26, 2017, at 11:23 a.m. ET

**On May 2, 2015,** Susan Ingram lay facedown in the dark at her local Massage Envy in West Chester, Pennsylvania, one of the franchise's nearly 1,200 spas nationwide. It was her seventh session with James Deiter, a massage therapist whom the spa had enthusiastically recommended. By now, Ingram trusted Deiter, and she closed her eyes and relaxed as he worked her muscles. Then, without warning, Deiter ground his erect penis against Ingram's body. He groped her breasts. He put his fingers in and out of her vagina.

Ingram lay there, frozen in fear and disbelief, until the session was over. After driving home sobbing, she called the spa to report the sexual assault. She was shocked when the manager refused to interrupt the session Deiter was having with a female client, Ingram said, or to connect Ingram with the spa's owner.

EXHIBIT A



Susan Ingram
*Jillian Guyette for BuzzFeed News*

"I said to her, 'Nicole, he stuck his fingers in my vagina less than an hour ago,'" she later underlined recounted in court. She begged the manager to get Deiter's client out of the massage room immediately. "She said she could not do that, and she invited me in to talk about my services," Ingram added.

Frustrated, Ingram called the police, who interviewed Deiter that afternoon. He quickly admitted to assaulting not just Ingram but other Massage Envy clients as well. "I need help," he confessed. The next year, Deiter pleaded guilty to sexually molesting a total of nine women while working at Massage Envy from fall 2014 to spring 2015.

> "I said to her, 'Nicole, he stuck his fingers in my vagina less than an hour ago.'"

Two of those women had tried to warn the spa about Deiter before Ingram had, court records show. Three months before Ingram's assault, one woman told the spa that Deiter had touched her genitals. One month before Ingram's assault, another woman reported he had touched her breasts. The spa decided their allegations weren't credible, in part because, like Ingram, both women had made them over the phone and wouldn't return to the spa to discuss the events in person. Lawyers would later ask the spa owner and another clinic manager why they would judge an alleged sexual assault victim on her willingness to return to the scene of the crime.

"I was following the policy of Massage Envy," the owner said, "and therefore I thought it was appropriate."

Massage Envy, the first and by far the largest chain of massage franchises in the country, is a billion-dollar business that promises trustworthy services at an affordable price. But BuzzFeed News found that more than 180 people have filed sexual assault lawsuits, police reports, and state board complaints against Massage Envy spas, their employees, and the national company. Like Susan Ingram, many say their claims were mishandled or ignored by employees and owners of individual Massage Envy spas, and by the national company itself.

Dozens of women reported digital and oral penetration. One Oregon woman said her massage therapist forced his entire fist into her vagina before ejaculating in her face. In Florida, a woman said she tried to push away her massage therapist as he licked her vagina. Over 100 reported that massage therapists groped their genitals, groped their breasts, or committed other explicit violations, such as the California woman who said she opened her eyes during a prenatal massage to find her massage therapist sucking on her nipple.

ELECTRONICALLY FILED - 2022 Jul 05 3:44 PM - DORCHESTER - COMMON PLEAS - CASE#2022CP1801053

These claims represent only a sliver of the tens of millions of services Massage Envy says its franchises have provided. Still, lawyers for aggrieved spa clients told BuzzFeed News that there are more cases where women report abuse by massage therapists to police but no arrest is made, and that Massage Envy spas sometimes offer a settlement before a suit is filed, leaving no public record. Statistically, most victims of sexual assault don't report at all. Even Massage Envy's own orientation manual, discussing client satisfaction in general, has warned new employees that "Only 4% of upset customers will tell you when there is a problem."

> **"I was following the policy of Massage Envy, and therefore I thought it was appropriate."**

Massage Envy told BuzzFeed News that it would not be "appropriate to respond point-by-point" to questions "because of pending litigation" and the confidential documents involved. But overall, Melanie Hansen, general counsel of Massage Envy Franchising, said the company has worked hard to create the industry's "most stringent, rigorous policies" for hiring, screening, and training therapists. "We hold franchise owners accountable to our policies and, when we say nothing is more important to us than treating clients with respect and giving them a safe, professional experience, we mean it," she said in an email to BuzzFeed News.

But a review by BuzzFeed News found the company's policies on reporting improper conduct do more to protect the company brand than to ensure customer complaints are handled appropriately. Customers have been violated in shocking ways, then seen their reports brushed aside, while offending therapists have been allowed to keep their professional standing with no consequences.

> **"Nothing is more important to us than treating clients with respect."**

In most states, massage facilities have no legal obligation to report sexual assault claims made on their premises. Still, leaders in the field say massage providers should recognize their inherent duty to address the issue as fully and as expeditiously as possible. The American Massage Therapy Association says it "strongly believes that any massage therapist who steps over the line to inappropriate touch should face the legal consequences." The association stressed that victims should determine how to proceed but encouraged "anyone who feels there may be inappropriate behavior to call the local police immediately."

Ben Benjamin, coauthor of the influential book *The Ethics of Touch*, puts it more bluntly: "If a person says, 'Someone put their finger in my vagina,' of course you call the police."

Even if employees aren't sure whether a client has been the victim of a crime, they should encourage the person to file formal charges with law enforcement or state regulatory boards, massage experts said. Victims' rights advocates said facilities should prominently display their reporting policies and hire specially trained, independent consultants if criminal allegations arise.

Massage Envy Franchising doesn't require its spas to take any of those steps. Except in the few places where local laws might demand it, the company does not compel its franchisees to notify law enforcement or to hire qualified investigators to help determine what happened. This holds true regardless of the seriousness of the allegation, even if it involves rape.

What the company tells franchisees they must do is conduct their own "prompt, fair, and thorough" investigation of any such claims. But it provides almost no guidance on how to do so.

Although experiences can vary widely from spa to spa, some former franchise owners and employees from California to Maryland said they didn't feel capable of handling such cases themselves.

"Honestly, they don't really prepare you for that serious of a scenario," said Kendra Simone, who oversaw more than a dozen Massage Envy spas as an operations director

ELECTRONICALLY FILED - 2022 Jul 05 3:44 PM - DORCHESTER - COMMON PLEAS - CASE#2022CP180I063

from 2010 to 2016. Employees learned how to ensure incidents didn't "escalate" into negative publicity, she said, but not how to investigate potential criminal behavior.

The internal review policy "is not in place to protect the client," said Kate Hardy, who worked on and off as a front desk associate and then clinic manager in Montana from 2014 until June 2017. "It's in place to protect the company. It's centered around defusing the situation so the client doesn't call the police. You don't want cop cars showing up at your location the next day."

> **The company's policy "is not in place to protect the client," one former employee said. "It's in place to protect the company."**

Simone said her spas never faced any sexual assault allegations. "If it did happen, do I have complete faith that the managers working at those locations would handle it appropriately, and that they have the proper tools to do that?" she asked. "Probably not."

In court filings and in public statements, Massage Envy corporate says it isn't liable for sexual assaults that take place at the spas because of the nature of the franchise arrangement. Spas control their own day-to-day operations, Hansen said, including figuring out how best to investigate inappropriate conduct.

Attorneys for former Massage Envy clients have made a different argument. They say that though the spas are independently owned, it's the parent company that trains employees in Massage Envy policies, sets operational standards such as the need to investigate internally, and monitors the progress of those investigations — and that as a result, the parent company should be held accountable for those policies' failures.

**Got a tip? You can email tips@buzzfeed.com. To learn how to reach us securely, go to tips.buzzfeed.com.**

It appears that Massage Envy Franchising has never had to answer in open court to a victim of sexual assault at one of its spas. Ingram's civil lawsuit may change that. Her trial is scheduled to start in January.

Meanwhile, clients continue to be sexually assaulted at Massage Envy spas. Some have kept massage therapists on staff even after multiple misconduct complaints. Others have quietly fired therapists without reporting their offenses to police or state regulatory boards, allowing the therapists to move on to new professional opportunities with a clean record.

Ingram still wonders whether Deiter would be working as a massage therapist today if she hadn't decided to call the police herself.

"Massage Envy is a partner in crime," Ingram said. "They had every opportunity, on multiple occasions, to remove him from his position, and they chose not to."

ELECTRONICALLY FILED - 2022 Jul 05 3:44 PM - DORCHESTER - COMMON PLEAS - CASE#2022CP1801053

ELECTRONICALLY FILED - 2022 Jul 05 3:44 PM - DORCHESTER - COMMON PLEAS - CASE#2022CP1801053

A Massage Envy storefront in Richmond, Virginia.
*Julia Rendleman for BuzzFeed News*

**In 2002, a massage therapist** and the co-owner of a chain of health clubs wondered whether they could apply a recurring monthly membership model to the massage industry, offering an accessible alternative to luxury day spas or seedy parlors. Over the next decade, the multitrillion-dollar global spa and wellness industry exploded — Americans now spend more than $12 billion on massage therapy alone — and Massage Envy grew into the largest massage franchise in the world.

Roark Capital, a private equity firm that owns dozens of big-name franchises like Carl's Jr. and Arby's, bought Massage Envy in 2012. The Arizona-based franchise

ELECTRONICALLY FILED - 2022 Jul 05 3:44 PM - DORCHESTER - COMMON PLEAS - CASE#2022CP1801053

network now collectively employs 20,000 massage therapists, makes more than $1.3 billion in annual sales, has 1.6 million members nationwide, and recently expanded to Australia. Although competitors have popped up, Massage Envy still holds a 67% share of the franchised day-spa market, according to a 2016 study by research firm IBISWorld. The chain, which regularly tops "best franchises to buy" lists, excels at capitalizing on the "self-care" zeitgeist by advertising its services, which now include skin care, as "body maintenance" instead of a luxury. Massage Envy's purple-logoed storefronts have become a strip mall staple.

## Massage Envy holds a 67% share of the franchised day-spa market.

Last year, a young woman sued a Massage Envy franchise in Winter Park, Florida, after her massage therapist put his finger in her vagina. She said in a deposition that she had trusted the brand completely.

"I thought of the fact that, you know, Massage Envy is such a reputable company and I've gotten massages from there before," she said. "I mean, you know, they're kind of like Publix, you see them everywhere."

Massage Envy advertises itself to potential owners and investors as "one of the fastest growing franchises" in a multibillion-dollar arena: "Now is the ideal time to capitalize on the unprecedented growth and demand," its website says. But while Massage Envy and its competitors have created more jobs than ever before, research shows massage schools are graduating fewer qualified therapists to take them. Many industry observers say that as a result, franchises are not able to be as selective with whom they hire.

The company points out that the franchise model, which limits the role it can take in any spa's day-to-day operations, has a "long and honorable" history in American business.

"Many of the best-known service brands in the world operate in a franchise environment, including iconic businesses in the restaurant, hotel, senior care, daycare, education, auto repair, fitness, weight management and hair care sectors, in addition to the massage and skincare service sector," Hansen said.

But Gina Liccardo, a New York City massage therapist, says that model doesn't translate well to her field. "You can't compare running a fast-food joint to laying your hands on someone's body," she said.

Hiring people straight out of school and placing them under the supervision of managers and owners who may have no experience with massage is a particularly dangerous combination, said Adam Horowitz, a lawyer who has sued dozens of Massage Envy spas.

"An inordinate amount of people are attracted to massage therapy because of sexual interest," said Horowitz, who used to represent plaintiffs in sex abuse cases against the Catholic Church. "Just like there was opportunity in the priesthood, there's opportunity in the massage room. When you get a massage, your guard is down completely. You're not expecting to be violated."

## "When you get a massage, your guard is down completely. You're not expecting to be violated."

Kayla Seely, a former director of operations for four Massage Envy spas on the East Coast, rejected the idea that Massage Envy's business model poses a particular risk. "There are bad eggs in every industry," she said. "There's never going to be something you can do to 100% prevent things from happening."

In her experience, she said, Massage Envy corporate did everything it could to ensure therapists "knew every protocol inside and out." All Massage Envy therapists undergo background checks and are informed of an extensive zero-tolerance policy toward, among other things, inappropriate touching and actions "that infer sexual suggestiveness or explicit sexuality." Names of any therapists found to have violated

the policy are entered into an internal database to keep them from working at a Massage Envy spa again.

Despite these measures, the company acknowledges that sexual assault remains a risk. "There are no policies in any business that can ensure that an employee of a business will not break the law," Hansen said. Massage Envy requires franchisees to buy an insurance rider that protects them and the national company against at least three sexual assault claims per year, according to one franchise agreement reviewed by BuzzFeed News.

## Only one question is marked "critical": "Could it negatively impact Massage Envy's Spa Brand?"

If franchisees fail to follow Massage Envy's policies, "our right as a franchisor is generally limited to enforcement of our contractual rights under the franchise agreement (and other related agreements), including, when appropriate, terminating the franchise," Hansen said. More than 20 franchise agreements have been terminated because of their policies on inappropriate conduct, she said.

The company's leadership has long feared the media would realize the national scope of the problem, said a former corporate employee, who spoke anonymously because of a nondisparagement agreement. That person recalled executives discussing what would happen "if someone connects the dots of how many sexual assaults have occurred across the country."

"But while I was there," the employee added, "they never figured out a solution."

In at least one risk management training, franchisees were told the goal when investigating claims is "to avoid police and keep membership," according to one recently filed court motion in Susan Ingram's case.

A communication guide from 2014, obtained by BuzzFeed News, directs employees facing potential crises to consider questions such as "Who is responsible?" "Can it happen again?" and "How will it affect me, my guest/members, or the clinic?"

There's only one question written in bold type and marked "critical": "**Could it negatively impact Massage Envy's Spa Brand?**"

ELECTRONICALLY FILED - 2022 Jul 05 3:44 PM - DORCHESTER - COMMON PLEAS - CASE#2022CP1801053

Danielle Dick
*Julia Rendleman for BuzzFeed News*

**In October 2015,** Danielle Dick was assaulted at a Virginia Massage Envy when her therapist grabbed her by the scalp, placed his hand over her mouth, then put his fingers in her vagina. Afterward, he told Dick it was "our little secret."

Dick immediately reported the assault to the desk manager. "It was clear that she had no idea what to do," Dick told BuzzFeed News. "She was like a deer in the headlights."

The manager told Dick they didn't have to call the police because the franchise would handle it internally. The next day, a spa employee called Dick to tell her she understood she was "unhappy with the massage experience" and that they wouldn't charge her for it.

"Then they went back to business as usual, and my entire life was turned over," Dick said. She reported the therapist to the police herself. Although he was convicted of felony sexual battery the next year, Massage Envy still refers to the incident as an "alleged" assault, Dick said, because her lawsuit is pending.

In October, Dick wrote about her experience and launched a Change.org petition that received over 50,000 signatures. Afterward, Massage Envy corporate told local media that it had reached out to her "to continue to listen to and better understand her concerns and ideas."

The company did reach out after Dick went public, she told BuzzFeed News — but it also let her know it was considering taking legal action. Hansen says she has an appointment to meet with Dick later this month and will listen to any suggestions the former client has to offer.

It might be an interesting conversation. "The way that Massage Envy has treated me," Dick wrote online, "clearly indicates a company that issues statements saying the right things to protect its corporate brand, but is unwilling to do anything to support victims of assault."

An example of behavior that Massage Envy says should result in firing.

ELECTRONICALLY FILED - 2022 Jul 05 3:44 PM - DORCHESTER - COMMON PLEAS - CASE#2022CP1801053

**When new employees** watch "Behind Closed Doors," Massage Envy's required training program, they're greeted by a photo of Hansen. "Managers and franchisees must understand how to handle complaints of inappropriate conduct," she tells them. "This training will help accomplish all those things."

When a guest makes an allegation against a therapist, the immediate goal is to address the guest's concerns "in a safe and secure environment in order to retain them as a valued client and avoid negative attention," a voiceover explains.

Managers are directed to offer these guests water and observe their "demeanor or any other behavior that may go towards credibility." While the manager investigates, any therapist accused of breaching Massage Envy's zero-tolerance policy should be suspended.

As to how the investigation should be conducted, the video says nothing.

If, by whatever means, a therapist is found to have violated the zero-tolerance policy, that person must be fired. If on the other hand the facts are "inconclusive," the manager is simply instructed to consider steps the spa "might take to ensure incidents of this nature do not happen again."

Employees are tested on three scenarios. In the first, Chandler, a client, accuses Monica, his massage therapist, of pressing too hard on his back. In the second, another massage therapist named Ross offers to photograph the upcoming wedding of his client Rachel. In the third, a therapist named Joey texts his client Phoebe after-hours to tell her he thinks she is "really sexy." The last of these three, employees are told, is a fireable offense.

None of these scenarios resemble anything close to sexual assault, which may help explain why managers are so often accused of mishandling it. It's one thing to confront an employee about a text message, and quite another to determine what happened in a dark room, with no witnesses, when a coworker's professional standing or even freedom hangs in the balance.

> **"When you work with people day in and day out, it can be hard to see them as capable of doing something like that."**

"When you work with people day in and day out, it can be hard to see them as capable of doing something like that," said Christina, a massage therapist who has worked at multiple Massage Envy spas on the West Coast.

Further complicating matters, managers aren't given any guidance on how to assess the credibility of accusers. For example, they aren't instructed on the effects of shock, which often renders trauma victims unable to give full and accurate accounts right away of what happened.

Managers must file a report about their investigation using the franchise's automated incident reporting tool, which copies the director of franchise operations, the regional director, and the corporate legal department. After that, Massage Envy closely monitors and reviews all incident reports for compliance with their brand standards, Hansen said.

In response to questions from BuzzFeed News, Hansen said that "As a franchisor of a service brand, we are not experts in investigating criminal acts" so the company advises spas "to secure expert help as needed to investigate incidents." That advice does not appear in the recent "Behind Closed Doors" training videos.

ELECTRONICALLY FILED - 2022 Jul 05 3:44 PM - DORCHESTER - COMMON PLEAS - CASE#2022CP1801053

ELECTRONICALLY FILED - 2022 Jul 05 3:44 PM - DORCHESTER - COMMON PLEAS - CASE#2022CP1801053

In "Behind Closed Doors," employees learn they must "thoroughly investigate" claims of inappropriate conduct.

A 2017 policy obtained by BuzzFeed News clarifies that in "certain situations," a franchisee "should consider" reporting an incident to local authorities. It does not say when during the investigation that should happen. No examples are listed, beyond observing any local laws that might require it.

Experts say that the nature of the massage profession — in which clients allow virtual strangers to touch their nearly naked bodies in private rooms — can make assault claims particularly hard to assess. It may be the client who is accused of inappropriately touching the therapist, or one employee who reports another.

Other complaints might have less to do with sexual predation than with individual sensitivities, such as discomfort with being massaged in more vulnerable areas. Some complaints turn out to be false. For all of these reasons, state regulatory boards and other agencies employ trained investigators who can step in, said Ahmos Netanel, CEO of the California Massage Therapy Council.

"It's beneficial for all sides to have an experienced professional examine the situation and come up with professional and objective conclusions," he said.

In January 2016, a Massage Envy client wanted to report that her therapist had groped her breasts and vagina during a session at a Sacramento spa two days prior — she was so shocked that she needed time to process, she told BuzzFeed News. She couldn't figure out how to call the corporate office, so she sent an email to guestrelations@massageenvy.com on Jan. 5, asking someone to call her back because she felt she had "been violated" by her massage therapist. "There was no corporate phone number on your website and I was instructed to email," she wrote.

**Adding insult to injury, Massage Envy continued to charge her membership fees for two months.**

By Jan. 12, she hadn't heard back, so she filed a complaint with the California Massage Therapy Council. The therapist was still working at the spa — in fact, on Jan. 16, another woman reported him to the council for misconduct, records show. But a regional manager from Massage Envy didn't call the woman until Jan. 25, her attorney said.

Adding insult to injury, the woman said, Massage Envy continued to charge her membership fees for two months, even though she told the manager she never wanted to return.

Massage Envy says it doesn't require spas to report allegations of sexual assault in jurisdictions that don't require it in part because the company has consulted with experts who say victims should maintain control over that "critical decision." Hansen, the company's general counsel, said that approach is consistent with the position of leading organizations such as the Rape, Abuse and Incest National Network.

But Kati N. Lake, an executive of that organization (which has never worked with Massage Envy), says its recommendations are not that simple.

A zero-tolerance policy is important, Lake said, but there are many other factors to consider, such as how easy a company makes it for clients to register complaints and how well it trains its managers to handle these investigations, which are difficult for all involved.

"You're not prepared mentally," said Amanda Owens, a former Massage Envy franchise owner in North Carolina. "What happens immediately when someone complains? How do you talk to the customer? If you're a woman," and the accused is a man, "how do you approach him and not feel threatened?"

Kandice Martellaro was a receptionist at a Los Angeles Massage Envy spa when she reported being sexually assaulted by a therapist. No action was taken, she said.

"I could never tell with our specific clinic administrator if she was being really clever and trying to brush it under the rug," Martellaro said, "or she just sincerely didn't know how to handle it."

Tara Woodley
*T.J. Kirkpatrick for BuzzFeed News*

On Sept. 17, 2017, Tara Woodley visited a Massage Envy in Washington, DC, to celebrate a new job by getting a relaxing Swedish massage. While Woodley's eyes were closed, her therapist put his tongue on her vagina and started to lick her, according to a lawsuit she filed later that month. Woodley jumped up and covered herself, after

ELECTRONICALLY FILED - 2022 Jul 05 3:44 PM - DORCHESTER - COMMON PLEAS - CASE#2022CP180105

which the therapist grabbed her hand and begged for forgiveness, she said, swearing he had never done that before.

In fact, two other women said they had reported the same therapist to Massage Envy spas. Three months earlier, when the therapist was working at a Maryland Massage Envy run by the same owner, a woman reported that he had touched her inappropriately. She asked to cancel her membership, she told her local NBC station, but the spa's management would only give her a free spa day as a courtesy — and told her the therapist had been transferred to DC.

Then, on Sept. 5, another woman reported the therapist to the spa that Woodley would later attend. The therapist had pulled the woman's underwear to the side and pressed his face to her vagina, according to the police report she later filed. Yet the therapist was still allowed to continue working there, up through his September 17 appointment with Woodley.

"It's so gut-wrenching that women had reported him to management, trying to create change, and Massage Envy just turned a blind eye," Woodley told BuzzFeed News. Her husband convinced her to call 911 right away, after which the other women came forward. "If he hadn't, I may have done what those women did, and he could have assaulted more women in the future," Woodley said.

ELECTRONICALLY FILED - 2022 Jul 05 3:44 PM - DORCHESTER - COMMON PLEAS - CASE#2022CP1801053

ELECTRONICALLY FILED - 2022 Jul 05 3:44 PM - DORCHESTER - COMMON PLEAS - CASE#2022CP1801053

A Massage Envy location in West Chester, Pennsylvania.
*Jillian Guyette for BuzzFeed News*

**Although Massage Envy** Franchising says it leads the industry when it comes to sexual assault policies, it also argues in court filings that as a company that sells franchise agreements rather than employing individual massage therapists, it should bear no liability in clients' sexual assault lawsuits. It's hard to know how these cases are resolved, since they are settled under strict confidentiality clauses.

But a case scheduled to go to trial in January may shed some light.

Susan Ingram and seven other women have brought lawsuits against the West Chester Spa — the one where she was assaulted, and where she says the manager refused to halt the massage therapist's next appointment — and Massage Envy LLC. Ingram's lawyers have argued that despite the company's claims that it plays no role in investigations of inappropriate conduct, it in fact dictates the way they are conducted

and followed, and oversees their progress. The West Chester spa had only reported one of the prior complaints to corporate headquarters, but in depositions, the manager said a regional supervisor approved of the way it was handled and didn't say to call police.

A franchise consultant who has worked with Massage Envy before said the company was in a particularly tricky position.

"There's no way to prevent issues from arising at franchisees," the person acknowledged. "But we're talking about people getting sexually assaulted on tables in dark rooms, in national brands."

"You have to be human first," the consultant added. "You have to think if your daughter or mother or aunt or grandmother came to you with a claim, how would you react?"

Last year, Ingram helped US Rep. Pat Meehan of Pennsylvania introduce bipartisan federal legislation that would require owners and employees of massage spas to report allegations of sexual assault to police. "Reporting alleged assault will help victims understand their rights, like pursuing an investigation and pressing charges, and the resources available," Meehan said. The bill would also require owners to publicly display policies about preventing and responding to sexual assault.

If passed, the legislation "will protect women when billion-dollar companies like Massage Envy fail to do the right thing," Ingram said.

Nearly every day, she drives past the Massage Envy where she was assaulted.

"It's so hard to resist the urge to walk in that front door and say, How could you have let this happen?" she said. "And how can you continue to let it happen, over and over?" ●




Katie Baker is an investigative reporter for BuzzFeed News and is based in London.

Contact Katie J.M. Baker at katie.baker@buzzfeed.com.

Got a confidential tip? Submit it here.

ELECTRONICALLY FILED - 2022 Jul 05 3:44 PM - DORCHESTER - COMMON PLEAS - CASE#2022CP1801053

# EXHIBIT "B"

ELECTRONICALLY FILED - 2022 Jul 05 3:44 PM - DORCHESTER - COMMON PLEAS - CASE#2022CP1801053

ELECTRONICALLY FILED - 2022 Jul 05 3:44 PM - DORCHESTER - COMMON PLEAS - CASE#2022CP1801053

**MASSAGE ENVY FRANCHISING, LLC**
**FRANCHISE AGREEMENT**

_____

FRANCHISEE

_____

DATE OF AGREEMENT

_____

ADDRESS OF MASSAGE ENVY BUSINESS

## TABLE OF CONTENTS

1. **PREAMBLES, ACKNOWLEDGEMENTS AND GRANT OF FRANCHISE.........................1**
   - A. PREAMBLES............................................................................................................1
   - B. GRANT OF FRANCHISE. ...................................................................................2
   - C. TERRITORIAL RIGHTS......................................................................................2
   - D. RIGHTS MAINTAINED BY US............................................................................3

2. **SITE SELECTION, LEASE OF SITE AND DEVELOPMENT AND OPENING OF YOUR MASSAGE ENVY BUSINESS. ..........................................................................4**
   - A. SITE SELECTION. ................................................................................................4
   - B. LEASE OF SITE. ...................................................................................................5
   - C. DEVELOPMENT OF THE MASSAGE ENVY BUSINESS. ...............................5
   - D. FIXTURES, EQUIPMENT, STOREFRONT AND SIGNS. ................................5
   - E. PRODUCTS.............................................................................................................6
   - F. COMPUTER SYSTEM AND PAYMENT CARD INDUSTRY COMPLIANCE.............6
   - G. OPENING. ..............................................................................................................7
   - H. GRAND OPENING MARKETING PROGRAM. ...................................................8

3. **FEES. ................................................................................................................................8**
   - A. INITIAL FRANCHISE FEE....................................................................................8
   - B. ROYALTY. .............................................................................................................8
   - C. MINIMUM PERFORMANCE REQUIREMENTS. ...............................................9
   - D. INTEREST ON LATE PAYMENTS; DISHONORED CHECKS. ...................9
   - E. APPLICATION OF PAYMENTS AND RIGHT OF SET-OFF. ....................10
   - F. SUCCESSOR FEE. ...............................................................................................10

4. **TRAINING AND ASSISTANCE. ...............................................................................10**
   - A. TRAINING. ..........................................................................................................10
   - B. ON-SITE ASSISTANCE......................................................................................11
   - C. GENERAL GUIDANCE. ......................................................................................11
   - D. OPERATIONS MANUAL. ...................................................................................11
   - E. DELEGATION OF PERFORMANCE. .................................................................12

5. **MARKS............................................................................................................................12**
   - A. OWNERSHIP AND GOODWILL OF MARKS.....................................................12
   - B. LIMITATIONS ON YOUR USE OF MARKS......................................................12
   - C. NOTIFICATION OF INFRINGEMENTS AND CLAIMS. .................................13
   - D. DISCONTINUANCE OF USE OF MARKS. ........................................................13

|     | E.  | INDEMNIFICATION FOR USE OF MARKS. | 13 |
| 6.  |     | **CONFIDENTIAL INFORMATION.** | **13** |
| 7.  |     | **EXCLUSIVE RELATIONSHIP** | **15** |
| 8.  |     | **OPERATION AND SYSTEM STANDARDS FOR MASSAGE ENVY BUSINESS.** | **16** |
|     | A.  | MANAGING OWNER & BUSINESS MANAGER | 16 |
|     | B.  | CONDITION AND APPEARANCE OF YOUR MASSAGE ENVY BUSINESS. | 16 |
|     | C.  | SERVICES AND PRODUCTS YOUR BUSINESS OFFERS. | 17 |
|     | D.  | APPROVED PRODUCTS, DISTRIBUTORS AND SUPPLIERS. | 17 |
|     | E.  | COMPLIANCE WITH LAWS AND GOOD BUSINESS PRACTICES. | 18 |
|     | F.  | INSURANCE. | 19 |
|     | G.  | MAXIMUM AND MINIMUM PRICES. | 19 |
|     | H.  | NATIONAL CORPORATE WELLNESS ACCOUNTS. | 20 |
|     | I.  | RECIPROCITY. | 20 |
|     | J.  | COMPLIANCE WITH SYSTEM STANDARDS. | 20 |
|     | K.  | SECURITY BREACH. | 22 |
| 9.  |     | **MARKETING.** | **22** |
|     | A.  | BY YOU. | 22 |
|     | B.  | MARKETING FUND. | 22 |
|     | C.  | MARKETING AND ADVERTISING COOPERATIVES. | 24 |
|     | D.  | WEBSITES AND INTERACTIVE MEDIA. | 25 |
|     | E.  | SOCIAL MEDIA. | 26 |
| 10. |     | **RECORDS, REPORTS AND FINANCIAL STATEMENTS.** | **26** |
| 11. |     | **INSPECTIONS AND AUDITS.** | **27** |
|     | A.  | OUR RIGHT TO INSPECT YOUR BUSINESS. | 27 |
|     | B.  | OUR RIGHT TO AUDIT. | 27 |
| 12. |     | **TRANSFER.** | **28** |
|     | A.  | DELEGATION TO REGIONAL DEVELOPER. | 28 |
|     | B.  | TRANSFER BY US. | 28 |
|     | C.  | TRANSFER BY YOU. | 28 |
|     | D.  | CONDITIONS FOR APPROVAL OF TRANSFER. | 29 |
|     | E.  | ASSIGNMENT TO ENTITY PRINCIPALLY CONTROLLED BY YOU. | 31 |
|     | F.  | DEATH OR DISABILITY. | 32 |
|     | G.  | EFFECT OF CONSENT TO TRANSFER. | 33 |
|     | H.  | OUR RIGHT OF FIRST REFUSAL. | 33 |

| | | |
|---|---|---|
| **13.** | **EXPIRATION OF THIS AGREEMENT.**............................................................**34** | |
| | A. | YOUR RIGHT TO ACQUIRE A SUCCESSOR FRANCHISE. ....................34 |
| | B. | GRANT OF A SUCCESSOR FRANCHISE...............................................35 |
| | C. | AGREEMENTS/RELEASES..................................................................35 |
| **14.** | **TERMINATION OF AGREEMENT.** ............................................................**35** | |
| | A. | TERMINATION FOR INSOLVENCY. ....................................................35 |
| | B. | IMMEDIATE TERMINATION FOR UNCURABLE DEFAULTS. .................35 |
| | C. | TERMINATION AFTER 10-DAY CURE PERIOD. ....................................37 |
| | D. | TERMINATION AFTER 30-DAY CURE PERIOD. ....................................37 |
| **15.** | **OUR AND YOUR RIGHTS AND OBLIGATIONS UPON TERMINATION OR EXPIRATION OF THIS AGREEMENT.**.............................................**39** | |
| | A. | PAYMENT OF AMOUNTS OWED. .......................................................39 |
| | B. | DE-IDENTIFICATION. .......................................................................40 |
| | C. | CONFIDENTIAL INFORMATION AND CUSTOMER INFORMATION. ..........40 |
| | D. | COVENANT NOT TO COMPETE. .......................................................41 |
| | E. | OUR RIGHT TO PURCHASE YOUR BUSINESS....................................41 |
| | F. | CONTINUING OBLIGATIONS.............................................................43 |
| **16.** | **RELATIONSHIP OF THE PARTIES/INDEMNIFICATION.** ..............................**43** | |
| | A. | INDEPENDENT BUSINESS OWNER. ...................................................43 |
| | B. | NO LIABILITY FOR ACTS OF OTHER PARTY......................................43 |
| | C. | TAXES. ...........................................................................................43 |
| | D. | INDEMNIFICATION. ..........................................................................43 |
| **17.** | **CONSTRUCTION & ENFORCEMENT.** ......................................................**45** | |
| | A. | GOVERNING LAW.............................................................................45 |
| | B. | SEVERABILITY AND SUBSTITUTION OF VALID PROVISIONS...............45 |
| | C. | WAIVER OF OBLIGATIONS................................................................46 |
| | D. | COSTS AND ATTORNEYS' FEES........................................................46 |
| | E. | YOU MAY NOT WITHHOLD PAYMENTS DUE TO US............................46 |
| | F. | RIGHTS OF PARTIES ARE CUMULATIVE. ...........................................46 |
| | G. | DISPUTE RESOLUTION. ...................................................................46 |
| | H. | CONSENT TO JURISDICTION.............................................................47 |
| | I. | WAIVER OF RIGHTS AND LIMITATIONS ON CLAIMS............................48 |
| | J. | INJUNCTIVE RELIEF. .......................................................................48 |
| | K. | BINDING EFFECT. ............................................................................48 |
| | L. | CONSTRUCTION...............................................................................49 |

M.     COVENANT OF GOOD FAITH ........................................................ 50

N.     INTERIM TERM................................................................................ 50

O.     FORCE MAJEURE ........................................................................... 50

P.     LIMITED LIABILITY FOR OUR RELATED PARTIES............................ 51

**18.    NOTICES AND PAYMENTS. ..................................................................... 51**

**19.    ACKNOWLEDGMENTS. ........................................................................... 51**

<u>**EXHIBITS**</u>

A.     Territory, Site, Term
B.     ACH Authorization Form
C.     Lease Rider

**MASSAGE ENVY**
**<u>FRANCHISE AGREEMENT</u>**

**THIS FRANCHISE AGREEMENT** (the **"Agreement"**) is made and entered into as of this \_\_\_\_\_ day of _____, 20\_\_\_ (the **"Effective Date"**), by and between **MASSAGE ENVY FRANCHISING, LLC**, a Delaware limited liability company, with its principal business address at 14350 North 87th Street, Suite 200, Scottsdale, Arizona 85260 (**"we," "us"** or **"our"**), and _____, a _____, with its principal business address at _____ (**"you"** or **"your"**).

1.      **PREAMBLES, ACKNOWLEDGEMENTS AND GRANT OF FRANCHISE.**

      A.      <u>**PREAMBLES.**</u>

          (1)      We and our affiliates have designed and developed valuable and proprietary formats and systems for the development and operation of personal health businesses under the name "Massage Envy" that offer total body care services, including massage therapy, stretch therapy, hot stone therapy and customized skin care services and related products and services offered or sold through a membership-based program.

          (2)      Currently we offer franchises under the Massage Envy name for the operation of the personal health businesses  described above (**"Massage Envy Business"** or "**Business**").

          (3)      We have developed, use, promote and license certain trademarks, service marks and other commercial symbols for use in operating Massage Envy Businesses, including "Massage Envy®" and we may create, use and license other trademarks, service marks and commercial symbols for use in operating Massage Envy Businesses (collectively, the **"Marks"**). The term "Marks" also includes any distinctive trade dress used to identify a Massage Envy Business, whether now in existence or hereafter created.

          (4)      We have developed and license certain works and materials for which we have secured common law or registered copyright protection and that we allow franchisees to use, sell or display in connection with the marketing and/or operation of a Massage Envy Business, whether now in existence or created in the future (collectively, the "**Copyrights**").

          (5)      We offer franchisees who meet our minimum standards for character, skill, aptitude, attitude, business ability and financial capacity, the right to own and operate a Massage Envy Business offering the products and services we authorize (and only the products and services we authorize) and using our business system, business formats, methods, procedures, signs, designs, layouts, standards, specifications, retail products, Copyrights and Marks, all of which we may improve, further develop and otherwise modify from time to time (collectively, the **"Franchise System"**).

          (6)      You have applied for a franchise to own and operate a Massage Envy Business, and we have approved your application relying on all of your representations, warranties and acknowledgments contained in the application and this Agreement.

MEF\FA\0418
EAST\165992616.4

B.    **GRANT OF FRANCHISE.**

You have applied for a franchise to own and operate a Massage Envy Business within the geographic area that we identify (the "**Territory**"). The approximate size and shape of the Territory will be an area that complies with our current general Territory profile criteria for minimum population, number of qualified households, age range and therapist availability as well as the specific market variables of your Site (as defined below), such as population density, demographic and psychographic criteria, market and development trends, traffic flow and natural and man-made boundaries. Unless the geographic area comprising the Territory is identified on Exhibit A attached to this Agreement at the time you sign this Agreement, the Territory shall be determined after you sign this Agreement, but prior to our approval of your proposed Site. We will work with you in an attempt to identify a mutually agreeable Territory. If you and we cannot agree, we have the right to determine your Territory. Once your Territory is determined, Exhibit A shall be modified to identify the exact geographic area comprising the Territory. The actual Territory description will consist of street map landmarks and compass directions or a radius of miles. Unless this Agreement is sooner terminated as provided herein, this Agreement shall be in effect upon its acceptance and execution by us and expire ten (10) years from the earlier of (i) the effective date of the real estate lease/sublease for your site (if you lease/sublease the Site) or (ii) one hundred eighty (180) days after the Effective Date (the "**Initial Term**"). Subject to the terms of this Agreement, during the Term, we grant you a franchise (the "**Franchise**") to operate a Massage Envy Business at a location we approve within the Territory (the "**Site**"), and to use the Franchise System in its operation, unless sooner terminated, and you agree to operate hereunder for the duration of the Term. You may not relocate your Business to a different site without our prior written approval which shall not be unreasonably withheld provided that you comply with our then-current Massage Envy Business standards.

C.    **TERRITORIAL RIGHTS.**

So long as you are in compliance with the terms and conditions of this Agreement, and except as expressly provided in this Agreement, neither we nor any affiliates we may have from time to time will establish, or grant rights to other persons to establish, another Massage Envy Business the physical premises of which are located within the Territory.

Notwithstanding the foregoing, if we determine, based on changes in circumstances which include, but are not limited to, changes in the population, demographic and psychographic criteria, usage of massage, skin care, and total body care services, drive times, or other market or economic conditions in the geographic area that includes all or part of the Territory, that the Territory could support an additional Massage Envy Business, then we will notify you in writing of our decision to proceed with another Massage Envy Business in the Territory. Subject to the conditions below, our notice will offer you a first right of refusal to purchase and operate the additional Massage Envy Business and you will have thirty (30) days to exercise such right by written response to us. The right of first refusal may not be exercised, and we may establish or grant rights to another person to establish a Massage Envy Business within your Territory, if anyone of the following conditions is satisfied:

(1)    You are not then in compliance with any material term of this Agreement and cannot cure the non-compliance within thirty (30) days of written notice;

ELECTRONICALLY FILED - 2022 Jul 05 3:44 PM - DORCHESTER - COMMON PLEAS - CASE#2022CP1801053

(2)     We determine, in our sole discretion, that you do not meet our then current standards for new franchisees of Massage Envy Business;

(3)     We determine, in our sole discretion, that you lack the financial resources to develop and operate an additional Massage Envy Business;

(4)     You fail to sign a franchise agreement (containing our then-current terms and conditions which may be different from the provisions of the Agreement) for the additional Massage Envy Business within thirty (30) days of the date we deliver a franchise agreement for signature; or

(5)     You notify us that you do not wish to develop and operate an additional Massage Envy Business within your Territory.

**D.     <u>RIGHTS MAINTAINED BY US.</u>**

We (and any affiliates that we might have from time to time) shall at all times have the right to engage in any activities we deem appropriate that are not expressly prohibited by this Agreement, whenever and wherever we desire, including, but not limited to:

(1)     establishing and operating Massage Envy Business, and granting rights to other persons to establish and operate Massage Envy Business, on any terms and conditions we deem appropriate and at any locations other than within the Territory;

(2)     providing, and granting rights to other persons to provide goods and services similar to and/or competitive with those provided at Massage Envy Business to customers located within the Territory (whether identified by the Marks or other trademarks and service marks) through any distribution channel other than a Massage Envy Business located within the Territory (including, but not limited to, sales of products via mail order, gift cards, catalogs, toll free telephone numbers and electronic means including the Internet);

(3)     establishing and operating Massage Envy Business, and granting rights to other persons to establish and operate Massage Envy Business, in captive venues, including those located within or outside your Territory, (for purposes of this section, a "captive venue" means a non-traditional Business for the sale of Massage Envy Business products or services that is located within, or is a part of, another establishment or facility that consumers may visit for a purpose other than purchasing the Massage Envy Business products or services, including, without limitation, outlets located in hotels, college campuses or universities, airports, train stations, bus stations, shopping malls, or within other similar types of establishments).  In such event, we will offer you a thirty (30) day first right of refusal for the same opportunity, according to the same first right of refusal terms as outlined in Section 1.C. above.  However, we can only agree to give you a right of first refusal on any such opportunity within your Territory if that opportunity is not part of a regional or national right that is already committed to a third party.

(4)     acquiring the assets or ownership interests of one or more businesses providing products and services similar to those provided at Massage Envy Business, and franchising, licensing or creating similar arrangements with respect to these businesses once

acquired, wherever these businesses (or the franchisees or licensees of these businesses) are located or operating (including within the Territory); and

(5) being acquired (regardless of the form of transaction) by a business providing products and services similar to those provided at Massage Envy Business, or by another business, even if such business operates, franchises and/or licenses competitive businesses within the Territory.

With respect to the acquisitions referenced in paragraphs (4) and (5) above, you acknowledge and agree that the competitive businesses that are acquired (or that are operated by a company that acquires us) may be converted into Massage Envy Business that operate under the Marks, regardless of their location, including competitive businesses that are located within your Territory on the date of the acquisition.

**2.      SITE SELECTION, LEASE OF SITE AND DEVELOPMENT AND OPENING OF YOUR MASSAGE ENVY BUSINESS.**

**A.      <u>SITE SELECTION.</u>**

We will assist you in finding you a site for your Business by providing assistance and guidance in your selection of a real estate broker, demographic and psychographic data, site search and approval, municipal code review and lease review and approval. You shall submit to us a complete site report (containing such demographic, commercial, and other information, photographs and video tapes as we may reasonably require) for a site you propose for your Business and which you reasonably believe conforms to our minimum site selection criteria we establish from time to time. We shall have the right to accept or reject all proposed sites. In accepting or rejecting a proposed site, we will consider such matters as we deem material, including, without limitation, demographic and psychographic characteristics of the proposed site, traffic patterns, parking, the predominant character of the neighborhood, competition from other businesses providing similar services within the area, the proximity to other businesses (including other Massage Envy Business), the nature of other businesses in proximity to the site, and other commercial characteristics (including the purchase price or rental obligations and other lease terms for the proposed site) and the size of premises, appearance, and other physical characteristics of the premises. We shall have thirty (30) days after receipt of the requisite materials to approve or disapprove a proposed site. Our approval of a site will be by delivery of written notice to you. If you do not receive a written notice of approval within thirty (30) days from us, your proposed site is considered disapproved. You acknowledge and agree that our approval of the Site does not constitute a representation or warranty of any kind, express or implied, of the suitability of the Site for a Massage Envy Business or any other purpose. Our approval of the Site indicates only that we believe that the Site meets our then acceptable criteria. We are not responsible if the Site fails to meet your or our expectations. In some jurisdictions, notably large metropolitan cities, you acknowledge that you may be required to use our designated real estate broker and expediter to assist you in locating a Site and for obtaining approval of the local governmental board that grants "relief" from the zoning code in the jurisdiction, thus making it potentially easier to obtain zoning variances and special permits that may be necessary prior to securing a location for your Massage Envy Business. You will be responsible for incurring the costs associated with retaining the expediter. We will inform you of

those jurisdictions where an expediter is necessary and the name of the designated expediter.

**B.     LEASE OF SITE.**

You must present to us for our approval any lease for the Site based on the lease satisfying the requirements in this Section 2. You must cause your landlord to sign the Lease Rider that is attached to this Agreement as <u>Exhibit C</u>. The Lease Rider includes important provisions that protect our interests. If your landlord refuses to sign the Lease Rider in the form attached to this Agreement, we may reject your proposed Site.

**C.     DEVELOPMENT OF THE MASSAGE ENVY BUSINESS.**

Prior to any construction or renovation of the Site, we shall provide you with copies of our standard specifications for the design and layout of a typical Massage Envy Business and required leasehold improvements (the "**Design Standards**"). You shall, in all respects, comply with the Design Standards unless we shall, in writing, agree to modifications thereof. You agree that your Business' facility will have the required number of multi-purpose rooms for facial treatments and massage as we designate. You shall employ a licensed architect, at your sole cost and expense, to prepare all necessary architectural, engineering and construction drawings and site plans (collectively referred to as the "**Construction Documents**"). To ensure the consistent design of Massage Envy Business, you must use an architect designated or approved by us. You shall obtain all permits required to construct, remodel, renovate, and/or equip the Site. You shall be solely responsible for ensuring that the construction of the Site complies with all applicable laws including, without limitation, local building codes and the Americans with Disabilities Act. All such Construction Documents, and all modifications and revisions thereto, shall be submitted to us for our prior review and approval before you commence construction.

**D.     FIXTURES, EQUIPMENT, STOREFRONT AND SIGNS.**

You agree to use in the operation of your Business the fixtures, furniture, items of equipment, furnishings and signs (collectively, "**Operating Assets**") that we have approved for Massage Envy Business as meeting our specifications and standards for appearance, function, design, quality and performance. You further agree to place or display at your Business facility (interior and exterior) only such signs, emblems, lettering, logos and display materials specified in the Operations Manual (defined in Section 4.C.) or otherwise approved by us in writing. If you propose to purchase, lease or otherwise use any Operating Asset which is not then approved by us, you shall first notify us in writing and shall submit to us sufficient specifications, photographs, drawings and/or other information or samples for our determination of whether such Operating Asset complies with our specifications and standards, which determination shall be made and communicated in writing to you within a reasonable time. At this time, we require that you purchase your initial "**Initial Opening Package**" from our affiliate. The Initial Opening Package includes: (i) most of your initial inventory (including massage and facial creams, oils, uniforms, Hot Stone equipment and printed items); (ii) the furniture and fixtures for your Business (including massage, skin care or multi-purpose room equipment and other items); and (iii) interior signage.

5

ELECTRONICALLY FILED - 2022 Jul 05 3:44 PM - DORCHESTER - COMMON PLEAS - CASE#2022CP1801053

E.     **PRODUCTS.**

Prior to opening your Business, you shall purchase from our approved supplier an opening inventory of products, materials and supplies which we have approved for use and/or sale at Massage Envy Business ("**Products**").

F.     **COMPUTER SYSTEM AND PAYMENT CARD INDUSTRY COMPLIANCE.**

In operating your Business, you agree to obtain and use computer hardware (including laptops and tablets) and software, including an integrated computer-based point-of-sale system, and all necessary communications equipment (collectively, the **"Computer System"**) that we specify from time to time. We may modify specifications for and components of the Computer System. You further agree to comply with the policies relating to the Computer System that we specify from time to time, including our IT policies, Payment Card Industry (**"PCI"**) policies, hardware policies and other related policies. You agree to maintain a functioning e-mail Massage Envy email address and Massage Envy communications network only for Massage Envy-related business we authorize. You must obtain the Computer System, software licenses, maintenance and support services and other services related to the Computer System from the suppliers we specify (which may be limited to us or our affiliates). You acknowledge and agree that our modifications of specifications for the Computer System, and/or technological developments or events, might require you to purchase, license and/or lease new or different computer hardware and/or software and to obtain service and/or support for the Computer System. Consistent with the foregoing, among other things, we reserve the right periodically to undertake technology initiatives, the purpose of which would be enhance the technology associated with the Franchise System including, without limitation, enhanced internet capability, use of proprietary digital applications and enhanced support services. Although we cannot estimate the future costs of the Computer System or required service or support, and although these costs might not be fully amortizable over the remaining term of this Agreement, you agree to incur the costs of obtaining the computer hardware and software comprising the Computer System (or additions or modifications) and required service or support. We have no obligation to reimburse you for any Computer System costs. Before you begin operating the Business, and then afterward within sixty (60) days after you receive notice from us, you agree to obtain the components of the Computer System that we designate and ensure that your Computer System, as modified, is functioning properly. As otherwise permitted in this Agreement, we may access the Computer System and retrieve all pertinent information relating to the operation of the Business in areas where you are bound by the terms of this Agreement and to ensure compliance with this Agreement.

We reserve the right to charge franchisees one or more monthly technology fees which, among other technology services, covers a portion of the costs we incur to provide you with certain technology tools and assistance with certain aspects of PCI compliance. Technology fees will be due and payable in accordance with the Operations Manual including on the same day of each month that you remit your fee for the Meevo Subscription Agreement.

We may charge you a reasonable fee if we develop or have developed (and, once developed, for supporting, modifying and enhancing) proprietary software that we license to you

and for other Computer System maintenance and support services that we or our affiliates provide to you. We may also enter into a license agreement with a third party licensor of software and then sublicense the software to you. If we or our affiliates license proprietary software or sublicense other software to you, or otherwise allow you to use similar technology we develop, maintain or sublicense, you agree to sign any software license agreement or similar document that we or our affiliates prescribe to regulate your use of, and our and your respective rights and responsibilities with respect to, the software.

Notwithstanding the fact that you must purchase, use and maintain the Computer System consistent with our standards and specifications, you will have sole and complete responsibility for: (1) the acquisition, operation, maintenance, updates and upgrading of the Computer System, including compliance with the PCI standards that we periodically require; (2) the manner in which your Computer System interfaces with our computer system and those of other third parties; (3) the installation, maintenance and support of the Computer System, although we may from time to time require or recommend third parties to provide these functions; and (4) any and all consequences that may arise if the Computer System is not properly operated, maintained and upgraded, including but not limited to virus and spyware issues.

Unless otherwise expressly provided herein, you agree that you are solely responsible for ensuring compliance with: (a) the Payment Card Industry Data Security Standards ("**PCIDSS**") enacted by the applicable Card Associations (as they may be modified from time to time or as successor standards are adopted); (b) the Fair and Accurate Credit Transactions Act ("**FACTA**"); and (c) all other standards, laws, rules, regulations or any equivalent thereof applicable to electronic payments that may be published from time to time by payment card companies and applicable to electronic payments ("**Electronic Payment Requirements**"). If you are required by one of the credit card companies or another third party (including any governmental body) to provide evidence of compliance with PCIDSS, FACTA or applicable Electronic Payment Requirements, or upon our request, we may require that you provide, or make available, to us copies of an audit, scanning results or related documentation relating to such compliance.

## G.    OPENING.

Within the earlier of one hundred eighty (180) days after we approve the Site or two hundred seventy (270) days after the Effective Date, you must open your Massage Envy Business for business utilizing the Franchise System; provided, however, you may not open your Massage Envy Business for business or sell memberships in the Massage Envy Business until: (1) we, or our affiliates, have inspected and approved your Business facility as developed in accordance with our specifications and standards (as an alternative, or in addition, to our physical inspection of your Business facility, we may require you to send us video tapes and/or photographs of facility); (2) you have provided us with a summary of your initial costs for the construction and development of your Massage Envy Business on our then-current designated form; (3) pre-opening training described in Section 4.A. has been completed to our satisfaction; (4) you have paid all amounts due to us, our affiliates and our designated and approved vendors; (5) you have satisfied all bonding, licensing, and other legal requirements for the lawful operation of your Business and given us satisfactory evidence of compliance; and (6) we have received the required evidence that you have obtained the insurance required by this Agreement. You acknowledge and agree that we have the right to retain, at an expense to you of no more

than Five Hundred Dollars ($500), the services of a third party auditor to verify that you have completed all of these requirements prior to granting you the right to commence operations. We will invoice you for the auditor's services and payment is due upon receipt of our invoice.

BY VIRTUE OF COMMENCING OPERATIONS OF YOUR BUSINESS, YOU ACKNOWLEDGE THAT WE HAVE FULFILLED ALL OF OUR OBLIGATIONS TO YOU THAT WE ARE REQUIRED TO FULFILL PRIOR TO THE OPENING OF YOUR MASSAGE ENVY BUSINESS.

### H. GRAND OPENING MARKETING PROGRAM.

You must, at your expense, and with our prior written approval, execute a grand opening marketing program for your Business in accordance with the System Standards (as defined below) for grand openings of Massage Envy Business in varying market conditions. You agree to spend a minimum of Fifteen Thousand Dollars ($15,000.00) on the grand opening marketing program during the time period that begins thirty (30) days prior to and ends thirty (30) days following the opening date of your Business. You agree to use only the media, materials, methods and formats we develop or approve according to Section 9 below.

### 3. FEES.

### A. INITIAL FRANCHISE FEE.

For your right to operate a Massage Envy Business, you agree to pay us a nonrecurring and nonrefundable initial franchise fee of Forty-Five Thousand Dollars ($45,000.00). If you are a veteran who qualifies under our VetFran program, you agree to pay us a discounted initial franchise fee in the amount of Thirty-Six Thousand Dollars ($36,000.00). If you desire to receive a license to establish and operate additional Massage Envy Business, we may, in our sole discretion, grant you a license to establish and operate additional Massage Envy Business in the same format as licensed to you hereunder) if you meet the following minimum conditions: (i) you satisfy our then-current qualifications and training requirements for new franchisees; (ii) you execute our then-current form of franchise agreement; and, (iii) you pay to us an initial franchise fee for a second and subsequent Massage Envy Business in the amount of Thirty-Five Thousand Dollars ($35,000), and if a veteran who qualifies under our VetFran program, you agree to pay us a discounted initial franchise fee for a second and subsequent Massage Envy Business in the amount of Twenty-Eight Thousand Dollars ($28,000).

Initial Franchise Fees are due and are fully earned by us when you sign this Agreement.

### B. ROYALTY.

You agree to pay us, on the day of each week that we periodically specify (the "**Payment Day**"), a weekly royalty ("**Royalty**") equal to six percent (6%) of your Gross Sales during the previous week. In this Agreement, "**Gross Sales**" means the total of all revenue and receipts derived from the operation of the Business, including, but not limited to, all amounts received at or away from the site of the Business, or through or by means of the business you conduct at your Business facility, such as fees for massage services, facial services, membership fees, fees for optional member services and charges, gift card sales, and revenue derived from products

sales, whether in cash or by check, credit card, debit card, barter or exchange, or other credit transactions, but excluding only (1) sales taxes collected from customers and paid to the appropriate taxing authority, (2) all customer refunds and credits your Business actually makes, and (3) tips received by massage therapists and aestheticians. Without limiting the generality of the foregoing, "Gross Sales" includes all amounts that third party marketing agencies, such as, for example, Groupon, receive and retain from your customers for marketing products or services that these customers purchase from your Business. "Gross Sales" also includes the full suggested retail price for any goods or services (including monthly amounts due under membership agreements) that are provided at a discount, other than discounts that are part of special programs recommended or approved by us.

You must execute and deliver to us an ACH Authorization Form allowing us to electronically debit a banking account that you designate (your "**Account**") for (i) all fees payable to us under this Agreement and (ii) any amounts that you owe to us or any of our affiliates for the purchase of goods or services. Our current form of ACH Authorization Form is attached to this Agreement as Exhibit B. You further agree to sign and deliver to us any other documents that we or your bank may require from time to time to authorize us to debit your Account for such amounts. You must deposit into the Account all Gross Sales generated by your Business. We will debit your account for the Royalty on or after the Payment Day, based on Gross Sales for the previous week. You agree to make the funds available for withdrawal by electronic transfer before each due date. If you fail to report your Gross Sales for any week, we may debit your account for one hundred twenty percent (120%) of the Royalty that we debited for the previous week. If the Royalty we debit from your account is less than the Royalty you actually owe us (once we have determined your true and correct Gross Sales for the week), we will debit your account for the balance of the Royalty due on the day we specify. If the Royalty we debit from your account is greater than the Royalty you actually owe us for the week (once we have determined your true and correct Gross Sales for the week), we will credit the excess against the amount we otherwise would debit from your account during the following week, without interest.

C.    **MINIMUM PERFORMANCE REQUIREMENTS.**

You agree that you will conduct your Business so as to generate minimum Gross Sales of not less than (i) Five Hundred Thousand Dollars ($500,000.00) during any twelve (12) month period after the opening of your Massage Envy Business. Your failure to generate such level of Gross Sales during any twelve (12) months of operation shall afford us the right to terminate this Agreement or, in lieu of such termination, to require you to operate your Business under an approved recovery plan designed to improve the performance of your Business.

D.    **INTEREST ON LATE PAYMENTS; DISHONORED CHECKS.**

All amounts which you owe us (including Royalty payments), if not paid on the due date, will bear interest at the rate of fifteen percent (15%) per annum or the highest commercial contract interest rate the law allows, whichever is less. We will calculate the interest that we charge you on the basis of monthly compounding and the actual number of days elapsed divided by 365. If we institute an automatic debit program for your Business, we may debit your Account automatically for these amounts. You shall pay us a fee of One Hundred Dollars ($100.00) each

time a check you write to us is dishonored by your bank. You acknowledge that this Section 3.D. does not reflect any agreement by us to accept any payments after they are due or our commitment to extend credit to, or otherwise finance your operation of, your Business. You further acknowledge that your failure to pay all amounts that you owe us when due constitutes grounds for our terminating this Agreement under Section 14, notwithstanding this Section 3.D.

### E. APPLICATION OF PAYMENTS AND RIGHT OF SET-OFF.

Despite any designation you make, we may apply any of your payments to any of your past due indebtedness to us (or our affiliates). We may set off any amounts you owe us or our affiliates against any amounts we or our affiliates might owe you. The application of payments and right of set-off shall include any past due indebtedness or set-off amounts owed to us (or we might owe) under this Agreement or any other agreement, including any other franchise agreement, between us and you or your affiliates.

### F. SUCCESSOR FEE.

You agree to pay us a nonrecurring and nonrefundable successor fee of two-thirds (2/3's) of our then-current initial franchise fee for new Massage Envy Business (the "**Successor Fee**"). The Successor Fee is due and is fully earned by us when you sign the Successor Agreement.

## 4. TRAINING AND ASSISTANCE.

### A. TRAINING.

Before your Business opens, you will be provided approximately three (3) weeks of initial training (approximately fifteen (15) training days) on the operation of a Massage Envy Business for your Managing Owner (defined in Section 8.A.), your Business Manager and up to three (3) of your management personnel. The initial training program will include approximately one (1) week of classroom training at our corporate headquarters and approximately two (2) weeks of on-site training (approximately ten (10) days) at your Site or an operating Massage Envy Business. Our skincare suppliers, (or any other supplier we designate), may conduct certain portions of the on-site training relating to facials and related products and services. If your Business is located in an area serviced by a Regional Developer (defined in Section 12.A.), then the Regional Developer shall provide the on-site training to you. Your Managing Owner, your Business Manager (defined in Section 8.A.) and the number of additional management personnel we designate must complete the initial training program to our satisfaction and participate in all other activities we require before opening your Business. Although we provide the initial training program at no additional fee, you must pay all travel and living expenses that you and your personnel incur.

In the event that your Managing Owner fails to satisfactorily complete and pass the required initial training program, then we reserve the right, in our sole discretion, to require your Managing Owner (or a successor Managing Owner that you appoint and we approve) to attend additional training and we will charge you an additional training fee of Two Hundred Fifty Dollars ($250.00) per day per person. If your Managing Owner is unable to satisfactorily complete and pass that initial training program, we reserve the right, in our sole discretion, to terminate this Agreement. If we determine that your Business Manager or any of your employees

has failed to satisfactorily complete the initial training program, you agree to immediately submit a substitute and promptly arrange for such person to complete the initial training program to our satisfaction. You shall pay the additional training fee for initial training programs furnished to any individual who replaces an employee who has previously attended such training programs. You are responsible for all travel and living expenses.

We may require you and/or your previously trained and experienced employees attend up to five (5) days of additional or refresher training courses each year and an annual convention up to three (3) days per year at the times and Business we designate. We may charge a fee of Two Hundred Fifty Dollars ($250.00) per day per person for these courses, conventions and programs. In the event that you fail to attend the annual convention, we may charge you a penalty of up to $400 per person per day for the duration of the annual convention. You are responsible for all travel and living expenses.

**B. ON-SITE ASSISTANCE.**

We will provide, at no additional cost to you, on-site advice, guidance and support for a period of no more than ten (10) days, in connection with the opening and initial operations of your Business; provided, however, that if you are a Regional Developer under a Regional Development Agreement with us, and this Agreement is not for your first Massage Envy Business, then you will not receive this on-site assistance. We shall determine, in our sole discretion, the composition of the on-site assistance team. If we determine, in our sole discretion, that additional on-site assistance is necessary or beneficial, we have the right, at our option, to provide such additional on-site assistance. You will be required to pay reasonable fees for any such additional on-site assistance and will also be responsible for the reasonable travel or living expenses incurred by our personnel in providing such additional on-site assistance.

**C. GENERAL GUIDANCE.**

We will advise you from time to time regarding your Business' operation based on your reports or our inspections. We will provide guidance to you in our operating manual and other technical manuals ("**Operations Manual**"); in bulletins or other written materials; by electronic media; by telephone consultation; and/or at our office or your Business. If you request and we agree to provide additional or special guidance, assistance or training, you must pay our then applicable charges, including our personnel's per diem charges and any reasonable travel and living expenses. Notwithstanding for foregoing, you are responsible for the terms and conditions of employment of your employees.

**D. OPERATIONS MANUAL.**

We will provide access to you, to use in operating your Business during this Agreement's term, one (1) copy of our Operations Manual, which might be or include audiotapes, videotapes, computer disks, compact disks and/or written or intangible materials and which may be available to you by various means, including access through the Internet. The Operations Manual contains mandatory and suggested specifications, standards, operating procedures and rules that we periodically prescribe for operating a Massage Envy Business and information on your other obligations under this Agreement ("**System Standards**") in order to help us ensure, among other

*MEF\FA\0419*
*EAST\165992616.4*

ELECTRONICALLY FILED - 2022 Jul 05 3:44 PM - DORCHESTER - COMMON PLEAS - CASE#2022CP1801053

things, that the Massage Envy brand is consistently operated by all franchisees within the Franchise System and because we have a legitimate interest in protecting the quality of the products and services offered at Massage Envy Business and the goodwill of our Marks and all Massage Envy Business are preserved. The Operations Manual is incorporated by reference into this Agreement and is a binding part of this Agreement. We may modify the Operations Manual periodically to reflect changes in System Standards. You agree to keep your copy of the Operations Manual current and in a secure location at your Business facility. If there is a dispute over its contents, our master copy of the Operations Manual controls. You agree that the contents of the Operations Manual are confidential and that you will not disclose the Operations Manual to any person other than your employees who need to know its contents. You may not at any time copy, duplicate, record or otherwise reproduce any part of the Operations Manual. With the exception of policies regarding inappropriate conduct and minimum requirements for managers, massage therapists and estheticians, any personnel policies or procedures which are made available in the Operations Manual are for your optional use and are not mandatory. You shall determine to what extent, if any, such personnel policies and procedures may be applicable to your Business operations in your jurisdiction. You and we recognize that we neither dictate nor control labor and employment matters for you and your employees.

### E.  DELEGATION OF PERFORMANCE.

You agree that we have the right to delegate the performance of any portion or all of our obligations under this Agreement to third party designees, whether these designees are our agents or independent contractors with whom we contract to perform these obligations, including our Regional Developer franchisees.

### 5.  MARKS.

### A.  OWNERSHIP AND GOODWILL OF MARKS.

Your right to use the Marks is derived only from this Agreement and is limited to the operation of your Business according to this Agreement and all System Standards we prescribe during its term. Your unauthorized use of the Marks is a breach of this Agreement and infringes our rights in the Marks, as applicable. You acknowledge and agree that your use of the Marks and any goodwill established by that use are for our exclusive benefit and that this Agreement does not confer any goodwill or other interests in the Marks upon you (other than the right to operate your Business under this Agreement). All provisions of this Agreement relating to the Marks apply to any additional and substitute trademarks and service marks we authorize you to use.

### B.  LIMITATIONS ON YOUR USE OF MARKS.

You agree to use the Marks as the sole identification of your Business (subject to the notices of independent ownership we designate). You may not use any Mark: (1) as part of any corporate or legal business name; (2) with any prefix, suffix or other modifying words, terms, designs or symbols (other than logos we have licensed to you); (3) in selling any unauthorized services or products; (4) as part of any domain name, electronic address or search engine you maintain on any **"Website"** (as defined in Section 9.D.) without our consent; or (5) in any other

manner we have not expressly authorized in writing. You may not use any Mark in advertising the transfer, sale or other disposition of your Business or an ownership interest in you (if a corporation, partnership, limited liability company or another business entity (an "**Entity**") holds the Franchise at any time during this Agreement's term) without our prior written consent, which we will not unreasonably withhold. You agree to prominently display the Marks at your Business facility in the manner we prescribe and on forms, advertising, supplies, employee uniforms and other materials we designate. You agree to give the notices of trademark and service mark registrations that we specify and to obtain any fictitious or assumed name registrations required under applicable law.

## C. NOTIFICATION OF INFRINGEMENTS AND CLAIMS.

You agree to notify us immediately of any apparent infringement of or challenge to your use of any Mark, or of any person's claim of any rights in any Mark, and not to communicate with any person other than us and our attorneys, and your attorneys, regarding any such infringement, challenge or claim. We may take the action we deem appropriate (including no action) and exclusively control any litigation, U.S. Patent and Trademark Office proceeding or other administrative proceeding arising from any infringement, challenge or claim or otherwise concerning any Mark. You agree to sign any documents and take any actions that, in the opinion of our attorneys, are necessary or advisable to protect and maintain our interests in any litigation or Patent and Trademark Office or other proceeding or otherwise to protect and maintain our interests in the Marks.

## D. DISCONTINUANCE OF USE OF MARKS.

If we believe at any time that it is advisable for us and/or you to modify or discontinue using any Mark and/or use one or more additional or substitute trademarks, or service marks, you agree to comply with our directions within a reasonable time after receiving notice. We need not reimburse you for your expenses in complying with these directions (such as costs you incur in changing your signs or replacing supplies), for any loss of revenue due to any modified or discontinued Mark, or for your expenses of promoting a modified or substitute trademark or service mark.

## E. INDEMNIFICATION FOR USE OF MARKS.

We agree to reimburse you for all damages and expenses you incur in any trademark infringement proceeding disputing your authorized use of any Mark under this Agreement if you have timely notified us of the proceeding, have complied with this Agreement, and comply with our directions in responding to the proceeding. At our option, we may defend and control the defense of any proceeding relating to any Mark.

## 6. CONFIDENTIAL INFORMATION.

We possess (and will continue to develop and acquire) certain confidential information relating to the development and operation of Massage Envy Business (the "**Confidential Information**"), which includes (without limitation):

(1)     site selection criteria;

ELECTRONICALLY FILED - 2022 Jul 05 3:44 PM - DORCHESTER - COMMON PLEAS - CASE#2022CP1801053

(2)     methods, formats, specifications, standards, systems, business policies, procedures, sales and marketing techniques, knowledge and experience used in developing and operating Massage Envy Business;

(3)     marketing research and promotional, marketing and advertising programs for Massage Envy Business;

(4)     knowledge of specifications for and suppliers of, and methods of ordering, certain Operating Assets and Products that Massage Envy Business use;

(5)     knowledge of the operating results and financial performance of Massage Envy Business including your Business;

(6)     customer communication and retention programs, along with data used or generated in connection with those programs;

(7)     graphic designs and related intellectual property;

(8)     information generated by, or used or developed in, your Business' operation, including customer names, addresses, telephone numbers, email addresses and related information and any other information contained from time to time in your Computer System or in any other format (e.g., paper records); and

(9)     any other information designated as confidential or proprietary by us.

You acknowledge and agree that by entering into this Agreement and/or acquiring the Franchise you will not acquire any interest in Confidential Information, other than the right to use certain Confidential Information in operating your Business during this Agreement's term and according to the System Standards and this Agreement's other terms and conditions, and that your use of any Confidential Information in any other business would constitute an unfair method of competition with us and our franchisees. You agree that we have the right to distribute information including operational results of Massage Envy Business, including yours, among our franchisees in order to provide, among other items, operational metrics to assist franchisees in operating their Massage Envy Business. You further acknowledge and agree that the Confidential Information is proprietary, includes our trade secrets, and is disclosed to you only on the condition that you agree, and you do agree, that you:

(a)     will not use any Confidential Information in any other business or capacity;

(b)     will keep the Confidential Information absolutely confidential during and after this Agreement's term;

(c)     will not make unauthorized copies of any Confidential Information disclosed via electronic medium or in written or other tangible form;

(d)     will adopt and implement all reasonable procedures that we periodically prescribe to prevent unauthorized use or disclosure of Confidential Information,

14

*MEF\FA\0419*
*EAST\165992616.4*

including, without limitation, restricting its disclosure to your personnel and others needing to know such Confidential Information to operate your Business, and using confidentiality and non-disclosure agreements with those having access to Confidential Information. We have the right to regulate the form of agreement that you use and to be a third party beneficiary of that agreement with independent enforcement rights; and

(e)      will not sell, trade or otherwise profit in any way from the Confidential Information, except using methods approved by us.

All ideas, concepts, techniques or materials relating to a Massage Envy Business, whether or not protectable intellectual property and whether created by or for you or your employees, must be promptly disclosed to us and will be deemed to be our sole and exclusive property, part of the Franchise System, and works made-for-hire for us. To the extent any item does not qualify as a "work made-for-hire" for us, by this paragraph you assign ownership of that item, and all related rights to that item, to us and agree to sign whatever assignment or other documents we request to evidence our ownership or to help us obtain intellectual property rights in the item.

"Confidential Information" does not include information, knowledge or know-how which is or becomes generally known in the massage, facial and personal health industry or which you knew from previous business experience before we provided it to you (directly or indirectly) or before you began training or operating your Business. If we include any matter in Confidential Information, anyone who claims that it is not Confidential Information must prove that the exclusion in this paragraph is fulfilled.

In order to protect our Confidential Information, you shall cause each of your Owners, directors, officers, management and supervisory employees, and other employees who have access to our Confidential Information, received training from us or whom we may reasonably require, to execute a confidentiality agreement. A recommended form of such confidentiality agreement shall be incorporated into the Operations Manual.

## 7.      EXCLUSIVE RELATIONSHIP.

You acknowledge that we have granted you the Franchise in consideration of and in reliance upon your agreement to deal exclusively with us in the massage and personal health industry. You therefore agree that, during this Agreement's term, neither you nor any of your shareholders or partners (if you are doing business as a corporation, limited liability company or partnership) nor any member of your immediate family will:

(1)      have any direct or indirect, controlling or non-controlling interest as an owner - whether of record, beneficial or otherwise - in a Competitive Business (defined below), wherever located or operating;

(2)      perform services as a director, officer, manager, employee, consultant, representative or agent, or in any other capacity, for a Competitive Business, wherever located or operating;

15

(3)    directly or indirectly loan any money or other thing of value to, or guarantee any other person's loan to, any Competitive Business or any owner, director, officer, manager, employee or agent of any Competitive Business, wherever located or operating;

(4)    divert or attempt to divert any actual or potential business or customer of your Business to a Competitive Business.

The term "**Competitive Business**" means (i) any business (or division of a business) that derives more than a nominal amount of its revenue per year from offering or providing any of the services authorized for Massage Envy Business or (ii) any business which grants franchises or licenses others to operate such a business, other than a Massage Envy Business operated under a franchise agreement with us.

## 8.    OPERATION AND SYSTEM STANDARDS FOR MASSAGE ENVY BUSINESSS.

### A.    <u>MANAGING OWNER & BUSINESS MANAGER.</u>

Concurrent with the execution of this Agreement, you shall designate one of your Owners who holds at least a 20% ownership interest in the franchise to serve as the managing owner (the "**Managing Owner**") of your Business as described in this Agreement. The Managing Owner will exert full-time efforts to manage and supervise the operation of your Business and will not engage in any other business or other activity, directly or indirectly, that may conflict with your obligations under this Agreement. The Managing Owner must successfully complete our initial training program before the opening of your Business. Any substitute Managing Owner must also complete our initial training program. You shall pay the charges that we establish for training programs furnished to any individual who replaces a previously trained Managing Owner.

Concurrent with the execution of this Agreement, you shall also designate a general manager (the "**Business Manager**") of your Business as described in this Agreement. The Managing Owner may, but need not, serve as the Business Manager. The Business Manager will exert full-time efforts to fulfill your obligations under this Agreement and will not engage in any other business or other activity, directly or indirectly, that requires any significant management responsibility or time commitments, or that may otherwise conflict with your obligations under this Agreement. If the Managing Owner does not serve as the Business Manager, the Managing Owner need not exert full-time efforts in the day-to-day operations of your Business, but the Managing Owner is responsible for supervising all activities of the Business Manager. If the relationship of the Business Manager to you terminates or materially changes, you agree to promptly designate a replacement. The Business Manager must successfully complete our initial training program before the opening of your Business. Any replacement Business Manager must also complete our initial training program. You shall pay the charges that we establish for training programs furnished to any individual who replaces a previously trained Business Manager.

### B.    <u>CONDITION AND APPEARANCE OF YOUR MASSAGE ENVY BUSINESS.</u>

You agree that you will not use your Business or any part of your Business facility for

16

any purpose other than operating a Massage Envy Business in compliance with this Agreement, and that you will place or display at your Business facility (interior and exterior) only those signs, emblems, designs, artwork, lettering, logos and display and advertising materials that we from time to time approve during this Agreement's term. You further agree to maintain the condition and appearance of your Business facility in accordance with our System Standards and consistent with the image of a Massage Envy Business as a professionally operated business offering high quality services and products and observing the highest standards of professionalism, cleanliness and courteous service. In connection therewith, you agree to take, without limitation, the following actions during this Agreement's term at your expense: (1) thorough cleaning, repainting and redecorating of the interior and exterior of your Business facility at intervals that we may prescribe; (2) interior and exterior repair of your Business facility as needed; and (3) repair or replacement, at our direction, of damaged, worn-out or obsolete equipment at intervals that we may prescribe (or, if we do not prescribe an interval for replacing any equipment, as that equipment needs to be repaired or replaced).

In addition to your obligations described above, we may periodically require you to substantially alter your Business facility's appearance, layout and/or design, and/or replace a material portion of your equipment, in order to meet our then current requirements for new Massage Envy Business. You acknowledge that this obligation could result in your making extensive structural changes to, and significantly remodeling and renovating, your Business facility, and you agree to incur any capital expenditures required in order to comply with this obligation and our requirements. We will not require you to make a fundamental and material change to the design of your facility within the first three (3) years of its operation. Within sixty (60) days after receiving written notice from us, you must have plans prepared according to the standards and specifications we prescribe and, if we require, using architects and contractors we designate or approve, and you must submit those plans to us for our approval. You must complete all work according to the plans we approve within the time period that we specify. However, nothing in this paragraph in any way limits your obligation to comply with all mandatory System Standards we specify.

## C.     <u>SERVICES AND PRODUCTS YOUR BUSINESS OFFERS.</u>

You agree that: (1) your Business will offer all services and products that we periodically specify; (2) you will not offer, sell, give away or otherwise provide at your Business facility or any other location any services or products we have not authorized; (3) you shall not sell any products at wholesale or through any channel of distribution other than retail sales at your Business facility (including, without limitation, sales of products via mail order, catalogs, toll free telephone numbers and electronic means including the Internet); (4) you shall not perform massage or other spa services or sell any products from any location other than your Business facility; and (5) you will discontinue selling and offering for sale any services or products that we at any time disapprove in writing. Without limiting the generality of the foregoing, you understand that you may not offer or sell waxing or similar or other services at your Business facility without our prior written approval.

## D.     <u>APPROVED PRODUCTS, DISTRIBUTORS AND SUPPLIERS.</u>

We reserve the right to periodically designate and approve standards, specifications,

suppliers and/or distributors of the Operating Assets, Products and support services we periodically authorize or require for use at your Business. During this Agreement's term you must acquire all Operating Assets and Products and services for your Business only according to our standards and specifications and, if we require, only from suppliers or distributors that we designate or approve (which may include or be limited to us and/or our affiliates). You acknowledge and agree that we and/or our affiliates may derive revenue based on your purchases and leases (including, without limitation, from charging you for products and services we or our affiliates provide to you and from promotional allowances, volume discounts and other payments made to us by suppliers that we designate or approve for some or all of our franchisees).

If you want to use any Operating Assets, Products or support services that we have not yet evaluated or purchase any item from a supplier or distributor that we have not yet approved (for items that we require you to purchase from designated or approved suppliers or distributors), you first must submit sufficient information, specifications and samples for us to determine whether the item complies with our standards and specifications or the supplier or distributor meets our criteria. We may condition our approval of a supplier or distributor on requirements relating to product quality, prices, consistency, warranty, reliability, financial capability, labor relations, customer relations, frequency of delivery, concentration of purchases, standards of service (including prompt attention to complaints) or other criteria. We have the right to inspect the proposed supplier's or distributor's facilities and to require the proposed supplier or distributor to deliver product samples or items, at our option, either directly to us or to any independent, certified laboratory which we designate for testing. Either you or the proposed supplier or distributor must pay us a fee (not to exceed the reasonable cost of the inspection and the actual cost of the test) to make the evaluation. We reserve the right to periodically re-inspect the facilities and products of any approved supplier or distributor and to revoke our approval if the supplier, distributor or product does not continue to meet our criteria.

E.     **COMPLIANCE WITH LAWS AND GOOD BUSINESS PRACTICES.**

It is your sole and absolute obligation to research all applicable federal, state and local laws and regulations governing the operation of your Business and to ensure that such operation does not violate any federal, state or local law or regulation. You must secure and maintain in force throughout this Agreement's term all required licenses, permits and certificates relating to the Business' operation and operate the Business in full compliance with all applicable laws, ordinances and regulations. All massage therapists and aestheticians providing services at your Business must also maintain all required licenses at all times. In all dealings with customers, suppliers, us and the public, you and your employees must adhere to the highest standards of honesty, integrity, fair dealing and ethical conduct. You agree to refrain from any business or advertising practice which might injure our business or the goodwill associated with the Marks or other Massage Envy Business. You must notify us in writing within five (5) days of: (1) the commencement of any action, suit or proceeding relating to your Business; (2) the issuance of any order, writ, injunction, award or decree of any court, agency or other governmental instrumentality which might adversely affect your operation or financial condition or that of your Business (including, without limitation, the revocation or threatened revocation of any license, permit or certification applicable to your Business); and (3) any notice of violation of any law, ordinance or regulation relating to your Business.

MEF\FA\0419
EAST\165992616.4

## F.   INSURANCE.

At your sole cost and expense, you must procure and maintain in full force and effect at all times during this Agreement's term, insurance policies, in such amounts and on such terms, as prescribed by us in the Operations Manual. All insurance policies shall be issued by insurance carriers rated A-VIII or better by Alfred M. Best & Company, Inc. (or similar criteria as we periodically specify). All carriers must be licensed and approved in the state(s) where you operate your Business. If you own multiple Massage Envy Businesses, you may consolidate the required insurance coverage for those Businesses so long as the limits meet the multi-unit coverage requirements that we specify. You must obtain such policies before opening the Massage Envy Business. Upon ten (10) days' notice to you, we may increase the minimum protection requirement as of the renewal date of any policy, and require different or additional types of insurance at any time, including excess liability (umbrella) insurance, to reflect inflation, identification of special risks, changes in law or standards or liability, higher damage awards or other relevant changes in circumstances.

All insurance policies required under this Section must insure you and us, and our affiliates including, at a minimum, specifically named affiliates we designate in writing to you, our direct and indirect parent companies (and ours and our affiliates' members, owners, officers, directors, and employees), and, if applicable, your Regional Developer and its members, owners, officers, directors and employees), as additional insureds, contain a waiver by the insurance carrier(s) of all subrogation rights against us and your Regional Developer, and shall provide that we receive thirty (30) days prior written notice of termination, expiration, cancellation or modification of any such insurance policy. Should any of your insurance companies fail to give us notice as required in this Section, then the policy of that company may be disapproved by us. In that event, you will be required to immediately find additional coverage satisfactory to us with an alternative carrier.

You shall furnish to us annually a copy of the certificate of insurance or other evidence of the renewal or extension of each such insurance policy required hereunder. If at any time you fail or refuse to maintain in effect any insurance coverage required by us, or to furnish satisfactory evidence thereof, we, at our option and in addition to our other rights and remedies in this Agreement, may, but need not, obtain such insurance coverage on behalf of you, and you shall promptly execute any applications or other forms or instruments required to obtain any such insurance and pay to us, on demand, any costs and premiums incurred by us and we may, at our option, debit your account for the amount of such costs or premiums. Your failure to provide insurance coverage as indicated will be considered a material event of default of this Agreement. Your obligation to obtain and maintain the insurance described in this Section shall not be limited in any way by reason of any insurance maintained by us, nor shall your performance of such obligations relieve you of any indemnification obligations contained in this Agreement. We reserve the right to request a copy of the certificate of insurance at any time to confirm coverage.

## G.   MAXIMUM AND MINIMUM PRICES.

To the extent permitted by applicable law, we may periodically establish maximum and/or minimum prices for services and products that your Business offers, including, without limitation, prices for promotions in which all or certain Massage Envy Business participate.

*MEF\FA\0419*
*EAST\165992616.4*

ELECTRONICALLY FILED - 2022 Jul 05 3:44 PM - DORCHESTER - COMMON PLEAS - CASE#2022CP1801053

### H.     NATIONAL CORPORATE WELLNESS ACCOUNTS.

We have the exclusive right, but not the obligation, to negotiate agreements with National Corporate Wellness Accounts (defined below) for the provision of goods and services by all Massage Envy Business. If we agree to terms with any National Corporate Wellness Account, you must provide products and services to all valid members of the National Corporate Wellness Account on those terms. If those terms include maximum prices, you may charge any prices you wish to the National Corporate Wellness Account's members up to and including the maximum prices. If any National Corporate Wellness Accounts contact you regarding goods or services to be provided by you and/or other Massage Envy Business, you must forward all relevant information regarding the National Corporate Wellness Account to us. In this Agreement, a **"National Corporate Wellness Account"** is any business or entity that would reasonably require the services of two (2) or more Massage Envy Business to serve the persons such business or entity represents (for example, a large employer, an employer with multiple offices, or a health plan).

### I.     RECIPROCITY.

During the term of this Agreement, upon proof that an individual is a valid and current member of another Massage Envy Business, you must allow any such member of another Massage Envy Business to receive massage and facial services at your Business at or below the reciprocity rates we specify from time to time in the Operations Manual. Members of your Massage Envy Business will have similar reciprocal rights with all other Massage Envy Business.

### J.     COMPLIANCE WITH SYSTEM STANDARDS.

You acknowledge that compliance with the entirety of the System Standards is essential for the success of your Business. In addition, you acknowledge and agree that operating and maintaining your Business according to the mandatory System Standards is essential to preserve the goodwill of the Marks and all Massage Envy Business. Therefore, you agree at all times to operate and maintain your Business according to each and every System Standard, as we periodically modify and supplement them. Except as otherwise specifically described in Section 4.D, System Standards may regulate certain necessary aspects of the operation and maintenance of your Business, including but not limited to any one or more of the following:

    (1)    design and layout specifications for a Massage Envy Business;

    (2)    sales, marketing, advertising and promotional programs and materials and media used in these programs;

    (3)    employee dress and appearance, although you have sole responsibility and authority for your employees' terms and conditions of employment and employee practices;

    (4)    minimum licensing, certifications, educational background, credentials and skill levels of massage therapists and aestheticians performing services at your Business;

    (5)    specification of required and authorized products and services;

(6)    use and display of the Marks;

(7)    days and hours of operation;

(8)    customer service standards and policies;

(9)    issuing and honoring gift cards and similar items and participating in other promotions (you agree not to issue any gift cards or similar items except in accordance with our policies relating to gift cards);

(10)    participation in market research and testing and product and service development programs;

(11)    accepting credit and debit cards, other payment systems and check verification services;

(12)    bookkeeping, accounting, data processing and record keeping systems and forms; formats, content and frequency of reports to us of sales, revenue, and financial reports and condition; and giving us copies of tax returns and other operating and financial information concerning the Franchise;

(13)    the terms and format of membership agreements; and

(14)    any violation of the Code of Conduct Violation, Handling and Reporting policy as set forth in our Operations Manual; and

(15)    any other aspects of operating and maintaining your Business that we determine to be useful to preserve or enhance the efficient operation, image or goodwill of the Marks and Massage Envy Business. However, the System Standards are not intended to be used by us to control or manage your Business on a day to day basis, which is your responsibility.

You agree that all mandatory System Standards we prescribe in the Operations Manual, or otherwise communicate to you in writing or another form, are part of this Agreement. All references to this Agreement include all mandatory System Standards as periodically modified. Subject to your rights under Section 8.B. relating to substantial alterations to the appearance, layout and/or design of your Business' facility and/or replacement of a material portion of your Operating Assets, you acknowledge that our periodic modification of our System Standards (including, without limitation, changes to the Computer System's components), which may accommodate regional and/or local variations, may obligate you to invest additional capital in your Business and incur higher operating costs, and you agree to comply with those obligations within the time period we specify. If (i) we notify you of a failure to comply with our System Standards and you fail to correct the non-compliance within the period of time that we require, then, in addition to any other remedies available to us under this Agreement (including, but not limited to, termination of this Agreement) or (ii) after committing a default under the Franchise Agreement, you commit the same default under the Franchise Agreement within 6 months, we may impose a fine of up to $500 per occurrence. Our collection of a fine for an uncured breach of any System Standard shall not preclude us from subsequently terminating this Agreement at any time that the breach remains uncured.

## K.     SECURITY BREACH.

You are required to notify us immediately if you suspect or become aware of a Security Breach. With the exception of any required notification to the payment card brands under PCIDSS (or other applicable standards), you agree that we will notify affected persons and regulatory authorities in accordance with applicable law. If, after consultation with you, we determine that notification is required or appropriate, you agree that you will bear all costs associated with such notification, which may include, without limitation, any costs for providing credit monitoring to the affected persons. Upon discovery of a Security Breach, you further agree that you will promptly investigate and remediate—at your expense—the source of such Security Breach. "**Security Breach**" means any known or suspected unauthorized use, theft, access, disclosure, loss, or acquisition of your Computer System or of any Confidential Information.

## 9.     MARKETING.

### A.     BY YOU.

You agree to spend at least six percent (6%) of your annual Gross Sales on advertising, marketing and promotional programs for your Business (the "**Minimum Marketing Spend Requirement**"). We will credit your Marketing Fund contributions (described below and equal to 2% of your annual Gross Sales), Cooperative contributions (described below), other amounts you spend to advertise, market or promote your Business consistent with this Agreement or the Operations Manual or such other instances in which we advise you or the Franchise System that amounts spent for designated marketing purposes will also be credited, toward the Minimum Marketing Spend Requirement. If your total Marketing Fund and Cooperative contributions are less than the Minimum Marketing Spend Requirement, you must spend the excess amount on other advertising, marketing and promotional programs for your Business. You may be required to spend more than the Minimum Marketing Spend Requirement if the total prescribed Marketing Fund contributions and Cooperative contributions exceed the Minimum Marketing Spend Requirement. We may review your books and records from time to time and/or require you to periodically submit reports to determine your advertising, marketing and promotion expenses.

You agree that your advertising, promotion and marketing will be completely clear, factual and not misleading and conform to the highest standards of ethical advertising and marketing and the advertising and marketing policies that we prescribe from time to time. Before you use them, you must send us for approval samples of all advertising, promotional and marketing materials which we have not prepared or previously approved during the last twelve (12) months. If we do not disapprove the materials within five (5) days of our receipt of them, they shall be deemed approved. You may not use any advertising, promotional or marketing materials that we have disapproved.

### B.     MARKETING FUND.

We have established a Marketing Fund (the "**Marketing Fund**") to pay for advertising, marketing, marketing materials, public relations programs, research and development and such other Franchise System development programs and activities that we deem appropriate from time

to time. You agree to contribute to the Marketing Fund the amounts that we periodically prescribe, not to exceed two percent (2%) of your Gross Sales, payable in the same manner as the Royalty (or in such other manner as we periodically prescribe). Massage Envy Business that we or our affiliates own will contribute to the Marketing Fund on the same basis as our franchisees. We will deposit all fines paid by you and other franchisees for non-compliance with our System Standards into the Marketing Fund.

We will designate, direct and have complete control over all advertising and marketing programs (including the creative concepts, materials, endorsements and media used for the programs as well as the geographic, market and media placement and allocation of the programs) and all other brand development activities. The Marketing Fund may pay for: (i) preparing and producing video, audio and written materials and digital and electronic media (including Social Media (defined below)); (ii) administering regional and multi-regional marketing and advertising programs, including, without limitation, marketing contests, purchasing trade journal, direct mail, radio and other media advertising and using advertising, promotion and marketing agencies and other advisors to provide assistance; (iii) supporting public relations, market research and other advertising, brand promotion and marketing activities; (iv) development and improvements to our Website (as defined herein); (v) research, development and promotion for new products and services that may be offered at or for Massage Envy Business; and (vi) research, development and promotion to improve our System Standards, customer brand loyalty, our Franchise System, and Business staffing including, but not limited to, safety and prevention efforts, assessments, and programs related to inappropriate conduct; guest relations and/or member/guest complaint programs (and associated research or analytics) locating qualified individuals for massage therapist and other positions in the massage therapy and spa industries, and/or the massage therapy, spa, or wellness industry generally. The Marketing Fund will periodically give you samples of advertising, marketing and promotional formats and materials at no cost and will sell you multiple copies of these materials at its direct cost of producing them, plus any related shipping, handling and storage charges.

We will account for the Marketing Fund separately from our other funds and not use the Marketing Fund for any of our general operating expenses, except to compensate us for the reasonable salaries, administrative costs, travel expenses and overhead we incur in administering the Marketing Fund and/or any of its permissible activities referenced in the prior paragraph, including, without limitation, collecting and accounting for Marketing Fund contributions. The Marketing Fund will not be our asset. The Marketing Fund is not a trust, and we do not owe you fiduciary obligations because of our maintaining, directing or administering the Marketing Fund or any other reason. The Marketing Fund may spend in any fiscal year more or less than the total Marketing Fund contributions in that year, borrow from us or others (paying reasonable interest) to cover deficits, or invest any surplus for future use. We will use all interest earned on Marketing Fund contributions to pay costs before using the Marketing Fund's other assets. We will prepare an annual, unaudited statement of Marketing Fund collections and expenses and give you the statement upon written request. We may incorporate the Marketing Fund or operate it through a separate entity whenever we deem appropriate. The successor entity will have all of the rights and duties specified in this Subsection.

We intend the Marketing Fund to maximize recognition of the Marks and patronage of Massage Envy Business and to help improve the overall consumer experience and brand

reputation. Although we will try to use the Marketing Fund, in part, to develop advertising and marketing materials and programs, and to place advertising and marketing, that will benefit all Massage Envy Business, we need not ensure that Marketing Fund expenditures in or affecting any geographic area are proportionate or equivalent to the Marketing Fund contributions by Massage Envy Business operating in that geographic area or that any Massage Envy Business benefits directly or in proportion to its Marketing Fund contribution from the development or placement of advertising and marketing materials. We have the right, but no obligation, to use collection agents and institute legal proceedings to collect Marketing Fund contributions at the Marketing Fund's expense. We also may forgive, waive, settle and compromise all claims by or against the Marketing Fund. Except as expressly provided in this Subsection, we assume no direct or indirect liability or obligation to you for collecting amounts due to, maintaining, directing or administering the Marketing Fund.

We may at any time defer or reduce the Marketing Fund contributions of a Massage Envy Business franchisee (and can later reinstate the Marketing Fund contributions at any time) and, upon thirty (30) days' prior written notice to you, reduce or suspend Marketing Fund contributions and operations for one or more periods of any length and terminate (and, if terminated, reinstate) the Marketing Fund. If we terminate the Marketing Fund, we will distribute all unspent monies to our franchisees, and to us and our affiliates, in proportion to their, and our, respective Marketing Fund contributions during the preceding twelve (12) month period.

## C.    MARKETING AND ADVERTISING COOPERATIVES.

(1)    You agree that we may designate a geographic area in which two (2) or more Massage Envy Business are located as a region in order to establish an advertising cooperative (a "**Regional Cooperative**"). The Regional Cooperative's members in any area will include all of the Massage Envy Business operating in that area (including us or our affiliates, if applicable). Each Regional Cooperative will (i) be organized and governed in a form and manner, (ii) begin operating on a date that we determine in advance, (iii) meet monthly, and (iv) submit to us the agenda and minutes for each meeting in accordance with our procedures. We may change, dissolve, or merge Cooperatives. Each Regional Cooperative's purpose is, with our approval, to administer advertising programs and develop advertising, marketing and promotional materials for the area that the Regional Cooperative covers. If, as of the time you sign this Agreement, we have established a Regional Cooperative for the geographic area in which your Business is located, or if we establish a Regional Cooperative in that area during the term of this Agreement, you agree to sign the documents we may require to become a member of the Regional Cooperative and to participate in the Regional Cooperative as those documents may require.

In addition to your Marketing Fund contribution in Section 9.B. above, you agree to contribute to the Regional Cooperative the amounts determined by the Regional Cooperative, subject to our approval and the Marketing Spending Requirement. All material decisions of the Regional Cooperative, including contribution levels, will require the affirmative vote of fifty-one percent (51%) of all Massage Envy Business operating within the Regional Cooperative's area (including, if applicable, those operated by us and our affiliates), with each Massage Envy Business receiving one (1) vote.

You agree to submit to us and the Regional Cooperative any reports that we or it requires. The Regional Cooperative will operate solely to collect and spend Regional Cooperative contributions for the purposes described above. The Regional Cooperative and its members may not use any advertising, marketing or promotional plans or materials without our prior written consent. Your Regional Cooperative may, with the majority vote of its members, engage in activities other than advertising and marketing including, but not limited to, therapist recruitment and promotion of massage therapy as a career, regional employee appreciation events, and joint purchasing or vendor arrangements.

(2)     During the term of this Agreement and while the Massage Envy National Marketing Cooperative (the "**National Coop**") continues in existence, all Massage Envy Business operating in the United States will be required to comply with the National Coop's requirements and obligations including financial contributions to the National Coop. The National Coop is governed by the Massage Envy National Marketing Cooperative Committee whose membership consists of individuals selected by us and individuals selected by franchisees on an annual basis. The exact criteria for membership on the Committee and its operating procedures and guidelines are described in the Operations Manual. As currently constructed, the Committee has the power and authority on behalf of all Massage Envy franchisees in the United States to approve all annual marketing plans of the National Coop and determine mandatory franchisee contribution levels for the National Coop. While contributions to the National Coop will be credited toward your Minimum Marketing Spend Requirement, you may be required to spend more than the Minimum Marketing Spend Requirement because National Coop contributions  must be fulfilled even if it means exceeding your Minimum Marketing Spend Requirement. Unless otherwise designated in the Operations Manual, certain technology fees paid by franchisees including you, will be credited towards your Minimum Marketing Spend Requirement.

## D.     WEBSITES AND INTERACTIVE MEDIA.

You specifically acknowledge and agree that any Website (as defined below) shall be deemed "advertising" under this Agreement, and will be subject to (among other things) our approval under Section 9.C. As used in this Agreement, the term "**Website**" means an interactive electronic document, a mobile media or a social media tool or page or Internet presence, contained in or utilizing a network of computers linked by communications software, including the Internet, World Wide Web and any similar successor technology, including texting, social media promotions, postings or sites, such as Facebook, Twitter and Myspace, and including any other electronic, mobile or digital device, method or system enabling the transmission of information. In connection with any Website that refers to your Business, Massage Envy Business, the services or products offered by Massage Envy Business, or the Marks, you agree to the following:

(1)     You shall not establish a separate Website without our prior written consent. We shall have the right, but not the obligation, to designate one or more web page(s) to describe you and/or your Business, such web page(s) to be located within our Website; and

(2)     If we approve, in writing, a separate Website for you, then each of the following provisions shall apply:

(a)     You shall not establish or use the Website without our prior written approval.

(b)     Before establishing the Website, you shall submit to us, for our prior written approval, a sample of the proposed Website domain name, format, visible content (including, but not limited to, proposed screen shots), and non-visible content (including, but not limited to, meta tags) in the form and manner we may reasonably require; and you shall not use or modify such Website without our prior written approval as to such proposed use or modification.

(c)     In addition to any other applicable requirements, you shall comply with our standards and specifications for Websites as we prescribe from time to time in the Operations Manual or otherwise in writing.

(d)     If we require, you shall establish such hyperlinks to our Website and others as we may request in writing.

(e)     We may revoke our approval at any time, in writing, and require that you discontinue use of a separate Website.

### E.     SOCIAL MEDIA.

You must comply with the standards developed by us for the System, in the manner directed by us in the Operations Manual or otherwise, with regard to our authorization to use, and use of, blogs, common social networks (including "Facebook" and "Myspace"), professional networks (including "LinkedIn"), live blogging tools (including "Twitter"), virtual worlds, file , audio and video sharing sites and other similar social networking media or tools ("**Social Media**") that in any way references the Marks or involves the System, Massage Envy Business or the Business.

### 10.     RECORDS, REPORTS AND FINANCIAL STATEMENTS.

You agree to establish and maintain at your own expense a bookkeeping, accounting and recordkeeping system conforming to the requirements and formats we prescribe from time to time, including by completing our standard Chart of Accounts in the manner we specify. We may require you to use a Computer System to maintain certain sales and expense data and other information, in such formats as we periodically prescribe, and to transmit that data and information to us on a schedule we periodically prescribe. You also must maintain the Computer System in order to allow us unlimited independent access to, and the ability to download, all information in your Computer System at any time. In addition to our ability to access and download information in your Computer System, you agree to give us and your Regional Developer in the manner and format that we periodically prescribe:

(1)     on or before the Payment Day, a report on your Gross Sales during the previous week;

(2)　within five (5) days after the end of each month, the operating statements, financial statements, statistical reports and other information we request regarding you and your Business covering that month;

(3)　by February 28th of each year, the operating statements, financial statements, statistical reports and other information we request regarding you and your Business for the previous calendar year; and

(4)　within ten (10) days after our request, exact copies of federal and state income and other tax returns and any other forms, records, books and other information we periodically require relating to your Business or the Franchise

You agree to verify and sign each report and financial statement in the manner we prescribe. We may disclose data derived from these reports, although we will not (without your consent) disclose your identity in connection with that data in any materials that we circulate publicly. If you ever receive formal notice from us of your failure to comply with your reporting or payment obligations under this Agreement, we may require you to have audited financial statements prepared annually during the remainder of the term of this Agreement.

## 11.　INSPECTIONS AND AUDITS.

### A.　OUR RIGHT TO INSPECT YOUR BUSINESS.

To determine whether you and your staff are complying with this Agreement and all System Standards, we and our designated agents and representatives may at all times and without prior notice to you:

(1)　inspect your Business;

(2)　observe, photograph, and videotape your Business' operation (including so called "mystery shopping") for consecutive or intermittent periods we deem necessary;

(3)　remove samples of any Products;

(4)　interview your personnel and customers; and

(5)　inspect and copy any books, records and documents relating to your operation.

You agree to cooperate with us fully. If we exercise any of these rights, we will use our best efforts not to interfere unreasonably with your operation. You agree to present to your customers the evaluation forms that we periodically prescribe and to participate and/or request your customers to participate in any surveys performed by or for us.

### B.　OUR RIGHT TO AUDIT.

We may at any time during your business hours, and without prior notice to you, examine your business, bookkeeping and accounting records, sales and income tax records and returns,

and other records. You agree to cooperate fully with our representatives and independent accountants in any inspection or audit. If any inspection or audit discloses an understatement of your Gross Sales, you must pay us, within fifteen (15) days after receiving the inspection or audit report, the Royalty and the Marketing Fund and Cooperative contributions due on the amount of the understatement, plus interest (in the amount described in Section 3.D above) from the date originally due until the date of payment. Further, if an inspection or audit is necessary due to your failure to furnish reports, supporting records or other information as required, or to furnish these items on a timely basis, or if our examination reveals a Royalty or Marketing Fund contribution understatement exceeding two percent (2%) of the amount that you actually reported to us for the period examined, you agree to reimburse us for the cost of our examination, including, without limitation, the charges of attorneys and independent accountants and the travel expenses, room and board, and compensation of our employees. These remedies are in addition to our other remedies and rights under this Agreement and applicable law.

## 12. TRANSFER.

### A. DELEGATION TO REGIONAL DEVELOPER.

You acknowledge that we may delegate some or all of our obligations under this Agreement relating to sales, training, site assistance, and supervisory services to any person identified as a "Regional Developer" in the Franchise Disclosure Document that was provided to you or that we subsequently designate as a Regional Developer. You agree in advance to any such delegation and assignment by us of any portion or all of our obligations and rights under this Agreement. You also acknowledge that you are not a third party beneficiary of any Regional Development Agreement or other agreement between us and any Regional Developer.

### B. TRANSFER BY US.

We may change our ownership or form and/or assign this Agreement and any other agreement without restriction. This Agreement and any other agreement will inure to the benefit of any transferee or other legal successor to our interest in it.

### C. TRANSFER BY YOU.

You understand and acknowledge that the rights and duties this Agreement creates are personal to you and that we have granted you the Franchise in reliance upon our perceptions of your character, skill, aptitude, attitude, English language proficiency, business ability and financial capacity. Accordingly, neither: (i) this Agreement or any interest in this Agreement; (ii) your or any Entity's interest in the Franchise, your Business or its assets (or any right to receive all or a portion of your profits or losses or any capital appreciation relating to your Business); (iii) all or substantially all of the Operating Assets; (iv) any ownership interest in you; nor (v) any ownership interest in any Entity holding the Franchise, may be transferred without our prior written approval. A transfer of the Business' ownership, possession, or control, or all or substantially all of the Operating Assets, may be made only with the concurrent transfer (to the same proposed transferee) of the franchise rights (with the transferee assuming this Agreement or signing our then-current form of franchise agreement and related documents, as we may require). Any transfer without our prior written approval is a breach of this Agreement and has

28

no effect, meaning you and your owners will continue to be obligated to us for all obligations under this Agreement.

In this Agreement, the term **"transfer"** includes any voluntary, involuntary, direct or indirect assignment, sale, gift or other disposition and includes the following events:

(1)     transfer of record or beneficial ownership of capital stock (if the Entity holding the Franchise is a corporation), a partnership or membership interest (if the Entity holding the Franchise is a partnership or limited liability company), or any other ownership interest or right to receive all or a portion of your profits or losses;

(2)     a merger, consolidation or exchange of shares or other ownership interests, or issuance of additional ownership interests or securities representing or potentially representing shares or other ownership interests, or a redemption of shares or other ownership interests;

(3)     any sale or exchange of voting interests or securities convertible to voting interests, or an agreement granting the right (directly or indirectly) to exercise or control the exercise of the voting rights of any owner or to control your (or an Entity with an ownership interest in you) or the Business' operations or affairs;

(4)     transfer of an interest in you, this Agreement, your Business or its assets (or any right to receive all or a portion of your profits or losses or any capital appreciation relating to your Business) in a divorce, insolvency or entity dissolution proceeding, or otherwise by operation of law;

(5)     if you or an Owner of the Entity holding the Franchise dies, transfer of an interest in the Entity, this Agreement, or your Business or its assets (or any right to receive all or a portion of your profits or losses or any capital appreciation relating to your Business) by will, declaration of or transfer in trust, or under the laws of intestate succession; or

(6)     pledge of this Agreement (to someone other than us) or of an ownership interest in the Entity holding the Franchise as security or collateral, foreclosure upon or attachment or seizure of the Business, or your transfer, surrender or loss of the possession, control or management of your Business.

D.     **CONDITIONS FOR APPROVAL OF TRANSFER.**

You will need our approval of any transfer you and your Owner(s) are contemplating in addition to you and your Owner's being in full compliance with this Agreement and the proposed buyer(s) being, in our opinion, individuals of good moral character who have sufficient business experience, English language proficiency, aptitude and financial resources to own and operate the Massage Envy Business and otherwise meet our then applicable standards for franchisees, and further provided that the following conditions are met prior to, or concurrently with, the effective date of the sale:

(1)     all your obligations incurred in connection with this Agreement have been discharged or assumed by the buyer(s);

ELECTRONICALLY FILED - 2022 Jul 05 3:44 PM - DORCHESTER - COMMON PLEAS - CASE#2022CP1801053

(2)    you shall have paid such Royalty Fees, Marketing Fund Fees and Cooperative contributions, and amounts owed for purchases by you from us which are then due and unpaid;

(3)    the buyer(s) shall have completed the training program required of new franchisees; the buyer(s) shall have proven to us its or their have the minimum net worth and liquidity requirements we have established in order to undertake and perform the requirements of

(4)    the lessor shall have consented to your assignment of the lease to the buyer(s), or the buyer(s) shall have secured substitute premises for the Massage Envy Business that has been approved by us; at our option, either (i) the buyer(s) and its or their owner shall have executed an assignment agreement and personal guaranty and agreed to be bound by the existing franchise agreement and such ancillary agreements that accompanied the grant of the Franchise for the transferred Massage Envy Business or (ii) the buyer and its or their owner will execute the then-current franchise agreement and its ancillary agreements, with the term to begin on the effective date of such agreement; and

(5)    you or the buyer(s) shall have paid a training and assignment fee to us in the amount equal to two-thirds (2/3's) of our then-current initial franchise fee for new Massage Envy Business to defray expenses incurred by us in connection with the transfer, including, without limitation, legal and accounting fees, credit and other investigation charges and evaluation of buyer(s) and the terms of the transfer; and

(6)    the buyer(s) shall have replaced or refurbished fixtures, signs, equipment, furniture and furnishings, and otherwise modified the methods and operations of the Massage Envy Business in compliance with specifications and standards then applicable to new franchises for Massage Envy Business; and

(7)    you and the Owner(s) shall have executed a general release, in a form satisfactory to us, of any and all claims against us and our members, managers, officers, directors, employees and agents and, if applicable your Regional Developer and its members, owners, officers, directors and employees; and

(8)    we shall have approved the material terms and conditions of such transfer, including, without limitation, that the price and terms of payment are not so burdensome as to adversely affect the future operations of the Massage Envy Business by the buyer(s) in compliance with assigned franchise agreement and ancillary agreements;

(9)    you and the Owner(s) shall reaffirm a covenant not to compete in favor of us and the buyer(s), all as contained within this Agreement; you and the Owner(s) shall have entered into an agreement with us to subordinate the buyer(s)' obligations to you or your Owner(s) to those obligations owed to us;

(10)    you shall have complied with our insurance requirements for your Business including if your professional and/or general liability clinic insurance is on a claims made form, then you shall have purchased tail insurance extending for a period of at least three (3) years following the date of the sale that includes the insurance coverage mandated in conjunction with the operation of your Business prior to the transfer;  and

ELECTRONICALLY FILED - 2022 Jul 05 3:44 PM - DORCHESTER - COMMON PLEAS - CASE#2022CP1801053

(11)     we have not exercised our right of first refusal under this Agreement.

If the proposed transfer is to an entity described in Subsection (E) below, then Subsection (7) above will not apply, although you must reimburse us for the costs we incur in the transfer, including any reasonable personnel and legal expenses. We may review all information regarding your Business that you give the transferee and give the transferee copies of any reports that you have given us or we have made regarding your Business.

### E.     ASSIGNMENT TO ENTITY PRINCIPALLY CONTROLLED BY YOU.

The franchise and its assets and liabilities may be assigned to a newly-formed corporation or other legal entity that conducts no business other than the operation of the Massage Envy Business and in which you and any of your principals own and control in the aggregate not less than one hundred percent (100%) of the equity and voting power of all outstanding capital stock or ownership interest, provided as follows:

(1)     that the proposed transferee complies with the provisions of this Agreement; and

(2)     that you are empowered to act for said corporation or other legal entity; and

(3)     that you shall submit to us documentation that we may reasonably request to effectuate the transfer, including the approving and acknowledging execution of this Agreement; and

(4)     that you shall submit to us a true and complete list of the shareholders, members or partners, showing number of shares or interests owned, and a list of the officers and directors if a corporation, or managers if a limited liability company, or managing partners if a partnership. We shall be promptly notified of any changes in said lists; and

(5)     that all certificates of shares or interests issued by transferee at any time shall have endorsed thereon an appropriate legend to conform with state law, referring to this Agreement by date and name of parties hereto, and stating "Transfer of This Certificate is Limited by the Terms and Condition of a Franchise Agreement Dated _____;" and

(6)     that a copy of this Agreement shall be given to every shareholder, member or partner of the legal entity, all of whom shall execute an Assignment Agreement in the form prepared by us to effect this assignment and who, along with their respective spouses, shall also execute the Guaranty and Assumption of Obligations; and

(7)     that a copy of the organizational documents and any corporate resolutions, and a Certificate of Good Standing, will be furnished to us at our reasonable request, and prompt notification in writing of any amendments thereto will be provided to us; and

(8)     That the number of shares or interests issued or outstanding in the transferee will not be increased or decreased without prior written notice to us and only in

compliance with Section 12.C. and 12.D. above. In addition, new shareholders, members or partners must agree to be bound by this entire Agreement. Shareholders, members or partners may make a separate agreement among them providing for purchase by the survivors among them of the shares of any shareholders or interests of any members or partners upon death, or other agreements affecting ownership or voting rights, so long as voting control and a majority representation of the board of directors or members or partners remains with those individuals who initially applied for and were approved as franchisees under this Agreement. Shareholders, members or partners must notify us in writing of any such agreement which affects control of the transferee.

**F.**      **DEATH OR DISABILITY.**

    (1)     Transfer Upon Managing Owner's Death or Disability.

Upon the death or disability of the Managing Owner, the Managing Owner's executor, administrator, conservator, guardian or other personal representative must transfer the Managing Owner's interest in this Agreement, the Lease, the Business and its assets, or the Managing Owner's ownership interest in the Entity holding the Franchise, to a third party or to another existing Owner. That transfer (including, without limitation, transfer by bequest or inheritance) must occur, subject to our rights under Subsection (2) below, within a reasonable time, not to exceed nine (9) months from the date of death or disability, and is subject to all of the terms and conditions in Section 12.D.(1) through (6) as well as to any other requirements we have for "Managing Owners." A failure to transfer such interest within this time period is a breach of this Agreement. The term **"disability"** means a mental or physical disability, impairment or condition that is reasonably expected to prevent or actually does prevent the Managing Owner from supervising the management and operation of your Business for ninety (90) or more consecutive days.

    (2)     Operation Upon Your Death or Disability.

If, upon the death or disability of the Managing Owner, you do not have a Business Manager to manage the day-to-day operations of your Business, then the Managing Owner's executor, administrator, conservator, guardian or other personal representative must within a reasonable time, not to exceed thirty (30) days from the date of death or disability, appoint a Business Manager we approve to operate your Business. Any new Business Manager that you appoint must, at your expense or at the expense of the Managing Owner's estate, satisfactorily complete the training that we designate within the time period we specify. In the event the Managing Owner is disabled, we have the right to evaluate the capabilities of the Business Manager to determine whether he/she can operate as the Business Manager during a period in which the Managing Owner will likely not be able to supervise the Business Manager on a full-time basis. For the avoidance of any doubt, retaining a Business Manager does not alleviate the obligation of the Managing Owner or the Managing Owner's executor, administrator, conservator, guardian or other personal representative, depending on the circumstances, to designate a Managing Owner.

ELECTRONICALLY FILED - 2022 Jul 05 3:44 PM - DORCHESTER - COMMON PLEAS - CASE#2022CP180103

### G.     **EFFECT OF CONSENT TO TRANSFER.**

Our consent to any transfer is not a representation of the fairness of the terms of any contract between you and the transferee, a guarantee of the transferee's prospects of success, or a waiver of any claims we have against you or of our right to demand the transferee's full compliance with this Agreement's terms and conditions.

### H.     **OUR RIGHT OF FIRST REFUSAL.**

If you or any of your Owners, or the owner of any ownership interest in an Entity with an ownership interest in you shall at any time determine to sell or transfer for consideration the franchise rights granted by this Agreement and the Business (or all or substantially all of its Operating Assets), any ownership interest in you, or any ownership interest in an Entity with an ownership interest in you (except to or among your current owners or in a transfer under Section 12.E. which are not subject to this Section 12.H.), you or your Owners shall obtain a bona fide, executed written offer relating exclusively to an interest in you or in the Business from a responsible and fully disclosed buyer, and shall submit a true and complete copy of such offer to us. The offer must include details of the payment terms of the proposed sale and the sources and terms of any financing for the proposed purchase price. To be a valid, bona fide offer, the proposed purchase price must be in a fixed dollar amount and without any contingent payments of purchase price (such as earn-out payments). We may require you (or your owners) to send us copies of any materials or information you send to the proposed buyer or transferee regarding the possible transaction.

For a period of thirty (30) days from the date of the delivery of the offer, we shall have the right, exercisable by written notice to you or your Owners, to purchase the Business or such ownership interest in you for the price and on the terms and conditions contained in such offer, provided that: (1) we may substitute cash for any form of payment proposed in the offer; (2) our credit will be deemed equal to the credit of any proposed buyer; (3) the closing will be not less than thirty (30) days after notifying you of our election to purchase or, if later, the closing date proposed in the offer; (4) we must receive, and you and the Owners agree to make, all customary representations and warranties given by the seller of the assets of a business or ownership interests in a legal entity, as applicable, including, without limitation, representations and warranties regarding ownership and condition of, and title to, assets and (if applicable) ownership interests, liens and encumbrances and validity of contracts and agreements, and the liabilities, contingent or otherwise, relating to the assets or ownership interests being purchased, and indemnities for all actions, events and conditions that existed or occurred in connection with the Business prior to the closing of our purchase; and (5) you and your Owners sign a general release, in a form satisfactory to us, of any and all claims against us and our affiliates and their respective owners, officers, directors, employees, representatives, agents successors and assigns. If we exercise our right of first refusal, you and your Owners (and their spouses) agree that, for eighteen (18) months beginning on the closing date, you and the selling Owners (and their spouses) will be bound by the non-competition covenant contained in Section 15.D. below.

If we do not exercise our right of first refusal, you and your Owners may complete the sale to the proposed buyer on the original offer's terms, but only if we approve the transfer as provided in Sections 12.C. and 12.D. above. If you do not complete the sale to the proposed

buyer (with our approval) within sixty (60) days after we notify you that we do not intend to exercise our right of first refusal, or if there is a material change in the terms of the sale (which you must tell us promptly), we will have an additional right of first refusal during the thirty (30) day period following either the expiration of the sixty (60) day period or our receipt of notice of the material change(s) in the sale's terms, either on the terms originally offered or the modified terms, at our option.

We have the right to assign our right of first refusal under this Section 12.H. to any person or entity (who may be an affiliate), and that person or entity will have all of the rights and obligations under this Section 12.H. If we do not exercise our right of first refusal, you and your Owners may complete the sale of the Business or such ownership interest pursuant to and on the terms and conditions of such offer, subject to our approval of the purchaser in Section 12.D. of this Agreement.

## 13.    EXPIRATION OF THIS AGREEMENT.

### A.    YOUR RIGHT TO ACQUIRE A SUCCESSOR FRANCHISE.

Upon expiration of the Initial Term, if you (and each of your Owners) have substantially complied with this Agreement during the term of this Agreement, are then in compliance with this Agreement, meet our then applicable standards for franchisees, including but not limited to the minimum net worth and liquidity requirements for new franchisees to operate a Massage Envy Business, and:

(1)    you either (i) maintain possession of the Site and agree to remodel and/or expand your Business facility, add or replace improvements, equipment, fixtures, furnishings, and signs, and otherwise modify your Business facility as we require to bring it into compliance with specifications and standards then applicable for new Massage Envy Business or (ii) if you are unable to maintain possession of the Site, or if in our judgment your Business should be relocated, you: secure a substitute Site we approve; develop the substitute Site in compliance with specifications and standards then applicable for new Massage Envy Business; and continue to operate the Business at the original Site until operations are transferred to the substitute Site;

(2)    you pay us a Successor Fee as defined in Section 3.F. above; and

(3)    we have not indicated to you, prior to the date that you give us notice, our intent to withdraw from the market serviced by you under this Agreement and cease the offer and sale of Massage Envy Business in such market;

then, subject to the terms and conditions in this Section, you will have the right to acquire another Franchise (the "Successor Franchise") to operate the Business on the terms and conditions of the Franchise Agreement we are then using in granting Successor Franchises, any and all of the terms of which may differ materially from those contained in this Agreement (including fees and the boundaries of your Territory). If you are not granted a Successor Franchise because we have indicated our withdrawal from your market under Subsection (3) above, you shall retain the right to operate your Business as an independent, non-franchised business provided that you agree to comply with Sections 15.A., 15.B., 15.C. and 15.F. and our purchase option shall not apply.

MEF\FA\0419
EAST\165992616.4

ELECTRONICALLY FILED - 2022 Jul 05 3:44 PM - DORCHESTER - COMMON PLEAS - CASE#2022CP180153

## B.    GRANT OF A SUCCESSOR FRANCHISE.

You agree to give us notice of your election to acquire a Successor Franchise at least twelve (12) months but not more than fifteen (15) months prior to the expiration of the Term. We may require you to provide certain financial information relating to you and your Business' operation along with (and after delivering) your notice. After we receive your notice and all required information, we will conduct an audit of your Business to determine your compliance with your obligations under this Agreement and whether you meet our minimum standards for character, skill, aptitude, attitude, English language proficiency (to ensure you can effectively communicate with your staff, your customers and us) business ability and financial capacity, the right to own and operate a Massage Envy Business. We will advise you within ninety (90) days after we receive your notice and all required information of any deficiencies which must be corrected by you before we will grant you a Successor Franchise or the reason why we will not grant you a Successor Franchise.

## C.    AGREEMENTS/RELEASES.

If you satisfy all of the other conditions to the grant of a Successor Franchise, you and your Owners must, at least six (6) months prior to the expiration of the Initial Term, execute and return to us the form of Franchise Agreement and any ancillary agreements we are then using in connection with the grant of Successor Franchises (modified as permitted in Section 13.A above). As a further condition to the grant of a Successor Franchise, you and each Owner must also execute and deliver to us (together with delivery of the signed Franchise Agreement) general releases, in form satisfactory to us, of any and all claims against us, our affiliates, and our and our affiliates' respective subsidiaries, shareholders, officers, directors, employees, agents, successors, and assigns and, if applicable, your Regional Developer and its members, owners, officers, directors and employees. Subject to the terms and conditions contained herein, you shall receive one (1) Successor Franchise, the term of which shall be modified to begin on the date such franchise agreement is executed.

## 14.    TERMINATION OF AGREEMENT.

## A.    TERMINATION FOR INSOLVENCY.

You shall be in default under this Agreement, and all rights granted to you herein shall automatically terminate without notice to you, if you make an assignment for the benefit of creditors or admit in writing your insolvency or inability to pay your debts generally as they become due; you consent to the appointment of a receiver, trustee or liquidator of all or the substantial part of your property; the Business or its assets are attached, seized, subjected to a writ or distress warrant, or levied upon, unless the attachment, seizure, writ, warrant or levy is vacated within thirty (30) days; or any order appointing a receiver, trustee or liquidator of you or the Business is not vacated within thirty (30) days following the order's entry.

## B.    IMMEDIATE TERMINATION FOR UNCURABLE DEFAULTS.

Upon the occurrence of any of the following events of default, we may, at our option, terminate this Agreement and all rights granted hereunder, without affording you any opportunity to cure the default, effective immediately upon the provision of notice to you:

(1)    if you have made or make a material misrepresentation or omission in acquiring the Franchise or operating your Business;

(2)    if you breach Section 8.C. of the Agreement;

(3)    if your Managing Owner (or a substitute Managing Owner that you appoint) or your Business Manager does not satisfactorily complete initial training;

(4)    if you abandon or fail actively to operate your Business for three (3) or more consecutive calendar days, unless you close the Business for a purpose we approve;

(5)    if you surrender or transfer control of the operation of your Business without our prior written consent;

(6)    if you are convicted by a trial court of, or plead no contest to, a felony;

(7)    if you interfere with our right to inspect the Business or its records or observe its operation, as provided in Section 11;

(8)    if you engage in (a) any conduct which, in our opinion, is dishonest, unethical, offensive, or illegal or (b) any other conduct which, in our opinion, adversely affects the reputation of your Business, the reputation of other Massage Envy Business or the goodwill associated with the Marks;

(9)    if you make an unauthorized transfer in breach of Section 12;

(10)    if the lease for the Site is terminated for any reason or you otherwise lose possession of the Site and you do not find another site approved by us and sign a lease which meets our standards within ninety (90) days of such termination;

(11)    if any license or permit necessary for the proper operation of your Business is suspended, revoked or not renewed;

(12)    if you knowingly make any unauthorized use or disclosure of any part of the Operations Manual or any other Confidential Information;

(13)    if you fail to maintain minimum Gross Sales of $500,000 for a Massage Envy Business during any consecutive twelve (12) month period after opening of your Massage Envy Business;

(14)    if you knowingly make any unauthorized use of our Marks or Copyrights;

(15)    if you violate any law, ordinance or regulation relating to the ownership or operation of the Business (including, without limitation, any law pertaining to health, safety, or sanitation or licensing), or operate your Business in an unsafe manner, and (if the violation can be corrected) you do not begin to correct the violation immediately, and correct the violation fully within seventy-two (72) hours, after you receive notice of the violation from us;

(16)     if you fail to pay when due any federal, state or local income, service, sales or other taxes due with respect to the operation of your Business, or repeatedly fail to make or delay making payments to your suppliers or lenders, unless you are in good faith contesting your liability for these taxes or payments;

(17)     if you understate your Gross Sales three (3) times or more during this Agreement's term or by more than five percent (5%) on any one occasion;

(18)     if you (a) fail on three (3) or more separate occasions within any twenty four (24) consecutive month period to submit when due reports or other data, information or supporting records, pay when due any amounts due to us (or our affiliates), or otherwise comply with this Agreement, whether or not you correct any of these failures after we deliver written notice to you; or (b) fail on two (2) or more separate occasions within any twelve (12) consecutive month period to comply with the same obligation under this Agreement, whether or not you correct either of the failures after we deliver written notice to you;

(19)     if you default under a promissory note or loan agreement with respect to any material financing arrangement and fail to cure the default before the expiration of the cure period, if any;

(20)     if you fail to comply with your obligations under the Code of Conduct, Violation, Handling and Reporting Policy contained in the System Standards; or

(21)     if we send a notice of termination, no matter the reason, under any other franchise agreement to which you or one of your affiliates is a party or owns any direct or indirect ownership interest in a Massage Envy Business operating under any other franchise agreement with us or one of our affiliates.

## C.     TERMINATION AFTER 10-DAY CURE PERIOD.

Upon the occurrence of any of the following events of default, we may, at our option, terminate this Agreement by giving written notice of termination stating the nature of the default to you at least ten (10) days prior to the effective date of termination; provided, however, that you may avoid termination by immediately initiating a remedy to cure such default, curing it to our satisfaction, and by promptly providing proof thereof to us within the ten (10) day period. If any such default is not cured within the specified time, or such longer period as applicable law may require, this Agreement shall terminate without further notice to you, effective immediately upon the expiration of the ten (10) day period or such longer period as applicable law may require.

(1)     if you fail to pay us (or our affiliates) any amounts or you fail to pay any other financial obligation of your Business; or

(2)     if you fail to maintain the insurance we require from time to time.

## D.     TERMINATION AFTER 30-DAY CURE PERIOD.

Except as otherwise provided in Sections 14.A., 14.B., and 14.C. of this Agreement, upon

any other default by you that, in our discretion, is subject to cure, we may terminate this Agreement by giving written notice of termination stating the nature of the default to you at least thirty (30) days prior to the effective date of termination; provided, however, that you may avoid termination by immediately initiating a remedy to cure such default, curing it to our satisfaction, and by promptly providing proof thereof to us within the thirty (30) day period. If any such default is not cured within the specified time, or such longer period as applicable law may require, this Agreement shall terminate without further notice to you, effective immediately upon the expiration of the thirty (30) day period or such longer period as applicable law may require.

      **E.**    **REMEDIES UPON DEFAULT**. In addition to and without limiting our other rights and remedies under this Agreement, any other agreement and applicable law, upon the occurrence of any of the events that give rise to our right to terminate this Agreement under Sections 14.A., 14.B., 14.C. and 14.D., we may, at our sole option and upon delivery of written notice to you, elect to take any or all of the following actions without terminating this Agreement:

      (1)    temporarily or permanently reduce the size of the Territory, in which event the restrictions on us and our affiliates under the first paragraph of Section 1.C. will not apply in the geographic area that was removed from the Territory;

      (2)    temporarily remove information concerning the Massage Envy Business from the System Website and/or stop your or the Massage Envy Business's participation in any other programs or benefits offered on or through the System Website;

      (3)    suspend your right to participate in one or more programs or benefits that the Marketing Fund provides and/or your Marketing Fund contributions fund;

      (4)    suspend any other services that we or our affiliate provides to you under this Agreement or any other agreement;

      (5)    suspend or terminate any temporary or permanent fee reductions to which we might have agreed (whether as a policy, in an amendment to this Agreement or otherwise);

      (6)    refuse to provide any operational support that this Agreement requires or we have elected to provide; and/or

      (7)    enter the Massage Envy Business's premises and assume the management of the Massage Envy Business ourselves or appoint a third party (which may be our affiliate or a Regional Developer) to manage the Massage Envy Business. If we or our assignee does so, the manager will not exercise direct or indirect control over the working conditions of the Massage Envy Business except to the extent such indirect control is related to our legitimate interest in protecting the quality of products, services, or the Massage Envy brand. All funds from the operation of the Massage Envy Business while we or our appointee assumes its management will be kept in a separate account, and all of the expenses of the Massage Envy Business will be charged to that account. We or our appointee may charge you (in addition to the amounts due under this Agreement) a reasonable management fee we specify, up to eight percent (8%) of the Massage Envy Business's Gross Sales, but not less than $5,000.00 per month, plus our (or our

38

appointee's) direct out-of-pocket costs and expenses. We or our appointee has a duty to utilize only reasonable efforts and will not be liable to you for any debts, losses or obligations the Massage Envy Business incurs, or to any of your creditors for any products or services the Massage Envy Business purchases, while managing it. You shall not take any action or fail to take any action that would interfere with our or our appointee's exclusive right to manage the Massage Envy Business. Our (or our appointee's) management of the Massage Envy Business will continue for intervals lasting up to ninety (90) days each, and we will during each interval periodically evaluate whether you are capable of resuming the Massage Envy Business's operation and periodically discuss the Massage Envy Business's status with you. Our exercise of our rights under this Section 14.E. will not be a defense for you to our enforcement of any other provision of this Agreement or waive or release you from any of your other obligations under this Agreement. Our exercise of these rights will not constitute an actual or constructive termination of this Agreement nor be our sole or exclusive remedy for your default. You remain obligated to pay all fees due hereunder and otherwise comply with all of your obligations under this Agreement (except as set forth in Section 14.E.(7)) following our exercise of any of these rights, although you acknowledge and agree that we will use revenue generated at the Massage Envy Business to pay many of the operating and franchise-related expenses of the Business during the period we manage the Massage Envy Business; provided, however, that we will only pay such expenses to the extent of available funds (less a reasonable reserve for working capital). Notwithstanding the preceding sentence, you remain obligated to pay separately fees and expenses associated with the Business which are not directly related to its day-to-day operation such as, but not limited to, any debt service and taxes. If we request, you will execute a management agreement prepared by us to facilitate our or our appointee acting as manager pursuant to this Section 14.E. For purposes of clarity, you acknowledge and agree that, among other reasons, we (or a third party assignee) may assume management of the Massage Envy Business under this Section 14.E.(7) if: (i) you abandon or fail to actively operate the Business; (ii) this Agreement terminates or expires and we are deciding whether to exercise our option to purchase the Business under Section 15.E. of this Agreement; or (iii) in lieu of terminating this Agreement, we are facilitating the transition of the Business to another Massage Envy franchisee (new or currently existing) or an orderly winding-down of the Business. If we exercise any of our rights under this Section 14.E., we may thereafter terminate this Agreement without providing you any additional corrective or cure period, unless the default giving rise to our right to terminate this Agreement has been cured to our reasonable satisfaction.

## 15. OUR AND YOUR RIGHTS AND OBLIGATIONS UPON TERMINATION OR EXPIRATION OF THIS AGREEMENT.

### A. PAYMENT OF AMOUNTS OWED.

Within fifteen (15) days after this Agreement the earlier of the termination or expiration of this Agreement, or on any later date that we designate, you will pay us any and all accrued and unpaid and otherwise outstanding Royalties, Marketing Fund contributions, National or Regional Cooperative contributions, technology fees and interest charges as well as all other outstanding amounts owed to us, our affiliates or our or their franchisees. Irrespective of whether this Agreement expires or is earlier terminated, if your Massage Envy Business ceases operating as a result of the expiration or earlier termination of this Agreement, you acknowledge and agree you remain obligated to continue to pay all fees, expenses and reciprocity rates associated with the

ELECTRONICALLY FILED - 2022 Jul 05 3:44 PM - DORCHESTER - COMMON PLEAS - CASE#2022CP180 1053

then-active membership agreements to which you are a party and gift cards you previously sold.

B.    DE-IDENTIFICATION.

When this Agreement expires or is terminated for any reason:

(1)    you shall not directly or indirectly at any time thereafter or in any manner (except in connection with other Massage Envy Business you own and operate): (a) identify yourself or any business as a current or former Massage Envy Business or as one of our franchisees; (b) use any Copyright, Mark, any colorable imitation of a Mark, any trademark, service mark or commercial symbol that is confusingly similar to any Mark, or other indicia of a Massage Envy Business in any manner or for any purpose; or (c) use for any purpose any trade name, trademark, service mark or other commercial symbol that indicates or suggests a connection or association with us;

(2)    you agree to take the action required to cancel all fictitious or assumed name or equivalent registrations relating to your use of any Mark;

(3)    you agree to deliver to us within thirty (30) days all advertising, marketing and promotional materials, forms, and other materials containing any Mark or Copyright or otherwise identifying or relating to a Massage Envy Business that we request and allow us, without liability to you or third parties, to remove these items from your Business facility;

(4)    if applicable, notify all search engines of the termination or expiration of your right to use all domain names, Websites and other search engines associated directly or indirectly with your Business and authorize those search engines to transfer to us or our designee all rights to the domain names, Websites and search engines relating to the Marks or your Business. We have the absolute right and interest in and to all domain names, Websites and search engines associated with the Marks or your Business, and you hereby authorize us to direct all applicable parties to transfer your domain names, Websites and search engines to us or our designee if this Agreement expires or is terminated for any reason whatsoever. All parties may accept this Agreement as conclusive of our right to such domain names, Business telephone numbers, Websites and search engines and this Agreement will constitute the authority from you for all parties to transfer all such domain names, Websites and search engines to us; and

(5)    you agree to give us, immediately after the expiration or termination of this Agreement but not more than five (5) business days, evidence satisfactory to us of your compliance with these obligations.

C.    CONFIDENTIAL INFORMATION AND CUSTOMER INFORMATION.

You agree that, when this Agreement expires or is terminated, you will immediately cease using any of our Confidential Information and other intellectual property in any business or otherwise, and return to us all copies of the Operations Manual and any other confidential materials that we have loaned you or that you have in your possession or control. You further acknowledge and agree that despite your ownership of your relationship with your customer, we are the owner of all customer data and information that you are using such information during the term of this Agreement to operate the Business. We grant you permission to use such data

*MEF\FA\0419*
*EAST\165992616.4*

and information, subject that upon the expiration, termination or transfer of your Franchise, you must transfer all customer agreements, accounts and related information to us or to the person that we specify.

### D.    <u>COVENANT NOT TO COMPETE.</u>

If (i) we terminate this Agreement according to its terms, (ii) you terminate this Agreement without cause or (iii) this Agreement expires and we do not enter into a Successor Agreement with you, then you agree that during the Post-Term Restricted Period (defined below), neither, you, nor any Owner, nor any member of an Owner's immediate family, may have any direct or indirect interest (<u>e.g.</u>, through a spouse) as a disclosed or beneficial owner, investor, partner, director, officer, employee, consultant, representative or agent, or in any other capacity, in any Competitive Business (as defined in Section 7 above) operating (i) at the Site, or (ii) within twenty-five (25) miles of the Site, or (iii) within twenty-five (25) miles of any other Massage Envy Business in operation or under construction on the date of the termination or expiration, as applicable. These restrictions also apply after transfers, as provided in Section 12.C. above (including the transfer of any ownership interest by an Owner), in which case the Post-Term Restricted Period begins to run from the date of the transfer.

For purposes of this Section, the "**Post-Term Restricted Period**" shall mean a period of eighteen (18) months beginning on the effective date of the termination, expiration or transfer, as applicable; provided, however, that if a court of competent jurisdiction determines that the eighteen-month (18) period is unenforceable due to its duration, the "**Post-Term Restricted Period**" shall mean a period of twelve (12) months beginning on the effective date of the termination, expiration or transfer, as applicable. If you or an Owner violates the terms of this Section during the Post-Term Restricted Period (including by virtue of an Owner's immediate family member's activities), the Post-Term Restricted period for you or the non-compliant Owner (as applicable) shall be extended for an additional period of time equal to the amount of time that you or the non-compliant Owner (as applicable) was in breach of this Section.

You expressly acknowledge that you and your Owners possess skills and abilities of a general nature and have other opportunities for exploiting these skills. Consequently, our enforcing the covenants made in this Subsection will not deprive you or the Owners of your personal goodwill or ability to earn a living.

### E.    <u>OUR RIGHT TO PURCHASE YOUR BUSINESS.</u>

(1)    <u>Exercise of Option</u>.  Upon (a) our termination of this Agreement according to its terms and conditions; (b) your termination of this Agreement without cause; or (c) expiration of this Agreement (if we offer, but you elect not to acquire, a successor franchise, or if we do not offer you a successor franchise due to your failure to satisfy the conditions for a successor franchise set forth in Section 13), we have the option, exercisable by giving us written notice before or within thirty (30) days after the date of termination or expiration, (i) to purchase the Business and the fee simple interest in the premises (if you or one of your affiliates owns the premises) or if you (or one of your affiliates) do not own the premises or we choose not to purchase your (or your affiliate's) fee simple interest in the premises, (ii) right to purchase the

Business and exercise the rights under Section 15.E.(2) below. We have the unrestricted right to assign this option to purchase.

(2)    Right to Premises. If you lease the premises from an unaffiliated lessor, or if we choose not to purchase your (or your affiliate's) fee simple interest in the premises, you agree (as applicable) at our election: (a) to assign your leasehold interest (including renewal options) in the premises to us or our designee; (b) to enter into a sublease with us or our designee for the remainder of the lease term on the same terms (including renewal options) as the lease; or (c) to lease the premises to us or our designee for an initial ten (10) year term, with two five (5) year renewal terms (at our option), on commercially reasonable terms.

(3)    Purchase Price. The purchase price for the interest in the Business and any Operating Assets and Products we choose to acquire will be their fair market value, provided that these items will not include any value for (i) the Franchise or any rights granted by this Agreement, (ii) the leasehold improvements or any rights granted by the Lease, (iii) any goodwill, whether attributable to the Marks or to your operation of the Business, (iv) our brand image and other intellectual property, or (v) participation in the network of Massage Envy Business. For purposes of determining the fair market value of all equipment (including the Computer System) used in operating the Business, the equipment's useful life shall be determined to be no more than three (3) years.

(4)    Appraisal. If we and you cannot agree on fair market value, then the parties will proceed with arbitration, as follows: (a) an arbitrator will be selected in accordance with the process described in Section 17.G.; (b) each party will propose an amount that each believes represents fair market value in accordance with the terms and conditions described in Section 15.E.(2); (c) the arbitrator will select either the amount we propose or the amount you propose (but no other amount) as the closest approximation of fair market value; and (d) the arbitrator's decision shall be the final and binding determination of fair market value, which shall be the purchase price.

(5)    Closing. We (or our assignee) will pay the purchase price at the closing, which will take place not later than thirty (30) days after the purchase price is determined, although we (or our assignee) may decide after the purchase price is determined not to exercise our purchase option. We may set off against the purchase price, and reduce the purchase price by, any and all amounts you owe us or our affiliates (as further described in Section 3.E. of this Agreement). At the closing, you agree to deliver instruments transferring to us (or our assignee): (a) good and merchantable title to the assets purchased, free and clear of all liens and encumbrances (other than liens and security interests acceptable to us), with all sales and transfer taxes paid by you; and (b) all of the Business' licenses and permits which may be assigned or transferred; and (c) an executed lease assignment, consented by the lessor, to the us or our assignee for the continued operations of the Massage Envy Business.

If you cannot deliver clear title to all of the purchased assets, or if there are other unresolved issues, we and you will close the sale through an escrow. You further agree to execute general releases, in a form satisfactory to us, of any and all claims against us and our affiliates and our and their respective shareholders, officers, directors, employees, agents, representatives, successors and assigns. If we exercise our rights under this Section 15.E., you

MEF\FA\0419
EAST\165992616.4

ELECTRONICALLY FILED - 2022 Jul 05 3:44 PM - DORCHESTER - COMMON PLEAS - CASE#2022CP1801053

agree that, for purposes of Section 15.D. above, the Post-Term Restricted Period shall begin on the closing date rather than the date of the termination or expiration of this Agreement.

### F.    CONTINUING OBLIGATIONS.

All of our and your obligations hereunder which expressly or by their nature survive this Agreement's expiration or termination will continue in full force and effect subsequent to and notwithstanding its expiration or termination and until these obligations are satisfied in full or by their nature expire.

## 16.    RELATIONSHIP OF THE PARTIES/INDEMNIFICATION.

### A.    INDEPENDENT BUSINESS OWNER.

You and we understand and agree that this Agreement does not create a fiduciary relationship between you and us. You have no authority, express or implied, to act as agent of us or any of our affiliates for any purpose. You are, and shall remain, an independent business owner responsible for all obligations and liabilities of your Business and for all claims or demands based on injury, illness or death of any person or persons, directly or indirectly, resulting from the operation of your Business. Further, we and you are not, and do not intend to be, partners, associates, or joint employers in any way, and we shall not be construed to be jointly liable for any of your acts or omissions under any circumstances. We have no relationship with your employees and you have no relationship with our employees. You agree to identify yourself conspicuously in all dealings with customers, suppliers, public officials, your personnel and others as the operator of a Massage Envy Business under a franchise we have granted and to place notices of independent ownership on the forms, business cards, stationery, advertising and other materials we require from time to time.

### B.    NO LIABILITY FOR ACTS OF OTHER PARTY.

We and you agree not to make any express or implied agreements, warranties, guarantees or representations, or incur any debt, in the name or on behalf of the other or represent that our respective relationship is other than franchisor and franchisee. We will not be obligated for any damages to any person or property directly or indirectly arising out of the operation of the Business or your other activities conducted under this Agreement.

### C.    TAXES.

We will have no liability for any sales, use, service, occupation, excise, gross receipts, income, property or other taxes, whether levied upon you or your Business, due to the business you conduct (except any taxes we are required by law to collect from you for purchases from us and our income taxes). You are responsible for paying these taxes.

### D.    INDEMNIFICATION.

To the fullest extent permitted by law, you will defend, indemnify and hold harmless us, and our affiliates, and subsidiary companies, and their permitted successors and assigns, and each of their respective direct and indirect owners, directors, officers, managers, employees,

agents, attorneys, and representatives and, if applicable, your Regional Developer and its members, owners, officers, directors and employees (collectively, the "**Indemnified Parties**") from and against all Losses (defined below), which any of the Indemnified Parties may suffer, sustain or incur, regardless of whether or not caused in part by us, as a result of a claim asserted or inquiry made formally or informally, or a legal action, investigation, or other proceeding brought, by a third party and directly or indirectly arising out of the Business, your Franchise, the business you conduct under this Agreement, your breach of this Agreement and any noncompliance or alleged noncompliance with any law, ordinance, rule or regulation concerning the construction, design or operation of your Business including, without limitation, the Americans with Disabilities Act, any allegation that we or another Indemnified Party is a joint employer or otherwise responsible for the acts or omissions relating to your employees, and other laws regarding public accommodations for persons with disabilities. We will promptly notify you of any claim that may give rise to a claim of indemnity hereunder, provided, however, that the failure to provide such notice shall not release you from your indemnification obligations under this Section 16.D., except to the extent you are actually and materially prejudiced by such failure. You shall have the right, upon written notice delivered to the Indemnified Party within fifteen (15) days thereafter assuming full responsibility for Losses resulting from such claim, to assume and control the defense of such claim, including the employment of counsel reasonably satisfactory to the Indemnified Party and the payment of the fees and disbursements of such counsel. If (i) the Indemnified Party shall have been advised by counsel that there are one or more legal or equitable defenses available to it that are different from, or in addition to, those available to you, and in the reasonable opinion of the Indemnified Party, counsel for you could not adequately represent the interests of the Indemnified Party because such interests could be in conflict with your interests, or (ii) you do not assume responsibility for such Losses in a timely manner or you fail to defend a claim with counsel reasonably satisfactory to the Indemnified Party as contemplated above, then the Indemnified Party shall have the right to employ counsel of its own choosing and you shall pay the reasonable fees and disbursements of such Indemnified Party's counsel as incurred; provided that in any case, you shall not be obligated to pay the expenses of more than one separate counsel for all Indemnified Parties taken together. In connection with any claim, the Indemnified Party or you, whichever is not assuming the defense of such claim, shall have the right to participate in such claim and to retain its own counsel at such party's own expense. You or the Indemnified Party (as the case may be) shall keep you or the Indemnified Party (as the case may be) reasonably apprised of, and shall respond to any reasonable requests concerning, the status of the defense of any claim of which it is maintaining, and shall cooperate in good faith with each other with respect to the defense of any such claim. You shall not, without the prior written consent of the Indemnified Party, (a) settle or compromise any claim or consent to the entry of any judgment with respect to any claim which does not include a written release from liability of such claim for the Indemnified Party and its affiliates, direct and indirect owners, directors, officers, managers, employees, agents, attorneys and representatives, or (b) settle or compromise any claim in any manner that may adversely affect the Indemnified Party other than as a result of money damages or other monetary payments which will be paid by you. No claim which is being defended in good faith by you in accordance with the terms of this Section 16.D. shall be settled by the Indemnified Party without your prior written consent. Notwithstanding anything to the contrary herein, if a claim involves the Marks, you agree that the Indemnified Party shall have the exclusive right to assume the defense of such claim, at your expense with counsel selected by the Indemnified Party but

reasonably satisfactory to you.

You have no obligation to indemnify or hold harmless an Indemnified Party for any Losses to the extent they are determined in a final, unappealable ruling issued by a court or arbitrator with competent jurisdiction to have been caused solely and directly by the Indemnified Party's gross negligence, willful misconduct, or willful wrongful omissions.

For purposes of this Section 16.D., "Losses" include all obligations, liabilities, damages (actual, consequential, or otherwise), and reasonable defense costs that any Indemnified Party incurs. Defense costs include, without limitation, accountants', arbitrators', attorneys', and expert witness fees, costs of investigation and proof of facts, court costs, travel and living expenses, and other expenses of litigation, arbitration, or alternative dispute resolution, regardless of whether litigation, arbitration, or alternative dispute resolution is commenced.

Your obligations in this Section 16.D. will continue in full force and effect subsequent to and notwithstanding this Agreement's expiration or termination. An Indemnified Party need not seek recovery from any insurer or other third party, or otherwise mitigate its Losses, in order to maintain and recover fully a claim against you under this Section 16.D. You agree that a failure to pursue a recovery or mitigate a Loss will not reduce or alter the amounts that an Indemnified Party may recover from you under this Section 16.D.

## 17. CONSTRUCTION & ENFORCEMENT.

### A. GOVERNING LAW.

All matters relating to arbitration will be governed by the Federal Arbitration Act (9 U.S.C. §§ 1 et seq.). Except to the extent governed by the Federal Arbitration Act, the United States Trademark Act of 1946 (Lanham Act, 15 U.S.C. sections 1051 et seq.), or other federal law, this Agreement, the Franchise, and all claims arising from the relationship between us and you will be governed by the laws of the State of Arizona, without regard to its conflict of laws rules, except that any Arizona law regulating the sale of franchises or governing the relationship of a franchisor and its franchisee will not apply unless its jurisdictional requirements are met independently without reference to this Section 17.A.

### B. SEVERABILITY AND SUBSTITUTION OF VALID PROVISIONS.

Each section, subsection, term and provision of this Agreement, and any portion thereof, shall be considered severable. If any applicable and binding law imposes mandatory, non-waivable terms or conditions that conflict with a provision of this Agreement, the terms or conditions required by such law shall govern to the extent of the inconsistency and supersede the conflicting provision of this Agreement. If a court concludes that any promise, covenant or System Standard in this Agreement is unreasonable and unenforceable: (i) the court may modify such promise, covenant or System Standard to the minimum extent necessary to make such promise, covenant or System Standard enforceable; or (ii) we may unilaterally modify such promise, covenant or System Standard to the minimum extent necessary to make such promise, covenant or System Standard enforceable.

MEF\FA\0419
EAST\165992616.4

ELECTRONICALLY FILED · 2022 Jul 05 3:44 PM · DORCHESTER · COMMON PLEAS · CASE#2022CP1801053

C.    **WAIVER OF OBLIGATIONS.**

We and you may by written instrument unilaterally waive or reduce any obligation of or restriction upon the other. Any waiver that we grant shall be without prejudice to any other rights we may have and may be revoked upon written notice to you. Neither we nor you shall be deemed to have waived or impaired any right, power or option reserved by this Agreement (including the right to demand exact compliance with every term, condition and covenant in this Agreement or to declare any breach of this Agreement to be a default and to terminate the Franchise before the expiration of its term) by virtue of: (i) any custom or practice of the parties at variance with the terms of this Agreement; (ii) any failure, refusal or neglect of us or you to exercise any right under this Agreement or to insist upon exact compliance by the other with its obligations under this Agreement, including any mandatory System Standard or operating procedure; (iii) any waiver, forbearance, delay, failure or omission by us to exercise any right, power or option, whether of the same, similar or different nature, relating to other Massage Envy franchisees; or (iv) the acceptance by us of any payments due from you after breach of this Agreement.

D.    **COSTS AND ATTORNEYS' FEES.**

If we incur costs and expenses to enforce our rights or your obligations under this Agreement due to your failure to comply with any provision of this Agreement (including failure to pay when due amounts owed to us, to submit reports or records or comply with our System Standards), you agree to reimburse all costs and expenses we incur including, without limitation, reasonable accounting, attorneys', arbitrators' and related fees. Your obligation to reimburse us arises whether or not we begin a formal legal proceeding against you to enforce this Agreement. If we do begin a formal legal proceeding against you, this reimbursement obligation applies to all costs and expenses we incur preparing for, commencing, and prosecuting the legal proceeding until it has completely ended.

E.    **YOU MAY NOT WITHHOLD PAYMENTS DUE TO US.**

You agree that you will not withhold payment of any amounts owed to us on the grounds of our alleged nonperformance of any of our obligations under this Agreement.

F.    **RIGHTS OF PARTIES ARE CUMULATIVE.**

Our and your rights under this Agreement are cumulative, and our or your exercise or enforcement of any right or remedy under this Agreement will not preclude our or your exercise or enforcement of any other right or remedy under this Agreement which we or you are entitled by law to enforce.

G.    **DISPUTE RESOLUTION.**

The parties agree to submit any claim, dispute or disagreement, including any matter pertaining to the validity, enforcement or interpretation of this Agreement (including compliance with our System Standards) or issues relating to the offer and sale of the franchise or the relationship between the parties (a "**Dispute**") to mediation before a mutually-agreeable mediator prior to arbitration.

MEF\FA\0419
EAST\165992616.4

ELECTRONICALLY FILED - 2022 Jul 05 3:44 PM - DORCHESTER - COMMON PLEAS - CASE#2022CP180105З

If the Dispute is not resolved by mediation within 30 days after either party makes a demand for mediation, the parties will submit the dispute to mandatory and binding arbitration conducted, except as this Section 17 otherwise provides, pursuant to the then-existing Commercial Arbitration Rules of the American Arbitration Association by one (1) arbitrator. All matters relating to arbitration will be governed by the Federal Arbitration Act (9 U.S.C. §§ 1 et seq.). Each party must submit or file any claim which would constitute a compulsory counterclaim (as defined by the Federal Rules of Civil Procedure) within the same proceeding as the claim to which it relates. Any claim which is not submitted or filed as required is forever barred. The arbitrator may not consider any settlement discussions or offers that might have been made by either you or us. The party filing the arbitration must initially bear the cost of any arbitration fees or costs.

The arbitrators will not have authority to award exemplary or punitive damages, but will have the right to award or include in the arbitrator's award any other relief that the arbitrator deems proper in the circumstances, including without limitation, money damages (with interest on unpaid amounts from due date), specific performance, injunctive relief, and attorneys' fees and costs (in accordance with Section 17.D.), provided that: (i) the arbitrator has no authority to declare any Mark generic or otherwise invalid and (ii) subject to the exceptions in Section 17.I., we and you waive to the fullest extent permitted under applicable law any right to or claim for any punitive, exemplary, treble and other forms of multiple damages against the other. Judgment upon the arbitrator's award may be entered in any court of competent jurisdiction as specified or permitted under Section 17.H.

We and you agree that arbitration will be conducted on an individual basis and not in a class, consolidated, or representative action, that only we (and our affiliates and our and their respective owners, officers, directors, agents, and employees, as applicable) and you (and your affiliates and your and their respective owners, officers, and directors, as applicable) may be the parties to any arbitration proceeding described in this Section, and that no such arbitration proceeding may be consolidated or joined with another arbitration proceeding involving us and/or any other person. Despite the foregoing or anything to the contrary in this Section or Section 17.B., if any court or arbitrator determines that all or any part of the preceding sentence is unenforceable with respect to a dispute that otherwise would be subject to arbitration under this Section 17.G., then we and you agree that this arbitration clause will not apply to that dispute, and such dispute will be resolved in a judicial proceeding in accordance with this Section 17 (excluding this Section 17.G.).

The provisions of this Section are intended to benefit and bind certain third party non-signatories and will continue in full force and effect subsequent to and notwithstanding this Agreement's expiration or termination.

### H.  CONSENT TO JURISDICTION.

Except as otherwise provided in this Section, you and your Owners agree that all mediation, arbitration and litigation proceedings involving any Dispute must be commenced in the county in which our principal place of business is located at the time the Dispute arises (currently, Maricopa County, Arizona) and you (and each Owner) irrevocably submit to the jurisdiction of the state and federal courts of general jurisdiction in such county. Notwithstanding

ELECTRONICALLY FILED - 2022 Jul 05 3:44 PM - DORCHESTER - COMMON PLEAS - CASE#2022CP1801053

the foregoing, you and your Owners agree that: (i) we may enforce this Agreement and any arbitration orders and awards in the courts of the state or states in which you are domiciled or your Business is located; and (ii) if the laws of the state in which your Business is located prohibit us from restricting jurisdiction or venue exclusively to a forum outside of that state with respect to any claim arising under such state's franchise laws, then either party may bring such claim either in the county in which our principal place of business is located or the state in which your Business is located. The arbitrator shall not have the power to select a different locale for the arbitration than as set forth in this Section 17.H.

### I. WAIVER OF RIGHTS AND LIMITATIONS ON CLAIMS.

ANY DISPUTE (OTHER THAN FOR PAYMENT OF MONIES OWED MUST BE BROUGHT WITHIN TWO (2) YEARS FOLLOWING THE CONDUCT, ACT OR OTHER EVENT OR OCCURRENCE GIVING RISE TO THE CLAIM, OR THE RIGHT TO ANY REMEDY WILL BE DEEMED FOREVER WAIVED AND BARRED. WE AND YOU IRREVOCABLY WAIVE: (i) TRIAL BY JURY; (ii) THE RIGHT TO ARBITRATE OR LITIGATE ON A CLASS ACTION BASIS, IN ANY ACTION, PROCEEDING OR COUNTERCLAIM, WHETHER AT LAW OR IN EQUITY, BROUGHT BY EITHER OF THE PARTIES; AND (iii) THE RIGHT TO CLAIM OR RECOVER ANY PUNITIVE OR EXEMPLARY DAMAGES. EACH PARTY SHALL BE LIMITED TO EQUITABLE RELIEF AND TO RECOVERY OF ANY ACTUAL DAMAGES IT SUSTAINS.

### J. INJUNCTIVE RELIEF.

Despite our and your agreement to arbitrate, nothing in this Agreement bars our right to obtain preliminary orders of specific performance of the provisions of this Agreement and temporary or preliminary injunctive relief against threatened conduct that will cause us, the Marks, or the Franchise System loss or damage, under customary equity rules, including applicable rules for obtaining restraining orders and preliminary injunctions (subject to our obligation to arbitrate the underlying claims if required under Section 17.G above). You agree that we may obtain such injunctive relief in addition to such further or other relief as may be available at law or in equity. You agree that we will not be required to post a bond to obtain injunctive relief and that your only remedy if an injunction is entered against you will be the dissolution of that injunction, if warranted, upon due hearing (all claims for damages by injunction being expressly waived hereby). If a court requires the filing of a bond notwithstanding the preceding sentence, the parties agree that the amount of the bond shall not exceed $1,000.

### K. BINDING EFFECT.

This Agreement is binding upon us and you and our and your respective executors, administrators, heirs, beneficiaries, permitted assigns and successors in interest. Subject to our rights to unilaterally modify the Operations Manual under Sections 4.D, the System Standards under Section 8.J and the System Standards and restrictive covenants under Section 17.B, this Agreement may not be modified except by a written agreement signed by both you and us.

L.    **CONSTRUCTION.**

This Agreement constitutes the entire agreement between the parties and may not, except as permitted by Sections 4.A., 8.J. and 17.B., be changed except by a written document signed by both parties.  Any e-mail correspondence or other form of informal electronic communication shall not be deemed to modify this Agreement unless such communication is signed by both parties and specifically states that it is intended to modify this Agreement. The preambles and exhibits are a part of this Agreement which, together with the Operations Manual, the Lease and any riders or addenda signed at the same time as this Agreement, constitutes our and your entire agreement and supersedes all prior and contemporaneous oral or written agreements and understandings between us and you. You  acknowledge that you have not received or relied upon any statements or representations by us or any of our representatives or agents) which are not expressly set forth in this Agreement. There are no other oral or written understandings or agreements between us and you, relating to the subject matter of this Agreement. Except as provided in Section 16.D. and 17.G., nothing in this Agreement is intended nor deemed to confer any rights or remedies upon any person or legal entity not a party to this Agreement.  Nothing in this Agreement or in any related agreement is intended to disclaim the representations we made in the franchise disclosure document.

Except where this Agreement expressly obligates us reasonably to approve or not unreasonably to withhold our approval of any of your actions or requests, we have the absolute right to refuse any request you make or to withhold our approval of any of your proposed, initiated or completed actions that require our approval.

The headings of the sections and paragraphs are for convenience only and do not define, limit or construe the contents of these sections or paragraphs.

References in this Agreement to "**we**" "**us**" and "**our**," with respect to all of our rights and all of your obligations to us under this Agreement, include any of our affiliates with whom you deal in connection with your Business. The term "**affiliate**" means any person or entity directly or indirectly owned or controlled by, under common control with, or owning or controlling us. "**Control**" means the power to direct or cause the direction of management and policies.

If two or more persons are at any time the Owners of the Franchise and your Business, whether as partners or joint venturers, all of those persons must sign this Agreement and their obligations and liabilities to us will be joint and several. References to "**you**" mean each of those persons. If you are an Entity, "**you**" includes that Entity and each of the Entity's Owners. "**Owner**" means you (if you consist of one or more individuals) and also means any individual holding a direct or indirect ownership interest (whether of record, beneficially or otherwise) or voting rights in any Entity that owns the Franchise or any interest in the Franchise. "**Person**" means any natural person, corporation, limited liability company, general or limited partnership, unincorporated association, cooperative or other legal or functional entity. The term "**Business**" includes all of the assets of the Massage Envy Business you operate under this Agreement, including its revenue and income.

This Agreement may be executed in multiple copies, each of which will be deemed an original.

*MEF\FA\0419*
*EAST\165992616.4*

ELECTRONICALLY FILED - 2022 Jul 05 3:44 PM - DORCHESTER - COMMON PLEAS - CASE#2022CP1801053

ELECTRONICALLY FILED - 2022 Jul 05 3:44 PM - DORCHESTER - COMMON PLEAS - CASE#2022CP1801053

M.    **COVENANT OF GOOD FAITH**.

If applicable law implies a covenant of good faith and fair dealing in this Agreement, the parties agree that the covenant shall not imply any rights or obligations that are inconsistent with a fair construction of the terms of this Agreement. Additionally, if applicable law shall imply the covenant, you agree that: (i) this Agreement (and the relationship of the parties that is inherent in this Agreement) grants us the discretion to make decisions, take actions and/or refrain from taking actions not inconsistent with our explicit rights and obligations under this Agreement that may favorably or adversely affect your interests; (ii) we will use our judgment in exercising the discretion based on our assessment of our own interests and balancing those interests against the interests of our franchisees generally (including ourselves and our affiliates if applicable), and specifically without considering your individual interests or the individual interests of any other particular franchisee; (iii) we will have no liability to you for the exercise of our discretion in this manner, so long as the discretion is not exercised in bad faith; and (iv) in the absence of bad faith, no trier of fact in any arbitration or litigation shall substitute its judgment for our judgment so exercised.

N.    **INTERIM TERM.**

If you do not execute a Successor Agreement after the expiration of the Initial Term, and you continue to accept the benefits of this Agreement after the expiration of the Initial Term, then at our option, this Agreement may be treated either as: (i) expired as of the date of the expiration with you then operating without a franchise to do so and in violation of our right; or (ii) continued on a month-to-month basis (the "**Interim Term**") until either party provides the other party with written notice of such party's intention to terminate the Interim Term. In the latter case, all of your obligations shall remain in full force and effect during the Interim Term as if this Agreement had not expired, and all obligations and restrictions imposed on you upon expiration of this Agreement shall be deemed to take effect upon termination of the Interim Term.

O.    **FORCE MAJEURE**

(1)    Subject to Section 17.O.(2) below, neither party to this Agreement shall be in breach of this Agreement or responsible for damages caused by delay or failure to perform in full or in part its obligations under this Agreement, provided that there is due diligence in attempted performance under the circumstances and that such delay or failure is due to one of the following events of *force majeure:* fire, earthquake, unusually severe weather, strikes, government sanctioned embargo, flood, act of God, war, terrorism, act (or delay in acting) of any public authority or sovereign government (including government delays in issuing required permits), civil disorder, delay or destruction caused by public carrier, curtailment of transportation facilities or any other similar circumstance substantially beyond the control of the party to be charged, and which cannot be reasonably forecast or prevented. If the *force majeure* event continues for a period of six (6) months, then either party shall have the right to cancel this Agreement upon ten (10) days written notice to the other,

(2)     Each party agrees to notify the other promptly upon discovery of an event of *force majeure,* as described above, which may cause a failure or delay in performance under this Agreement.

## P.     <u>LIMITED LIABILITY FOR OUR RELATED PARTIES.</u>

You agree that no past, present or future director, officer, employee, incorporator, member, partner, stockholder, subsidiary, affiliate, controlling party, entity under common control, ownership or management, vendor, service provider, agent, attorney or representative of ours will have any liability for (i) any of our obligations or liabilities relating to or arising from this Agreement; (ii) any claim against us based on, in respect of, or by reason of, the relationship between you and us, or (iii) any claim against us based on any alleged unlawful act or omission of ours.

## 18.     NOTICES AND PAYMENTS.

All written notices, reports and payments permitted or required to be delivered by the provisions of this Agreement or the Operations Manual will be deemed so delivered:

(1)     at the time delivered via computer transmission if the sender has confirmation of a successful transmission and, in the case of the Royalty, Marketing Fund contributions and other amounts due, at the time we actually debit your account (if we institute an automatic debit program for your Business);

(2)     one (1) business day after transmission by telecopy, facsimile or other electronic system if the sender has confirmation of successful transmission;

(3)     one (1) business day after being placed in the hands of a commercial courier service for next business day delivery; or

(4)     three (3) business days after placement in the United States Mail by Registered or Certified Mail, Return Receipt Requested, postage prepaid;

and must be addressed to the party to be notified at its most current principal business address of which the notifying party has notice. However, if your check for payment of Royalties, Marketing Fund contributions, or other amounts due is dishonored by your bank, such payment will not be deemed to be made until your replacement check is cleared by your bank. Any required payment or report which we do not actually receive during regular business hours on the date due (or postmarked by postal authorities at least three (3) days before then) will be deemed delinquent.

## 19.     ACKNOWLEDGMENTS.

To induce us to sign this Agreement and grant you the Franchise, you acknowledge:

(1)     That you have independently investigated the Massage Envy Business franchise opportunity and recognize that, like any other business, the nature of a Massage Envy Business may, and probably will, evolve and change over time.

ELECTRONICALLY FILED - 2022 Jul 05 3:44 PM - DORCHESTER - COMMON PLEAS - CASE#2022CP1801053

(2)       That an investment in a Massage Envy Business involves business risks.

(3)       That your business abilities and efforts are vital to your success.

(4)       That retaining customers for your Business will require a high level of customer service and strict adherence to the Franchise System and our System Standards and that you are committed to maintaining our System Standards.

(5)       That except as described in our Franchise Disclosure Document you have not received or relied upon, and we expressly disclaim making, any representation, warranty or guaranty, express or implied, as to the revenues, profits or success of your Business or any other Massage Envy Business.

(6)       That any information you have acquired from other Massage Envy Business franchisees regarding their sales, profits or cash flows is not information obtained from us, and we make no representation about that information's accuracy.

(7)       That you have no knowledge of any representations made about the Massage Envy Business franchise opportunity by us, our subsidiaries or affiliates or any of their respective officers, directors, shareholders or agents that are contrary to the statements made in our Franchise Disclosure Document or to the terms and conditions of this Agreement.

(8)       That in all of their dealings with you, our officers, directors, employees and agents act only in a representative, and not in an individual, capacity and that business dealings between you and them as a result of this Agreement are only between you and us.

(9)       That you have represented to us, to induce our entering into this Agreement, that all statements you have made and all materials you have given us in acquiring the Franchise are accurate and complete and that you have made no misrepresentations or material omissions in obtaining the Franchise.

(10)     That you have read this Agreement and our Franchise Disclosure Document and understand and accept that the terms and covenants in this Agreement are reasonably necessary for us to maintain our high standards of quality and service, as well as the uniformity of those standards at each Massage Envy Business, and to protect and preserve the goodwill of the Marks.

**[SIGNATURES APPEAR ON FOLLOWING PAGE]**

**IN WITNESS WHEREOF**, the parties have executed and delivered this Agreement effective on the date stated on the first page above.

**MASSAGE ENVY FRANCHISING, LLC**,
a Delaware limited liability company

**FRANCHISEE(S)**

By:_____

By:_____

Name:_____Joe Magnacca_____

Name:_____

Title:_____President and CEO_____

Title:_____

*MEF\FA\0419*
*EAST\165992616.4*

ELECTRONICALLY FILED · 2022 Jul 05 3:44 PM · DORCHESTER · COMMON PLEAS · CASE#2022CP1801053

# GUARANTY AND ASSUMPTION OF OBLIGATIONS

**THIS GUARANTY AND ASSUMPTION OF OBLIGATIONS** ("**Guaranty**") is given this _____day of _____, 20____ by _____, a _____ ("**Guarantor**").

In consideration of, and as an inducement to, the execution of that certain Franchise Agreement (the "**Agreement**") on this date by Massage Envy Franchising, LLC ("**Massage Envy**"), each of the undersigned personally and unconditionally (a) guarantees to Massage Envy and its successors and assigns, for the term of the Agreement (including any extensions) and afterwards as provided in the Agreement, that _____ ("**Franchisee**") will punctually pay and perform each and every undertaking, agreement, and covenant set forth in the Agreement (including, without limitation, any amendments or modifications of the Agreement) and agrees to be personally bound by, and personally liable for the breach of, each and every provision in the Agreement (including any amendments or modifications of the Agreement), including, without limitation: (i) monetary obligations; (ii) obligations to take or refrain from taking specific actions or to engage or refrain from engaging in specific activities, including, without limitation, the confidentiality and transfer requirements; and (iii) the dispute resolution and enforcement provisions set forth in the Agreement. Capitalized terms used and not otherwise defined herein shall have the meaning ascribed to them in the Franchise Agreement.

Each of the undersigned acknowledges that he, she or it is either an owner (whether direct or indirect) Franchisee or otherwise has a direct or indirect relationship with Franchisee or its affiliates, that he, she or it will benefit significantly from Massage Envy entering into the Agreement with Franchisee, and that Massage Envy will not enter into the Agreement unless each of the undersigned agrees to sign and comply with the terms of this Guaranty.

Each of the undersigned consents and agrees that: (1) his, her or its direct and immediate liability under this Guaranty will be joint and several, both with Franchisee and among other guarantors; (2) he, she or it will render any payment or performance required under the Agreement upon demand if Franchisee fails or refuses punctually to do so; (3) this liability will not be contingent or conditioned upon Massage Envy pursuit of any remedies against Franchisee or any other person or entity; (4) this liability will not be diminished, relieved, or otherwise affected by any extension of time, credit, or other indulgence that Massage Envy may from time to time grant to Franchisee or any other person or entity, including, without limitation, the acceptance of any partial payment or performance or the compromise or release of any claims (including the release of other guarantors), none of which will in any way modify or amend this Guaranty, which will be continuing and irrevocable during and after the term of the Agreement (including extensions) for so long as any performance is or might be owed under the Agreement by Franchisee or any of its guarantors and for so long as Massage Envy has any cause of action against Franchisee or any of its guarantors; and (5) this is an absolute and continuing guaranty and shall remain in full force and effect for (and as to) any extension or modification of the Agreement and despite the transfer of any direct or indirect interest in the Agreement or Franchisee, and each of the undersigned waives notice of any and all renewals, extensions, modifications, amendments, or transfers.

1

ELECTRONICALLY FILED - 2022 Jul 05 3:44 PM - DORCHESTER - COMMON PLEAS - CASE#2022CP1801053

Each of the undersigned waives: (i) all rights to payments and claims for reimbursement or subrogation which any of the undersigned may have against Franchisee arising as a result of the undersigned's execution of and performance under this Guaranty, for the express purpose that none of the undersigned will be deemed a "creditor" of Franchisee under any applicable bankruptcy law with respect to Franchisee's obligations to Massage Envy; (ii) all rights to require Massage Envy to proceed against Franchisee for any payment required under the Agreement, proceed against or exhaust any security from Franchisee, take any action to assist any of the undersigned in seeking reimbursement or subrogation in connection with this Guaranty or pursue, enforce or exhaust any remedy, including any legal or equitable relief, against Franchisee; (iii) any benefit of, any right to participate in, any security now or hereafter held by Massage Envy; and (iv) acceptance and notice of acceptance by Massage Envy of his or her undertakings under this Guaranty, all presentments, demands, and notices of demand for payment of any indebtedness or non-performance of any obligations hereby guaranteed, protest, notices of dishonor, and notice of default to any party with respect to the indebtedness or nonperformance of any obligations hereby guaranteed, and any other notices and legal or equitable defenses to which he, she or it may be entitled. Without affecting the obligations of the undersigned under this Guaranty, Massage Envy may, without notice to the undersigned, extend, modify, supplement, waive strict compliance with, or release all or any provisions of the Agreement or any indebtedness or obligation of Franchisee, or settle, adjust, release, or compromise any claims against Franchisee or any other guarantor, make advances for the purpose of performing any obligations of Franchisee under the Agreement, and/or assign the Agreement or the right to receive any sum payable under the Agreement, and each of the undersigned hereby waives notice of same. Each of the undersigned expressly acknowledge that the obligations hereunder survive the expiration or termination of the Agreement.

Massage Envy shall have no present or future duty or obligation to the undersigned under this Guaranty, and each of the undersigned waives any right to claim or assert any such duty or obligation and to discover from Massage Envy or require us to disclose to the undersigned any financial or other information concerning Franchisee, any other guarantor, or any collateral securing any of Franchisee's obligations to Massage Envy.

In addition, the undersigned each waive any defense arising by reason of any of the following: (a) any disability or any counterclaim or right of set-off or other defense of Franchisee, (b) any lack of authority of Franchisee with respect to the Agreement, (c) the cessation from any cause whatsoever of the liability of Franchisee, (d) any circumstance whereby the Agreement shall be void or voidable as against Franchisee or any of Franchisee's creditors, including a trustee in bankruptcy of Franchisee, by reason of any fact or circumstance, (e) any event or circumstance that might otherwise constitute a legal or equitable discharge of the undersigned's obligations hereunder, except that the undersigned do not waive any defense arising from the due performance by Franchisee of the terms and conditions of the Agreement, (f) any right or claim of right to cause a marshaling of the assets of Franchisee or any other guarantor, and (g) any act or omission of Franchisee.

Each of the undersigned agrees that all actions arising under this Guaranty or otherwise as a result of the relationship between us and the undersigned, must be commenced in the state or federal court of general jurisdiction in Phoenix, Arizona, and each of the undersigned irrevocably

2

ELECTRONICALLY FILED - 2022 Jul 05 3:44 PM - DORCHESTER - COMMON PLEAS - CASE#2022CP1801053

submits to the jurisdiction of those courts and waives any objection he or she might have to either the jurisdiction of, or venue in, those courts.

If Massage Envy is required to enforce this Guaranty in a judicial or arbitration proceeding, and prevail in such proceeding, Massage Envy shall be entitled to reimbursement of our costs and expenses, including, but not limited to, reasonable accountants', attorneys', attorneys' assistants', arbitrators', and expert witness fees, costs of investigation and proof of facts, court costs, other litigation expenses, and travel and living expenses, whether incurred prior to, in preparation for, or in contemplation of the filing of any such proceeding. If Massage Envy is required to engage legal counsel in connection with any failure by the undersigned to comply with this Guaranty, the undersigned shall reimburse us for any of the above-listed costs and expenses we incur even if we do not commence a judicial or arbitration proceeding.

[Signatures on following page]

MEF\FA\0419
EAST\165992616.4

**IN WITNESS WHEREOF**, each of the undersigned has affixed his, her or its signature on the same day and year as the Agreement was executed.

**GUARANTOR(S)**

**[ENTITYNAMECAPS]**

By:_____
Name: _____
Title: _____

**[ENTITYNAMECAPS]**

By:_____
Name: _____
Title: _____

**[INDIVIDUALS]**

_____

_____

MEF\FA\0419
EAST\165992616.4

ELECTRONICALLY FILED - 2022 Jul 05 3:44 PM - DORCHESTER - COMMON PLEAS - CASE#2022CP1801053

# EXHIBIT "C"

ELECTRONICALLY FILED - 2022 Jul 05 3:44 PM - DORCHESTER - COMMON PLEAS - CASE#2022CP1801053

ELECTRONICALLY FILED, 2022 Jul 05 3:44PM, DORCHESTER COMMON PLEAS, CASE#2022CP1801053

# ME Massage Envy™

**Global ID #:** _____

Massage Envy
Lamorinda
558 Center Street
Moraga, CA 94556

Name: _____
Email: _____
Address: _____

The words "you" and "your" mean the Member listed above (and the Buyer signing below with respect to payment). The words we, our, and us refer to Crazy Daisy Ventures Inc.,
d/b/a Massage Envy
Lamorinda,
an independently owned and operated Massage Envy® franchise. This contract is between you and us. Neither Massage Envy Franchising, LLC, the entity who granted us contractual authority to independently own and operate our franchised location, nor any of its past, present, or future affiliates or subsidiaries and their respective officers, directors, incorporators, members, partners, owners, agents, management, controlling parties, entities under common control, vendors, service providers, attorneys, employees, or representatives (all of the foregoing hereafter collectively referred to as "MEF") is a party to your Wellness Agreement or the Wellness Program. You understand and agree that neither MEF nor any of its affiliates are responsible for any acts or omissions related in any way to this Agreement or the services provided to you under this Agreement.

## Wellness Benefits

You are entitled to the Wellness Benefits on the terms and conditions described below.

- One 60-minute Wellness Massage session monthly.
- You may upgrade a Wellness Massage to a 60-minute Healthy Skin facial session for an additional $10.
- Unlimited additional 60-minute wellness massage sessions at a discounted rate of $~~59~~ 59.99
- Unlimited additional 60-minute Healthy Skin facial sessions at a discounted rate of $~~69~~ 69.99  *59.49 Moraga*
- Discounts on other additional services, service enhancements and specified retail products.

## Additional Benefit Details

**Session Length:** Our Wellness Massage sessions and Healthy Skin Facial sessions include a total of 10 minutes for client consultation and dressing, which occurs both pre and post service.

**Cancel/Reschedule Sessions:** You may cancel or reschedule an appointment with no charge by giving us notice no less than 24 hours preceding your appointment. Same day cancellations or appointment changes may be charged at 50% of the scheduled service price or half of one accrued but unused monthly Wellness Massage. If you do not call to cancel and do not show up for a scheduled appointment, you may be charged the full service price at the rate specified in this Agreement or one full accrued but unused Wellness Massage.

**National Reciprocity:** While you are an active member, you may use your Wellness Benefits at any nationwide Massage Envy® independently owned and operated location; however, prices and services offered at each location may vary and may require additional payments. You are an active member if you have timely made all monthly Wellness Agreement payments, we have not terminated or suspended this Agreement, and you have not cancelled or frozen this Agreement.

**Transfer Services:** While you are an active member, you can transfer one accrued but unused Wellness Massage each month to another person by paying a $10 transfer fee. You may transfer only one accrued but unused Wellness Massage to the same person during a six (6) month period.

Initials: _____

## Payment Terms

**Initial Term:** Your Wellness Agreement Initial Term begins on 7/31/16 and ends on 8/30/17. Your Wellness Agreement will thereafter automatically renew and continue on a month-to-month basis until cancelled by you or terminated by us in accordance with the terms of this Agreement.

**Enrollment Fee:** Your enrollment fee of $ 0 is due upon signing this Agreement.

**Payment(s):** You've elected to pay for your Wellness Agreement
☑ On a monthly basis in the amount of $ 69.99 which will be automatically charged to your credit card on file on the 20th day of each month until this Agreement is cancelled by you or terminated by us in accordance with this Agreement. Following the initial term, we will give you 30 days advance written notice of any increase in the monthly payment.

☐ Paid in full in the total amount of $ _____
You will be able to redeem all Wellness Benefits immediately.

## Cancellation/Use and Accrual of Wellness Benefits

During the Initial Term, you may cancel this Agreement if: (a) you provide written proof (e.g., executed mortgage or rental agreement, utility bill, car insurance) that you have moved more than 25 miles from your residence on the date you signed this Agreement and such relocation also puts you more than 25 miles away from any Massage Envy® location; or (b) you provide a written statement from your medical provider certifying that you are unable to receive massages for medical reasons; or (c) other extenuating circumstances exist that we decide in our sole discretion permit you to cancel during the Initial Term.

**After the Initial Term, you may cancel this Agreement at any time upon written notice as provided herein.** All cancellation requests must be submitted in writing to us at the above address or by email at Clinic0699@MassageEnvy.com and will become effective ten (10) days after the cancellation request is received by us. Any payments due under this Agreement prior to the cancellation effective date will be charged by us as scheduled. Some state laws may provide you with additional cancellation rights.

**Accrual of Wellness Benefits:** If you pay in full prior to or at the time of signing of this Agreement, you will be able to redeem all Wellness Benefits immediately. If you pay on a monthly basis, your Wellness Benefits will accrue monthly and may be used after each monthly payment is received provided you are an active member.

**Use of Accrued but Unused Wellness Benefits:** If your Agreement is not renewed, is cancelled, or is terminated for any reason (other than for any inappropriate conduct by you), you will have a 60-day period after such nonrenewal, cancellation, or termination to redeem any accrued but unused Wellness Benefits. UPON EXPIRATION OF THE SIXTY (60) DAY PERIOD AFTER NONRENEWAL, CANCELLATION OR TERMINATION, ALL ACCRUED BUT UNUSED WELLNESS BENEFITS SHALL EXPIRE AND YOU WILL NO LONGER HAVE THE RIGHT TO USE ANY ACCRUED BUT UNUSED WELLNESS BENEFITS. YOU ACKNOWLEDGE AND AGREE THAT YOU HAVE NO RIGHT TO RECEIVE ANY REFUNDS OR CREDITS OF ANY KIND UNDER ANY CIRCUMSTANCES FOR ANY UNUSED WELLNESS BENEFITS, INCLUDING WITHOUT LIMITATION ANY UNUSED MASSAGES. We may, in our sole discretion, extend the time period for you to redeem accrued but unused Wellness Benefits, but we are not obligated to do so. Any such extension must be in writing signed by you and us.

EXHIBIT C

©2016 Massage Envy Franchising, LLC | version 1.4.16

To the best of our knowledge, only professional massage therapists and estheticians who comply with state, city, and/or local licensing or certification requirements are hired by us. Ask us if you would like to see a particular massage therapist's or esthetician's license or certification. You understand that the services we provide are not a replacement for medical care, should not be construed as a substitute for medical examination, diagnosis, or treatment, that no medical diagnosis will be made, and that you should see a medical provider for any medical issues you may have. It is your responsibility to inform us of any pre-existing conditions, limitations, or specific sensitivities. Male/female genitalia and women's breasts will not be exposed or massaged at any time. Modest draping will be used during each of your services. If you do experience discomfort or pain or are uncomfortable for any reason during a service, you agree to immediately ask the therapist or esthetician to adjust the manipulation, draping, pressure, heat, or environment (or, if you prefer, you can ask the therapist or esthetician to end the service at any time). If the therapist or esthetician is unable to relieve your discomfort after you request an adjustment, you will inform the therapist or esthetician you would like to end the service immediately. If you have any concerns about your therapist or esthetician, you agree to bring it to our attention immediately following your service. Inappropriate or illegal conduct will not be tolerated in any manner. We may, in our sole discretion, refuse or discontinue a service if we determine such service may be unsafe or cause discomfort for you or if you engage in any inappropriate conduct as determined by us in our sole discretion.

We reserve the right to terminate or refuse to renew your Agreement for any reason not prohibited by law including, but not limited to, an unsatisfactory payment history. We reserve the right to collect at any time any delinquent or outstanding balance(s) that has not been paid for any services provided or monthly payments owed. For purposes of identification and billing, you agree to provide us with current, accurate, complete, and updated information including your name, address, telephone number, and applicable payment data. You agree to notify us promptly of any changes in your information, including your payment data.

We may delay enforcing any of our rights without losing them. We can enforce this Agreement against your heirs and legal representatives. We may assign or transfer this Agreement or any of our rights under it without notice to you, except as otherwise required by law. Your rights or obligations under this Agreement cannot be assigned by you to anyone else without our prior written consent. In the event of our closure, you will be directed to another Massage Envy® franchise. The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision of this Agreement, which shall remain in full force and effect. You understand and agree that this Agreement does not grant you the privilege of exclusive or preferred access to our or any other Massage Envy® location or to any service offered at our or any other Massage Envy® location. You or any other individual may obtain access to and purchase any and all services offered by us or at any Massage Envy® location without entering into an Agreement, and you understand that this Agreement only entitles you to the benefits set forth herein.

For residents of all U.S. states except California and Utah residents: YOU ARE ENTITLED TO A COPY OF THIS AGREEMENT AT THE TIME YOU SIGN IT. YOU MAY CANCEL THIS AGREEMENT AT ANY TIME BEFORE MIDNIGHT OF THE THIRD OPERATING DAY AFTER RECEIVING A COPY OF THIS AGREEMENT. IF YOU CANCEL THIS AGREEMENT WITHIN THE THREE-DAY PERIOD, YOU ARE ENTITLED TO A FULL REFUND OF YOUR MONEY LESS A FEE EQUAL TO THE VALUE OF ANY SERVICES RECEIVED. IF THE THIRD OPERATING DAY FALLS ON A SUNDAY OR A HOLIDAY, NOTICE IS TIMELY GIVEN IF MAILED OR DELIVERED AS SPECIFIED IN THIS NOTICE ON THE NEXT OPERATING DAY. REFUNDS MUST BE MADE WITHIN THIRTY (30) OPERATING DAYS OF RECEIPT OF THE CANCELLATION NOTICE BY US. "OPERATING DAY" MEANS ANY DAY ON WHICH PATRONS MAY INSPECT AND USE OUR FACILITIES AND SERVICES DURING A PERIOD OF AT LEAST EIGHT (8) HOURS. ALL CANCELLATION REQUESTS MUST INCLUDE A SIGNED AND DATED WRITTEN NOTICE OF CANCELLATION PERSONALLY DELIVERED OR SENT BY REGISTERED MAIL, RETURN RECEIPT REQUESTED, TO US. IF YOU DO NOT CANCEL WITHIN THE THREE-DAY PERIOD, YOU SHALL BE BOUND BY ALL THE TERMS OF THIS AGREEMENT INCLUDING THOSE RELATED TO CANCELLATION.

By signing below, you authorize us to automatically charge the card you have specified. Monthly payments will be automatically charged on or after the same day of each month until you cancel this Agreement in accordance with its terms. You understand we may continue to automatically charge your card or terminate this Agreement in accordance with its terms. Additionally, you authorize us to automatically charge your card in lieu of presenting it for any services received.

Payment Method: _   Credit Card ending in: __   __ ID Checked: _____ (Member's Initials) __

## ASSUMPTION OF RISK, RELEASE, WAIVER OF LIABILITY, AND INDEMNIFICATION

By signing below, you understand, acknowledge, agree and hereby voluntarily accept all risk and responsibility associated with the services provided and use of any of the facilities at any Massage Envy® location. You hereby waive all claims, assume all liability, and release, hold harmless, indemnify, and agree to defend us (including our affiliates, agents, and employees), MEF, MEF's affiliates, and any other Massage Envy® location you may visit, from liability for any injury, claim, cause of action, suit, demand, and damages (including, without limitation, personal, bodily, or mental injury, property damage, economic loss, consequential damages, and punitive damages), arising from or related to (1) your failure to disclose any pre-existing conditions, limitations, or sensitivities; (2) your failure to inform your therapist or esthetician of discomfort or pain during or at the end of the service; (3) your presence on the premises of any Massage Envy® location; and/or (4) any negligence on our part (including our employees) or on the part of any other Massage Envy® franchise. You further expressly agree that this Assumption of Risk, Release, Waiver of Liability, and Indemnification is intended to be as broad and inclusive as permitted by law and that if any portion of it is held invalid, the balance shall be valid and continue in full legal force and effect. These provisions are binding on your estate, family, heirs, administrators, personal representatives, and assigns.

YOU ACKNOWLEDGE AND AGREE THAT YOU UNDERSTAND THE PROVISIONS CONTAINED WITHIN THIS AGREEMENT, HAVE HAD ADEQUATE TIME TO REVIEW SUCH PROVISIONS BEFORE SIGNING, ACKNOWLEDGE AND AGREE THAT YOUR CONSENT TO THESE PROVISIONS IS GIVEN IN EXCHANGE FOR OUR RENDERING OF SERVICES, AND AGREE THAT THESE PROVISIONS APPLY AT EACH VISIT TO ANY MASSAGE ENVY® LOCATION. YOU ACKNOWLEDGE AND AGREE THAT EACH MASSAGE ENVY® LOCATION IS INDEPENDENTLY OWNED AND OPERATED AND YOUR AGREEMENT IS WITH US AND NOT WITH MEF OR ANY OF ITS AFFILIATES. YOU UNDERSTAND AND AGREE THAT OUR THERAPISTS AND ESTHETICIANS ARE OUR EMPLOYEES AND ARE NOT EMPLOYED BY AND ARE NOT EMPLOYEES OF MEF OR ANY OF ITS AFFILIATES. YOU ACKNOWLEDGE AND AGREE THAT AT NO TIME SHALL YOU HAVE A RIGHT TO, NOR SHALL YOU, ASSERT OR BRING ANY CLAIM, DEMAND, OR LEGAL ACTION AGAINST MEF OR ANY OF ITS AFFILIATES RELATING TO THIS AGREEMENT OR THE SERVICES PROVIDED UNDER THIS AGREEMENT. YOU FURTHER ACKNOWLEDGE AND AGREE THAT NEITHER MEF NOR ANY OF ITS AFFILIATES SHALL HAVE ANY LIABILITY FOR (i) ANY OBLIGATIONS OR LIABILITIES RELATING TO OR ARISING FROM THIS AGREEMENT; (ii) ANY CLAIM BASED ON, IN RESPECT OF, OR BY REASON OF THE RELATIONSHIP BETWEEN YOU AND US; OR (iii) ANY CLAIM BASED UPON ANY ALLEGED UNLAWFUL ACT OR OMISSION BY US OR ANY OTHER MASSAGE ENVY® LOCATION.

_____   _____

MEMBER SIGNATURE   MEMBER NAME PRINTED

_____   _____

BUYER SIGNATURE (if different than Member)   BUYER NAME PRINTED

# Exhibit B

(Court of Common Pleas Notice of Removal)

**STATE OF SOUTH CAROLINA** ) **IN THE COURT OF COMMON PLEAS**
)
**COUNTY OF DORCHESTER** ) **CASE NO.: 2022-CP-18-01053**

JANE DOE, )
)
       Plaintiff, )
) **NOTICE OF NOTICE OF REMOVAL**
   v. )
)
MASSAGE ENVY FRANCHISING, LLC; )
MASSAGE ENVY WESCOTT; PGD )
INVESTMENTS, INC.; ROBERT W. LEE and )
CATHERINE H. LEE; ABC, INC 1-10 (fictitious )
entities); and JOHN DOES 1-10 (fictitious )
persons), )
)
       Defendants. )
)

     NOTICE is hereby given that this action has been removed to the United States District Court for the District of South Carolina, Charleston Division.

     The Notice of Removal that has been filed with the United States District Court by Defendants Massage Envy Wescott, Robert W. Lee and Catherine H. Lee is hereto attached as Exhibit 1.

 Dated: August 12, 2022          GORDON REES SCULLY MANSUKHANI LLP

By     *s/Brittany T. Bihun*

Peter G. Psiachos (SC 68465)
E-mail: psiachos@grsm.com
Brittany T. Bihun (SC 102496)
E-mail: bbihun@grsm.com
Amy E. McLaren (SC )
E-mail: amclaren@grsm.com
40 Calhoun Street, Suite 350
Charleston, SC  29401
Telephone: (843) 278-5900
*Attorneys for Defendants Massage Envy*
*Wescott, Robert W. Lee and Catherine H.*
*Lee*

ELECTRONICALLY FILED - 2022 Aug 12 3:56 PM - DORCHESTER - COMMON PLEAS - CASE#2022CP1801053

# Exhibit C

(Affidavit of Service)

# STATE OF SOUTH CAROLINA
## COUNTY OF DORCHESTER

### IN THE COURT OF COMMON PLEAS

**Jane Doe**

CASE NO.    2022-CP-18-01053

VS.                                          **PLAINTIFF**

**Massage Envy Franchising, LLC;
Massage Envy Wescott; PGD
investments, Inc.; Robert W. Lee and
Catherine H. Lee; ABC , Inc 1-10 (
fictitious entities ) and John Doe 1-10
( fictitious persons )**

**AFFIDAVIT OF SERVICE**

**DEFENDANT**

**Personally appeared before me the undersigned deponent, who being
duly sworn, says that he served a SUMMONS, COMPLAINT and EXHIBITS on JODI
BROCIOUS as Manager of MASSAGE ENVY**

( X) **By delivering to him/her personally**

(    ) **By delivering to**

**a person of age and discretion and leaving with him/her copies of same at**

**95 Dorchester Road Suite 134 , Summerville, SC 2943 on July 6, 2022 at 10:10 am**

**The Deponent is not a party to this action, and has no interest or connection
therewith.**

Sworn before me this
6 Day July                          , 20 20

Notary Public for South Carolina
My Commission Expires _____

R. MARIE SABO
NOTARY
My Comm. Exp.
02-10-2024
PUBLIC.
SOUTH CAROLINA

R. L. Miller